# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

### No. 25-7137 and 25-7142 (Consolidated)

---

PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY,

WASHINGTON,

and

NORTHWEST REQUIREMENTS UTILITIES,

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

---

## OPENING BRIEF OF PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, WASHINGTON

---

Irion Sanger
John Maxwell Greene
SANGER GREENE P.C.
4031 SE Hawthorne Boulevard
Portland, OR 97214
(503) 756-7533
irion@sanger-law.com

*Counsel for Petitioner Public Utility District No. 2 of Grant County, Washington*

## RULE 26 CORPORATE DISCLOSURE STATEMENT

Petitioner Public Utility District No. 2 of Grant County, Washington has provided its Form 34 Disclosure Statement in a separate filing as required by Ninth Circuit Rule 26.1-1.

i

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE .........................................................................3

STANDING ....................................................................................................20

ARGUMENT AND AUTHORITIES.............................................................21

    I.    Background.........................................................................................21

        A.    The Priest Rapids Project...........................................................21

        B.    BPA Contracting: Subscription .................................................22

        C.    Grant Relicensing .....................................................................23

        D.    BPA Contracting: Regional Dialogue .......................................24

        E.    BPA Contracting: Provider of Choice .......................................26

        F.    CHWM Policy and ROD .............................................................29

    II.    Standard of Review ...........................................................................33

    III.    Argument..........................................................................................35

        A.    BPA's Forced Dedication of the Priest Rapids Project Was Unlawful..36

        B.    BPA's Erroneous Analysis Regarding Grant's Entitlement to Priest Rapids Project Power Was Arbitrary, Capricious, and an Abuse of Discretion .................................................................................49

CONCLUSION AND REQUEST FOR RELIEF.................................................56

# TABLE OF AUTHORITIES

**Cases**

*Alcoa v. Central Lincoln PUD*, 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984) ..................................................................................................34

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013) ................................................................... 20, 21, 34

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) .................................................................34

*Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021) ..............43

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006) ..................................................................................................37

*Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1050-51 (9th Cir. 2010) ... 33, 49, 52

*Jimenez v. Quarterman*, 555 U.S. 113, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009) ....37

*Kootenai Elec. Coop., Inc. v. FERC*, 192 F.3d 144 (D.C. Cir. 1999) ............. 22, 23

*Loper Bright v. Raimondo*, 144 S.Ct. 2244, 603 U.S. 369, 219 L.Ed.2d 832 (2024) ........................................................................................... 33, 34

*Lopez v. Garland*, 116 F.4th 1032 (9th Cir. 2024) ...............................................34

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ..............39

*M-S-R Public Power Agency v. Bonneville Power Admin.*, 297 F.3d 833 (9th Cir. 2002) ..................................................................................................34

*Organized Village of Kake v. Dept. of Agriculture*, 795 F.3d 956 (9th Cir. 2015) 43, 56

*Pac. Nw. Generating Co-op. v. Dep't of Energy*, 580 F.3d 792 (9th Cir. 2009).....34

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007) ....................................................................................................9

*Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), aff'd sub nom. *New York v. FERC*, 535 U.S. 1, 122 S. Ct. 1012, 152 L. Ed. 2d 47 (2002) ....................................................................................................2

*United States v. Lillard*, 935 F.3d 827 (9th Cir. 2019)..............................................37

*United States v. Wells*, 156 F.4th 907 (9th Cir. 2025) ...................................... 36, 37

**Statutes**

16 U.S.C. § 832c ........................................................................................................5

16 U.S.C. § 837b(d) ..................................................................................................47

16 U.S.C. § 837f..........................................................................................................6

16 U.S.C. § 839 *et seq.*..............................................................................................1

16 U.S.C. § 839(1) ....................................................................................................40

16 U.S.C. § 839(5)(B)............................................................................................5, 41

16 U.S.C. § 839c(b)(1)....................................................................................... passim

16 U.S.C. § 839c(b)(1)(A) ................................................................................ passim

16 U.S.C. § 839c(b)(1)(B) ................................................................................ passim

16 U.S.C. § 839e .........................................................................................................6

16 U.S.C. § 839f(c) ...................................................................................................47

16 U.S.C. § 839f(e) ....................................................................................... 19, 20, 33

16 U.S.C. § 839f(e)(1)(B) ......................................................................................9, 45

16 U.S.C. § 839f(e)(2) ..............................................................................................33

16 U.S.C. § 839f(e)(5) ................................................................................................1

16 U.S.C. § 837a .........................................................................................................5

16 U.S.C. §§ 837a-837c ..............................................................................47

16 U.S.C. § 839f(e)(3) ...............................................................................45

16 U.S.C. Ch. 12B .......................................................................................5

5 U.S.C. § 551(2) ......................................................................................20

5 U.S.C. § 701(b)(2) ..................................................................................20

5 U.S.C. § 702 ...........................................................................................20

5 U.S.C. § 706 .................................................................................... 19, 33

Administrative Procedure Act, 5 U.S.C. §§ 701–06 .....................................1

**Other Authorities**

"Contract", Black's Law Dictionary (5th Ed. 1979) ..............................9, 39

"Contract", Oxford American Dictionary (1980) .........................................8

"Determine," Oxford American Dictionary (1980) .....................................38

BPA, *Clarifications Issued on BPA's Policy for Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act, dated May 23, 2000* (Mar. 7, 2003).......................... 10, 46

BPA, *Notice of Availability of Record of Decision (ROD)* (Jul. 18, 1997), *available at* https://www.bpa.gov/-/media/Aep/about/publications/records-of-decision/1997-rod/rod-19970718-pacific-northwest-coordination-agreement.pdf ....................................................................................................................31

BPA, *Pacific Northwest Electric Power Planning and Conservation Act: Legislative history of the Act to assist the electrical consumers of the Pacific Northwest through use of the Federal Columbia River Power System to achieve cost-effective energy conservation* at 84-85 (1981)...............................................8

BPA, *Policy on Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act, Administrator's Record of Decision* (May 2000) ...............................................12

v

BPA, *Revised Policy on Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act* at 2-4 (2009) ................................................................................. 10, 27, 55

H.9864 (Sept. 29, 1980) ............................................................. 7, 14, 41

H.R. REP. NO. 96-976 (1980) ................................................................6

Pub. L. No. 544, § 6, 68 Stat. 573, 574 (1954) .....................................21

**FERC Orders**

*Grant County Public Utility District No. 2*, 123 FERC ¶ 61,049 (2008) .. 12, 24, 32, 50

*Grant County Public Utility District No. 2*, 125 FERC ¶ 62,131 (2008) ................24

*Public Utility District No. 2 of Grant County*, 108 FERC ¶ 62,075 (2004) ............24

*Public Utility District No. 2 of Grant County, Washington*, 113 FERC ¶ 62,205 (2005) ................................................................24

## JURISDICTIONAL STATEMENT

This is a petition for review of final actions and decisions of the Bonneville Power Administration ("BPA") in executing and implementing the Contract High Water Mark ("CHWM") Implementation Policy ("Policy") and CHWM Implementation Policy Record of Decision ("ROD"). The petition is properly before this Court under the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act"), 16 U.S.C. § 839 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–06. BPA issued both the Policy and ROD on August 14, 2025. The petition was filed on November 12, 2025 – 90 days after BPA issued the Policy and ROD – and is thus timely under the Northwest Power Act. 16 U.S.C. § 839f(e)(5).

## STATEMENT OF THE ISSUES

Public Utility District No. 2 of Grant County, Washington ("Grant") asks that this Court hold unlawful and set aside BPA's decision to require Grant to "dedicate" a portion of certain hydroelectric resources (collectively the "Priest Rapids Project") to Grant's retail load, wrongfully reducing Grant's entitlement to federal hydropower under the Northwest Power Act. Specifically, Grant is challenging BPA's decision to require Grant to dedicate approximately 112 aMW of what BPA calls "relicensing power", a category invented in the CHWM Policy

1

and ROD.[1]  If the Court rules in Grant's favor, then it should direct BPA to remove this 112 aMW of relicensing power from Grant's resource dedication.

The Northwest Power Act generally entitles consumer-owned utilities ("COU") such as Grant to purchase low-cost federal hydropower from BPA at an amount equal to a COU's retail load minus the resources dedicated to serving that load.[2]  The Northwest Power Act provides that resources may be dedicated to load only under two circumstances, neither of which applies to the challenged BPA action.  Those circumstances were carefully designed to encourage BPA customers to invest in additional electricity generation, but BPA's forced dedication here undermines that policy.  BPA's forced dedication will also harm Grant by preventing it from accessing federal power to which it is entitled, and which it needs to serve its customers.  More importantly, because the Northwest Power Act does not permit BPA to dedicate resources to load against a customer's will, BPA's forced dedication was contrary to law.

---

[1]  The actual figure is 111.511 aMW, but all figures are rounded to the nearest whole number in the body of this Opening Brief.  1-GrantER-0084 ("Therefore, for purposes of determining Grant's CHWM, Bonneville will consider 111.511 aMW as serving general requirements load".).

[2]  In the electricity context, "load" means demand for electric power.  *See*, *e.g.*, *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 725 n.11 (D.C. Cir. 2000), aff'd sub nom. *New York v. FERC*, 535 U.S. 1, 122 S. Ct. 1012, 152 L. Ed. 2d 47 (2002).  Retail load is the demand for power by the retail customers of a power supplier.  As a matter of physics, generation – power produced – must always equal load – power consumed.

2

Grant also challenges *how* BPA determined the dedication amount. BPA originally determined the dedication amount by reference to a factually erroneous read of Grant's license for Priest Rapids Project issued by the Federal Energy Regulatory Commission ("FERC"). When made aware of that error during this appeal, BPA issued a revised ROD that applied an inadequate *post hoc* justification to reach the same conclusion. This flawed methodology is arbitrary and capricious, constitutes an abuse of discretion, and underscores why resource dedication is voluntary under the Northwest Power Act and memorialized in an agreed-upon contract rather than a unilateral decision on BPA's part.

## STATEMENT OF THE CASE

The world of BPA can be arcane and complex, but the matter before the Court is deceptively simple and straightforward: BPA cannot forcibly dedicate a customer resource to customer load. In Grant's case, BPA's decision to sidestep the law and forcibly dedicate a portion of the Priest Rapids Project will cause hundreds of millions of dollars in damages while Grant is facing unprecedented challenges to meet the energy demand of its customers.

Under the plain language of the Northwest Power Act, there are two ways a resource can be dedicated to load.[3] One of them requires history that does not

---

[3] The Northwest Power Act uses the word "*determining*" or "such other resources as the entity *determines* … will be used to serve its firm load"

3

apply to the contested portion of the challenged dedication (the resource must have served the customer's load prior to 1980). Northwest Power Act § 5(b)(1)(A), codified at 16 U.S.C. § 839c(b)(1)(A).[4] The other requires the customer to determine (i.e., make an official and affirmative decision) that a resource will be dedicated to load, as memorialized in a specific manner (i.e., a contract). Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B). Here, BPA has forcibly dedicated[5] a portion of the Priest Rapids Project, which BPA called "relicensing" power, that Grant did not dedicate pursuant to a contract under the Northwest Power Act. Accordingly, BPA's forcible dedication was unlawful.

An understanding of the issues under dispute in this case requires an understanding of the Northwest Power Act. Enacted in 1980 following the energy crisis of the 1970s, the Northwest Power Act requires BPA to sell federal power from the Columbia River System of hydroelectric dams to the region's COUs.

---

rather than "dedicating" or "dedicates". Section 5(b)(1); 16 U.S.C. § 839c(b)(1). BPA's administrative documents use the term "dedication", which Grant generally uses in this Brief.

[4] As with other federal statutes, the Northwest Power Act is often referred to by reference to the section numbers assigned in the Act as passed by Congress, as opposed to the numbers associated with its codification in the United States Code. For the Court's convenience, this brief uses both conventions. Citations to Northwest Power Act provisions will be provided using the format Section [X]; 16 U.S.C. § [Y].

[5] Grant uses the term "forcibly dedicate" to mean that BPA made a unilateral decision to dedicate a customer's resource to the customer's load without that customer officially deciding to dedicate the resource to load, as memorialized in a contract.

4

Section 5(b)(1); 16 U.S.C. § 839c(b)(1).  Congress set forth several express purposes for the Northwest Power Act.  Section 1; 16 U.S.C. § 839.  Among these purposes were "to encourage … the development of renewable resources within the Pacific Northwest" and "to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply[.]"  Section 1(1) & (2); 16 U.S.C. § 839(1) & (2).  The Northwest Power Act also clarified "that Congress intends that this chapter not be construed to limit or restrict the ability of customers to take actions … to plan, develop, and operate resources and to achieve conservation, without regard to this chapter[.]"  Section 1(5)(B); 16 U.S.C. § 839(5)(B).  At its core, the Northwest Power Act was designed to encourage COUs to develop resources while preserving the right to require BPA to sell electric power to meet their firm power loads (with limited exceptions).

To do this, the Northwest Power Act built on two other fundamental BPA statutes – the Bonneville Project Act and the Preference Act.  Enacted in 1937, the Bonneville Project Act, 16 U.S.C. Ch. 12B, establishes that BPA must give "preference and priority" to COUs when marketing and selling federal power.  16 U.S.C. § 832c.  The Preference Act, 16 U.S.C. Ch. 12F, limits BPA to selling only *surplus* hydroelectric energy and capacity outside the Northwest, applies the same limitation to BPA's customers, and provides that customers entitled to priority power may have that right enshrined in their BPA contracts.  16 U.S.C. §§ 837a,

5

837f. The Northwest Power Act preserves the COUs' preference and priority rights. Section 5(a); 16 U.S.C. § 839c(a); H.R. REP. NO. 96-976, at 46 (1980) ("Section 5(a) makes clear that all power sales under this bill are subject at all times to the Bonneville Project Act, particularly sections 4 and 5 of that Act. This provision therefore retains the preference and priority accorded public bodies and cooperatives in BPA power sales."). Together, the Bonneville Project Act, Preference Act, and Northwest Power Act provide that COUs are entitled to purchase federal power at the cost of producing that power. 16 U.S.C. §§ 832f, 839e.

The Northwest Power Act outlines how much power a COU is entitled to buy from BPA at cost. This entitlement is equal to the COU's firm power load – the power demanded by the COU's retail customers – minus the non-federal resources that the COU has officially decided to dedicate to serving its own load. Section 5(b)(1); 16 U.S.C. § 839c(b)(1). Under the Northwest Power Act, resource dedication can occur in one of two ways.

First, resources that were already serving COU load prior to 1980 – when Congress passed the Northwest Power Act – will generally still be considered dedicated to serving that load going forward. Section 5(b)(1)(A); 16 U.S.C. § 839c(b)(1)(A). The reason for this provision is that power supply in the Northwest was tight at the time the Northwest Power Act was enacted. *See* H.9864 (Sept. 29,

1980) (discussing a "power shortage problem"). Congress did not want COUs that had their own resources serving their own firm load during this time of scarcity to sell the output of those resources to others and shift that portion of their load on to BPA. At the same time, Congress sought to encourage COUs to invest in additional resources. H.9864 (Sept. 29, 1980) (expressing the intent to "encourage[e] independent … resource programs on the part of individual utilities so that they will be able to meet their loads in the manner they wish"). Accordingly, resources were automatically dedicated to the extent they were already serving load in 1980, but new resources were not.

Second, a COU may elect to dedicate a resource to load only by contract. Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B). Specifically, this elective form of dedication applies to "resources [a COU] determines, *pursuant to contracts under this chapter*, will be used to serve its firm load in the region." Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B) (emphasis added). The core reason for this provision is to ensure that BPA does not create a disincentive to a COU developing its own resources. *See* H.9864 (Sept. 29, 1980). Accomplishing dedication via contract ensures: 1) that a COU that wishes to develop a resource will not inadvertently reduce or eliminate its access to low-cost power from BPA; and 2) that the terms of the dedication are known by both the COU and BPA. As BPA's summary of the Legislative History of the Northwest Power Act explains:

7

> Section 5(b)(l) mandates net requirements contracts for utilities; i.e., the BPA Administrator must offer to sell each requesting preference entity and IOU the firm power each needs beyond its own firm power resources (defined by Section 5(b)(l)(A) as the firm peaking and energy resources used in the year prior to enactment, plus resources *the utility determines, pursuant to contracts* under this Act, to dedicate to its regional firm power loads) to serve the firm power loads of its service areas. In practice, this subsection means that … preference utilities, whose current loads are now met entirely by BPA, will receive from BPA all the firm power required to serve their consumers[.]

BPA, *Pacific Northwest Electric Power Planning and Conservation Act:*

*Legislative history of the Act to assist the electrical consumers of the Pacific*

*Northwest through use of the Federal Columbia River Power System to achieve*

*cost-effective energy conservation* at 84-85 (1981) (emphasis added).

The Northwest Power Act itself does not define "contract", but the term, as

used in the Act, is well understood. Standard dictionary and legal definitions are

similar. The Oxford American Dictionary from 1980, the year the Northwest

Power Act was enacted, defines "contract" as "a formal agreement between people

or groups or countries" or "a document setting out the terms of such an

agreement." "Contract", Oxford American Dictionary (1980). The 1979 fifth

edition of Black's Law Dictionary defines "contract" as "[a]n agreement between

two or more persons which creates an obligation to do or not to do a particular

thing" or "[t]he writing which contains the agreement of the parties, with the terms

and conditions, and which serves as the proof of the obligation." "Contract",

8

Black's Law Dictionary (5th Ed. 1979). Interpreting the Act, this Court has stated that "BPA's final actions include the execution of settlement agreements and other contracts, 16 U.S.C. §§ 839f(e)(3), 839f(e)(1)(B), which are final only upon execution of such agreements." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023 (9th Cir. 2007). The Court's reference to execution and finality track the formality embedded in the dictionary definitions above. As is discussed further below, BPA contracts are typically lengthy, formal documents that, when executed by BPA, constitute challengeable final agency actions.

BPA's policies and practices have long reflected that dedication under Section 5(b)(1)(B) occurs explicitly via contract, and not by actual use of a resource. Indeed, the record in this case shows that, practically speaking, the normal mechanism for dedicating a resource under 16 U.S.C. § 839c(b)(1)(B) is to list it in a standard document called an "Exhibit A" because the dedication is formalized as Exhibit A to a power contract between BPA and a COU customer of BPA. *See, e.g.*, 1-GrantER-0007-08; 2-GrantER-0303-05. The use of Exhibit A to memorialize resource dedications has been in place for the past fifteen years. *See* BPA, *Revised Policy on Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act* at

9

2-4 (2009) ("Revised 5(b)/9(c) Policy").[6]  Before that, resource dedications were memorialized in Exhibit C to BPA contracts.  Revised 5(b)/9(c) Policy at 4; 2003 Clarifications at 1.  While the formal mechanism changed from Exhibit C to Exhibit A, there has been a longstanding formal mechanism to accomplish resource dedication that has always occurred via formal contract.  Further, dedication consists of more than just identifying a named resource, but extends to specific numerical values for time periods *within* a given contract year (e.g., MW or aMW on a monthly basis).

Outside of the two mechanisms set forth in Section 5(b)(1), there is no other mechanism for a resource to be dedicated to load, and there is no statutory means for BPA to forcibly dedicate a resource against a COU's will.  Congress decided that the only two mechanisms are the automatic dedication of pre-1980 resources to serve firm load, and the right of the COU alone to determine which of its other resources would be dedicated to serve its firm load.

As a general rule, once a resource is dedicated under the Northwest Power Act, it must remain dedicated.  Section 5(b)(1); 16 U.S.C. § 839c(b)(1).  However, a resource dedication may be "discontinued with the consent of the Administrator,

---

[6]    The Revised 5(b)/9(c) Policy includes as Appendix A a separate document titled *Clarifications Issued on BPA's Policy for Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act, dated May 23, 2000* (Mar. 7, 2003). This document will be referred to as the "2003 Clarifications".

10

or … because of obsolescence, retirement, loss of resource, or loss of contract rights." Section 5(b)(1); 16 U.S.C. § 839c(b)(1). Notably, this section on discontinuing a resource dedication explicitly invokes the BPA Administrator's discretion; the section on establishing resource dedication, on the other hand, is objective. Resource dedication occurs either: 1) when a resource served load prior to 1980; or 2) when a COU elects to dedicate the resource pursuant to a contract. Section 5(b)(1); 16 U.S.C. § 839c(b)(1).

The specifics of this case center on BPA's treatment of the Priest Rapids Project, the collective name for two hydroelectric dams – the Priest Rapids and Wanapum Dams – owned and operated by Grant. Grant originally received a FERC license for the Priest Rapids Project in 1955. 1-GrantER-0075-76. Under the terms of the original license, Grant was entitled to some of the Priest Rapids Project's output and was obligated to make a "reasonable portion" of the Priest Rapids Project's power available to other utilities. 1-GrantER-0075-76. The Priest Rapids Dam currently has a nameplate capacity – the theoretical maximum amount of power it can generate at a given moment in time – of approximately 950 Megawatts ("MW") and the Wanapum Dam approximately 1,200 MW. 2-

11

GrantER-0141. However, in practice the dams do not operate at maximum capacity or anywhere near maximum capacity most of the time.[7]

Following passage of the Northwest Power Act, Grant entered into contracts under the Act to purchase hydroelectric power from BPA from 1981 through 2011. 1-GrantER-0076. At least as early as BPA's original 2000 5(b)/9(c) Policy, BPA knew how to effectuate a resource dedication by agreeing to detailed information about that dedication in a customer contract. *See* BPA, *Policy on Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act, Administrator's Record of Decision* at 22 (explaining that dedication is memorialized in a contract exhibit) and 25 ( "Section 5(b)(1) does give the customer a choice for deciding whether or not to apply a post-1980 resource to load. It is a unilateral decision made by the customer.") (May 2000). In the final year of these contracts, Grant dedicated approximately 235 aMW[8] of the Priest Rapids Project to its own load, representing Grant's share

---

[7]    By way of example, the current FERC license for the Priest Rapids Project assigns the project a total size of approximately 1,900 MW and estimates the project will generate approximately nine million Megawatt-hours ("MWh") of electricity annually. *Grant County Public Utility District No. 2*, 123 FERC ¶ 61,049 at ¶ 176 (2008). Divided by the number of hours in a non-leap year, 8,760, the actual average production of the project is approximately 1,030 average Megawatts ("aMW") – much less than 1,900.

[8]    It is common for energy (as opposed to capacity, discussed above) to be expressed in aMW, which represent a snapshot of a "normal" (rather than maximum) hour of generation based on how much energy a resource

12

of the Priest Rapids Project at the time. 1-GrantER-0076; *see also* Section 5(b)(1)(A); 16 U.S.C. § 839c(b)(1)(A). Some of the other COUs that purchased Priest Rapids Project power from Grant also dedicated their shares of Priest Rapids Project power to load. Specifically, Public Utility District No. 1 of Cowlitz County ("Cowlitz"), Eugene Water and Electric Board ("EWEB"), Seattle City Light ("SCL"), and Tacoma Power ("Tacoma") declared an aggregate of approximately 89 aMW as a dedicated resource. 1-GrantER-0087. Grant is not challenging these two numbers – 235 aMW and 89 aMW – and they are only relevant because they are part of the math that BPA uses to calculate the amount of the Priest Rapids Project BPA has decided to dedicate to Grant's load.

Meanwhile, in 2008, Grant received a new FERC license for the Priest Rapids Project. 1-GrantER-0075-76 ("2008 License"). The 2008 License itself did not change the project size, but materially changed Grant's entitlement to the project, setting off the chain of events that ultimately led to this dispute. At around the same time, Grant separately undertook significant upgrades to the Priest Rapids Project, resulting in an increase to the project's size under separate FERC approvals – exactly the kind of development Congress meant to spur in passing the

---

produces over the course of a year divided by the 8,760 hours in a non-leap year.

13

Northwest Power Act, without reducing a COU's entitlement to low-cost federal power.  H.9864 (Sept. 29, 1980).

In 2008, the region negotiated new BPA contracts as part of the "Regional Dialogue" process.[9]  Again, BPA knew how to dedicate resources by agreeing to detailed information in a contract.  *See generally* BPA, *Regional Dialogue Policy Record of Decision* (July 2007) (discussing the dedication of various resources in an exhibit to a power sales contract); 3-GrantER-0465-524.  Grant decided that, for the Regional Dialogue contract period of 2012 through 2028, it would serve the majority of its load with its own resources rather than federal power from BPA.  However, at no point in the Regional Dialogue process did Grant officially dedicate additional Priest Rapids Project power in a BPA contract.  1-GrantER-0082 ("This amount was never officially dedicated in any public customer's power service contract with Bonneville."); *see also* Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B).

In fact, Grant obtained a new contract with BPA for its City of Grand Coulee load that did *not* include the Priest Rapids Project as a dedicated resource in

---

[9]  BPA provides contracts to COUs under the Northwest Power Act in uniform increments, and each increment is assigned a consistent label.  Contracts from 2001 through 2011 were "Subscription" contracts.  Contracts from 2012 through 2028 were "Regional Dialogue" contracts, sometimes referred to in the record using the abbreviation "RD".  Contracts from 2028 through 2044 are "Provider of Choice" contracts, sometimes abbreviated "POC".

14

Exhibit A. 1-GrantER-0076. Instead, Grant indicated by letter to BPA that it intended to use the Priest Rapids Project to serve its own load. 1-GrantER-0079-80; 2-GrantER-0389. Based on changes to the 2008 License, Grant also recalled the power it had previously provided from the Priest Rapids Project to Cowlitz, EWEB, SCL, and Tacoma. 1-GrantER-0078-79; 1-GrantER-0087. Each of those entities subsequently petitioned BPA and were approved to remove their Priest Rapids Project share from their dedicated Exhibit A resources in their BPA contracts. 2-GrantER-0364-76 (Cowlitz); 2-GrantER-0377-80 (Tacoma); 2-GrantER-0381-84 (EWEB); 2-GrantER-0385-88 (SCL). These changes were reflected in the contracts BPA executed with its customers as part of the Regional Dialogue administrative process. 1-GrantER-0087.

That brings us to now. With its Regional Dialogue contract expirations coming up, BPA began the Provider of Choice process for contracts covering power supply from 2028 through 2044. *See*, *e.g.*, 1-GrantER-0097; 2-GrantER-0106. With rising customer demand, Grant could no longer rely on its own resources to serve its load, and it began the process of taking additional federal power under its Northwest Power Act entitlement. 1-GrantER-0040.

Grant was the first COU to have a period of self-supply under the current contracting regime and then to increase its reliance upon BPA. 1-GrantER-0077. Accordingly, BPA unnecessarily struggled to apply to Grant the policies it had

15

adopted to implement its power marketing obligations under the Northwest Power Act.  Two such key policies are: 1) the 5(b)/9(c) Policy, adopted in 2000, clarified in 2003, and revised in 2009, so called because it implements those sections of the Northwest Power Act; and 2) the Provider of Choice Policy, which was the direct precursor establishing the structure underlying the more granular CHWM Policy and ROD challenged in this case.  1-GrantER-0032-44.

While the 5(b)/9(c) Policy provided that a resource must be dedicated in a contract, as the Northwest Power Act states, neither the 5(b)/9(c) Policy nor the Provider of Choice Policy spoke directly to the full suite of Grant's circumstances. 1-GrantER-0077 (stating that the "5(b)9(c) Policy does not directly address" issues presented by Grant taking additional power); 1-GrantER-0092 (stating that "the POC Policy did not discuss" issues presented by Grant taking additional power). Accordingly, Grant tried to work with BPA to figure out a mutually acceptable approach to taking additional federal power under Grant's entitlement. Meanwhile, the Northwest Requirements Utilities ("NRU") demanded that the entire Priest Rapids Project be dedicated to Grant's load.[10]  *See* 2-GrantER-0103-05.  Grant and BPA were unable to reach a resolution.

---

[10]    NRU has also appealed the CHWM Policy and ROD, and it is Grant's understanding that NRU intends to continue to press this argument.

16

In the end, because the parties were unable to reach a resolution, BPA forced the dedication of a portion of the Priest Rapids Project to Grant's load over Grant's objection. In other words, contrary to standard practice, BPA's 5(b)/9(c) Policy, and the language of the Northwest Power Act, BPA required Grant to dedicate a portion of the Priest Rapids Project that had never previously been dedicated and that Grant had not agreed to dedicate. This forced dedication occurred by means of the CHWM Policy and ROD that BPA released on August 14, 2025. 1-GrantER-0002; 1-GrantER-0045.

The CHWM Policy provides that approximately 401 aMW of the Priest Rapids Project is dedicated to Grant's load and explains in an endnote that "[i]nformation on the determination is available in Issue 13 of the Contract High Water Mark Implementation Policy Record of Decision." 1-GrantER-0023; 1-GrantER-0029. The ROD, in turn, explains that the 401 aMW number is derived from a combination of: 1) Grant's original 235 aMW dedication as reflected in its Subscription contract (this is the pre-1980 portion of the resource as of the end of the Subscription period, discussed above); 2) plus the 89 aMW Grant recalled from the COUs that had previously purchased Priest Rapids Project power from Grant ("recalled power", also discussed above); and 3) plus an additional 112 aMW that BPA believed Grant had used to serve its own load following its receipt of the

17

2008 License from FERC ("relicensing power"). 1-GrantER-0077-85.[11] It is this 112 aMW figure that Grant disputes.

Two of the three categories reflect past dedications memorialized in contracts between COUs and BPA; Grant is not challenging these. The 235 aMW figure reflected a dedication Grant made in its Subscription Contract with BPA. The 89 aMW figure reflected dedications made by the four COUs that purchase Priest Rapids Project power from Grant, also reflected in Subscription Contracts between those COUs and BPA.[12] The 112 aMW figure, on the other hand, does not represent a pre-1980 resource and was never dedicated in a contract. Instead, BPA forced Grant to dedicate that power against its will by including it as a dedicated resource in the CHWM Policy and ROD.

---

[11]  To arrive at the final 401 aMW number, BPA did some additional math. Specifically, BPA subtracted from each of the three identified categories of power a portion that Grant is obligated to supply to Canada as part of the so-called "Canadian Entitlement." Subtracting this amount modifies the three values above by reducing: 1) the Subscription amount from 235 to 214 aMW (1-GrantER-0078); 2) the recalled power from 89 to 83 aMW (1-GrantER-0080), and 3) the relicensing power 112 to 104 aMW (1-GrantER-0084). 214 aMW plus 83 aMW plus 104 aMW equals 401 aMW. To Grant's knowledge, the parties do not dispute that it is appropriate to account for the Canadian Entitlement, so this additional step is not discussed further in this brief.

[12]  Notably, BPA also discontinued these dedications, as discussed above. Nevertheless, because 89 aMW was at one time dedicated via elective contracts, Grant has elected not to challenge the 89 aMW "recalled power" dedication.

18

Because BPA's decision was unlawful, Grant filed this petition for review on November 12, 2025, under 16 U.S.C. § 839f(e). During the pendency of this appeal, BPA was made aware of a factual error underlying its analysis: BPA had misread the 2008 License and consequently its rationale for "relicensing power" discussed above was objectively incorrect. *Compare* 1-GrantER-0076-77 and 1-GrantER-0083 with 3-GrantER-0559-61 and 3-GrantER-0566; *see also* 3-GrantER-0587 (explaining that "Bonneville identified an error") and 3-GrantER-0587-602 (redlined version of ROD). Subsequently, BPA amended the challenged ROD to modify its discussion without changing its conclusion, wrongly declaring in the process that its revision to the ROD "does not change the CHWM Policy's reasoning[.]" *See* 3-GrantER-0587-602. The erroneous discussion in the original ROD and the incorrect assertion that BPA's reasoning remained unchanged are arbitrary and capricious and an abuse of discretion.

Grant now requests this Court hold that BPA's forcible dedication of 112 aMW of the Priest Rapids Project in the CHWM Policy and ROD was contrary to law, and its shifting and erroneous reasoning was arbitrary, capricious, and an abuse of discretion, in violation of the Northwest Power Act and the Administrative Procedure Act. 16 U.S.C. § 839f(e); 5 U.S.C. § 706.

**STANDING**

Grant has standing to challenge BPA's CHWM Policy and ROD under the Northwest Power Act and the Administrative Procedure Act. The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see also* 16 U.S.C. § 839f(e) (invoking the Administrative Procedure Act for judicial review of BPA final actions under the Northwest Power Act). Grant is a "person" within the meaning of the statute. 5 U.S.C. § 701(b)(2); 5 U.S.C. § 551(2) (defining "person" as including a "corporation, association, or public or private organization"). BPA's decision to forcibly dedicate the Priest Rapids Project deprives Grant of its right to low-cost federal power under the Northwest Power Act. 16 U.S.C. § 839c(b)(1). Accordingly, Grant has suffered a legal wrong and has been adversely affected and aggrieved by the CHWM Policy and ROD within the meaning of 5 U.S.C. § 702. Invalidation of the CHWM Policy and ROD by this Court will redress the harm to Grant by enabling Grant to obtain its full entitlement to federal power under the Northwest Power Act. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 954 (9th Cir. 2013). Grant is a COU whose right to purchase federal power from BPA is central to the Northwest Power

20

Act statutory scheme, so it also has prudential standing to pursue relief under the Act. *Ass'n of Pub. Agency Customers*, 733 F.3d at 954-55.

**ARGUMENT AND AUTHORITIES**

## I.  Background

### A. The Priest Rapids Project

The Priest Rapids Project comprises the Priest Rapids and Wanapum Dams, hydroelectric generating facilities located on the Columbia River in Grant, Kittitas, and Yakima Counties, Washington, and owned and operated by Grant.  2-GrantER-0141.  The Priest Rapids Project was authorized by a 1954 Act of Congress that required a license from FERC (then called the Federal Power Commission).  The Act provided that "[t]o assure that there shall be no discrimination between States in the area served by the project, such license shall provide that the licensee shall offer a reasonable portion of the power capacity and a reasonable portion of the power output of the project for sale within the economic market area in neighboring States[.]"  Pub. L. No. 544, § 6, 68 Stat. 573, 574 (1954).

Grant originally received a FERC license for the Priest Rapids Project in 1955.  1-GrantER-0075-76.  Under the terms of the original license, consistent with the Act, Grant was entitled to about 36.5% of the Priest Rapids Project's output and was obligated to make a "reasonable portion" of the Priest Rapids

21

Project's power available to other utilities. 1-GrantER-0075-76. Accordingly, Grant "entered into long-term contracts with [a group of purchasers] to provide them with 63.5% of the Project's firm power at a price determined by a cost-based formula." *Kootenai Elec. Coop., Inc. v. FERC*, 192 F.3d 144, 145-46 (D.C. Cir. 1999). Those purchasers included Cowlitz, EWEB, SCL, and Tacoma.

The Priest Rapids Dam began generating power in 1959 and the Wanapum Dam began generating power in 1963. 1-GrantER-0075. Prior to upgrades undertaken after issuance of the 2008 License, the Priest Rapids Project had a total nameplate capacity – the theoretical maximum amount of power it can generate at a given moment in time – of about 2,000 MW. *See* 4-GrantER-0623. Since the upgrades, the Priest Rapids Dam currently has a nameplate capacity of approximately 950 MW and the Wanapum Dam approximately 1,200 MW. 2-GrantER-0141. As discussed above, these figures are maximums, and in an average hour the dams produce about half that much power due to the availability of fuel (water) and a variety of operational constraints for environmental, irrigation, and recreational purposes.

### B. BPA Contracting: Subscription

Immediately following passage of the Northwest Power Act, Grant entered into contracts under the Act to purchase power from BPA from 1981 through 2011. 1-GrantER-0076. Most relevant here is Grant's Subscription contract, which ran

22

from 2001 through 2011. At the end of its Subscription contract, Grant had

dedicated approximately 235 aMW of the Priest Rapids Project to its own load,

representing the portion of the Priest Rapids Project that had served Grant's load

prior to 1980 and given the condition of the project at that point in time.[13] 1-

GrantER-0076; *see also* Section 5(b)(1)(A); 16 U.S.C. § 839c(b)(1)(A).

Some of the other COUs that purchased Priest Rapids Project power from

Grant also dedicated their shares of Priest Rapids Project power to their load as

well. Specifically, Cowlitz, EWEB, SCL, and Tacoma declared an aggregate of

approximately 89 aMW as a dedicated resource to their own retail loads.[14] 1-

GrantER-0087.

### C. Grant Relicensing

In 2008, Grant received a new FERC license for the Priest Rapids Project,

which changed Grant's entitlement to the project. 1-GrantER-0075-76 ("2008

License"). Instead of taking 36.5% of the project and selling "63.5% of the

Project's firm power at a price determined by a cost-based formula" via long-term

contracts, *Kootenai Elec. Coop.*, 192 F.3d at 145-46, Grant now had the

---

[13]    As a reminder, Grant is not challenging the 235 aMW figure, and it is only relevant because it is part of the math that BPA uses to calculate the total amount of the Priest Rapids Project BPA has decided to dedicate to Grant's load.

[14]    Again, this 89 aMW figure is only relevant because it is part of the math that BPA uses to calculate the total amount of the Priest Rapids Project BPA has decided to dedicate to Grant's load.

*theoretical* ability to access up to 70% of the project for its own use, subject to a complex marketing plan that still requires Grant to make power available to other purchasers. 2-GrantER-0364; 123 FERC ¶ 61,049 at ¶¶ 132-41. At the same time, separate decisions by FERC authorized Grant to increase the capacity of the Priest Rapids Project, work that continued throughout the early 2000s and 2010s. *See Public Utility District No. 2 of Grant County*, 108 FERC ¶ 62,075 (2004); *Public Utility District No. 2 of Grant County, Washington*, 113 FERC ¶ 62,205 (2005); *Grant County Public Utility District No. 2*, 125 FERC ¶ 62,131 (2008); *see also* 123 FERC ¶ 61,049 at ¶ 15, n.16, ¶ 171.

### D. BPA Contracting: Regional Dialogue

During the Regional Dialogue administrative process, Grant was inclined to shift from BPA supply to self-supply to serve the majority of its load. Grant's then-General Manager Tim Culbertson worked with BPA to figure out how the Grant-BPA relationship should proceed. An October 17, 2006 letter laid out a *proposal* (not a contract) under which, along with several other terms, Grant "would declare 100% of the Priest Rapids Project as their resource for Regional Dialogue contract purposes." 3-GrantER-0525-26. Mr. Culbertson stressed that the proposal was just that – a proposal – and that "[i]f any of these proposed elements are not adopted, the balance of this proposal and the resulting benefits could be affected." 3-GrantER-0526. A follow-up letter from Mr. Culbertson on

24

August 13, 2008, informed BPA that Grant intended to use the Priest Rapids Project to serve its own load. 1-GrantER-0079-80; 2-GrantER-0389. This intent was never memorialized in a contract. If it had been, the contract would have reflected specific numerical values and required authorization by Grant's governing body and execution by BPA.

Ultimately, Grant served all but a small portion of its load with its own resources rather than federal power from BPA. This small portion of Grant's load – approximately 5 aMW – was for the City of Grand Coulee. 1-GrantER-0092. Grant's contract with BPA to serve its City of Grand Coulee load did not include the Priest Rapids Project (or any other resource) as a dedicated resource in Exhibit A. 1-GrantER-0076. Grant did not execute any other BPA contract pursuant to the Northwest Power Act at this time.

At around the same time, Grant recalled the power it had previously provided from the Priest Rapids Project to Cowlitz, EWEB, SCL, and Tacoma Power. 1-GrantER-0078-79; 1-GrantER-0087. BPA followed an established administrative process, and properly reflected the removal of the Priest Rapids Project in the contracts of Cowlitz, EWEB, SCL, and Tacoma Power.

Each of those entities then petitioned BPA to remove their Priest Rapids Project share from their dedicated Exhibit C resources in their BPA contracts. 2-GrantER-0364-76 (Cowlitz); 2-GrantER-0377-80 (Tacoma); 2-GrantER-0381-84

25

(EWEB); 2-GrantER-0385-88 (SCL). BPA approved each request, deeming these COUs' Priest Rapids Project contracts "lost" under 16 U.S.C. § 839c(b)(1). These changes were reflected in the contracts BPA executed with its customers as part of the "Regional Dialogue" process that addressed contracts covering power supply from 2012 through 2028. 1-GrantER-0087. The process BPA followed with respect to the other COUs adhered to the Northwest Power Act: the dedication was originally reflected in a contract between BPA and the COU, and listed in each COU's contract; then the COUs formally petitioned for a "loss of resource"; then BPA issued a formal decision granting the loss of resource; and finally the resource was removed from the COU's contract.

Thus, beginning on October 1, 2011, Grant (for its City of Grand Coulee load), Cowlitz, EWEB, SCL, and Tacoma all had contracts with BPA, but no contract listed the Priest Rapids Project as a dedicated resource.

### E. BPA Contracting: Provider of Choice

In 2022, facing significant load growth leading to higher demand for power, Grant sought to begin purchasing a more significant portion of its power from BPA again (not just power to serve the City of Grand Coulee). Grant was the first COU to seek to take back its normal allocation of federal power to which it was statutorily entitled after a period of self-supply under the contracting regime established by the Northwest Power Act. 1-GrantER-0077. Accordingly, BPA

26

unnecessarily struggled to apply to Grant the policies it had adopted to implement its power marketing obligations under the Northwest Power Act.

The first relevant policy is the Revised 5(b)/9(c) Policy. The Revised 5(b)/9(c) Policy describes the agency's approach to determining customer eligibility for federal power, including how to accomplish resource dedication. *See generally* Revised 5(b)/9(c) Policy. The Revised 5(b)/9(c) Policy also indicates that BPA will continue to apply elements of the prior policy, specifically pointing to the 2003 Clarifications adopted as part of a litigation settlement. Revised 5(b)/9(c) Policy at 3.

In discussing the resources that are dedicated to serving a customer's load, the main text of the Revised 5(b)/9(c) Policy provides that resources must be listed in the customer's contract to be dedicated. The term "Dedicated Resource" is defined as "a Specified Resource or an Unspecified Resource Amount listed in Exhibit A [of the CHWM contract]". Revised 5(b)/9(c) Policy, Appx. B at 1 (brackets in original). In fact, the 2003 Clarifications specify that it is *formal inclusion in a contract*, not actual use of a resource, that determines whether a resource is dedicated under the Northwest Power Act:

> A customer can use an undeclared resource to serve its load with no long-term consequences to its 5(b) entitlements. Only resources specifically named as committed to load in section 2(a) of Exhibit C of the customer's BPA Power Sales Agreement will be expected to be committed to load in subscription and follow-on contracts. The use of undeclared resources to serve the customer's firm load is not a

27

declaration under section 5(b)(l) of the Northwest Power Act. A customer may or may not apply such resource to its load under the next contract.

2003 Clarifications at 2. BPA reiterated in the 2003 Clarifications that "a resource is *only* declared as dedicated to serving the customer's load under section 5(b) of the [NWPA] when it is named as so used in section 2(a) of Exhibit C of the BPA Power Sales Agreement."[15] 2003 Clarifications at 1 (emphasis added). Taken as a whole, the Revised 5(b)/9(c) Policy thus specifies that a resource is dedicated *only* if it is so named in a contract under the Northwest Power Act, just as the Act itself provides. Again, BPA has long established contract language that requires not only the identity of a resource but also the specific amounts of power that the customer will supply from the resource on a subannual basis. In other words, dedication is not a simple statement, but a detailed list of power amounts – which is one reason why it requires a contract.

The second relevant policy is titled the March 2024 Provider of Choice Policy, which was the direct precursor establishing the structure underlying the more granular CHWM Policy and ROD challenged in this case. In the Provider of Choice Policy, BPA subjectively identified Grant as a "returning public customer" as raising "unique considerations", but overall indicated that BPA would "apply a

---

[15] As discussed above, the location of resource dedications within a BPA contract has changed over time from Exhibit C to Exhibit A.

similar CHWM calculation methodology for Grant as all other [priority firm] customers." 2-GrantER-0330. That methodology indicated that BPA would, when determining a customer's CHWM, "deduct *dedicated* resources the customer used to serve its load during the index year" of 2023. 2-GrantER-0326 (emphasis added). The Provider of Choice Policy does not address which resources are, in fact, dedicated, nor does it indicate that BPA had changed its views as to what resource dedication means or how to accomplish resource dedication.

Neither the 5(b)/9(c) Policy nor the Provider of Choice Policy directly addressed all of Grant's circumstances. 1-GrantER-0077 (stating that the "5(b)9(c) Policy does not directly address" issues presented by Grant taking additional power); 1-GrantER-0092 (stating that "the POC Policy did not discuss" issues presented by Grant taking additional power). Grant tried to work with BPA to figure out a mutually acceptable approach to taking additional federal power under Grant's entitlement. In the end, however, BPA invented a new and different approach to fill in the gaps in its policies. In doing so, it departed from its standard practice, from the 5(b)/9(c) Policy, from the methods used for other customers, and from the Northwest Power Act itself.

### F. CHWM Policy and ROD

BPA released the decisions directly at issue here, the CHWM Policy and ROD, on August 14, 2025. 1-GrantER-0002; 1-GrantER-0045. As a reminder, the

29

CHWM Policy establishes BPA's determination that 401 aMW of the Priest Rapids Project is dedicated to Grant's load, and the ROD presents BPA's rationale for how the 401 aMW number was derived. Grant does not contest two inputs to this calculation – the 235 aMW pre-1980 dedication previously reflected in the final year of Grant's Subscription contract and the 89 aMW Grant recalled from the COUs that had previously purchased Priest Rapids Project power from Grant. Rather, Grant focuses its challenge on the additional 112 aMW that BPA determined Grant had used to serve its own load following its receipt of the 2008 License from FERC, which BPA called "relicensing power". 1-GrantER-0077-85.

While the sources of the 235 aMW and 89 aMW numbers were clear, the 112 aMW "relicensing power" number was not. This number (112 aMW) reflects BPA's unilateral decision to increase the portion of the Priest Rapids Project output dedicated to serving Grant's firm load because of BPA's view that, following the 2008 FERC license, Grant obtained a greater physical capability or entitlement to the project output that must be counted against its load. The mechanism BPA used to reach that result, however, was unclear and unsupported by the cited authorities.

Originally, BPA explained that its calculation began with the Pacific Northwest Coordination Agreement ("PNCA") Final Regulation from 2008-2009 to determine the physical capability of the Priest Rapids Project, which BPA

30

identified as 708.5 aMW.[16]  1-GrantER-0083.  BPA concluded (wrongly, as will be explained) that the 2008 License from FERC gave Grant a 63.5% right to the Priest Rapids Project's output.  1-GrantER-0075-76.  As support for this, BPA cited the 2008 License at paragraphs 133-40.  1-GrantER-0076.  BPA went on to state that Grant's physical right to the Priest Rapids Project was approximately 450 aMW – 63.5% of 708.5 aMW.  1-GrantER-0083.  BPA then subtracted the 235 aMW and 89 aMW figures that had already been accounted for, subtracted another portion of the Priest Rapids Project that it determined was serving loads other than Grant's retail loads, and it arrived at a "relicensing power" figure of 112 aMW.  1-GrantER-0084.

This analysis is not terribly clear on its face, but perhaps more problematic is that nowhere in the cited 2008 License does FERC indicate that Grant has a right to 63.5% of the Priest Rapids Project.  The 2008 License's only mention of the figure 63.5% is to observe that under Grant's original license, it sold 63.5% of the project's output to other purchasers.  123 FERC ¶ 61,049 at ¶ 132.  BPA's claim regarding the license was simply wrong.

---

[16]  The PNCA was an agreement among several utility parties in the Northwest designed to govern operation of a series of interrelated hydroelectric resources.  *See* BPA, Notice of Availability of Record of Decision (ROD) (Jul. 18, 1997), *available at* https://www.bpa.gov/-/media/Aep/about/publications/records-of-decision/1997-rod/rod-19970718-pacific-northwest-coordination-agreement.pdf.

31

After Grant initiated proceedings in this Court, BPA was made aware of this error. As BPA put it: "In the course of litigation regarding Bonneville Power Administration's (BPA) August 14, 2025 Contract High Water Mark Implementation Policy (CHWM Policy), BPA became aware of a narrow revision that was needed in the Record of Decision (ROD) that accompanied the CHWM Policy." 3-GrantER-0527. To address this error, BPA adopted an Amended CHWM ROD. *See* 3-GrantER-0587-602 (redlined version of ROD).

The Amended CHWM ROD leaned on different sources – Grant's bond declarations, planning documents, and communications – to reach the conclusion that, following the 2008 License, Grant now has the physical right to 63.3% (rather than 63.5%) of the Priest Rapids Project. *See*, *e.g.*, 3-GrantER-0592. Grant did not have the opportunity to respond to this material at any point in the administrative process – this brief is Grant's first opportunity to respond – and nowhere does BPA grapple with the complexities of Grant's entitlement to power under the 2008 License. Nor does the Amended CHWM ROD address the legal infirmities in BPA's forced dedication of the Priest Rapids Project.

The upshot of BPA's legally unsound CHWM Policy and ROD is that Grant is left with growing loads and reduced access to the federal power it is entitled to under the Northwest Power Act. In this time of high power demand and shrinking

32

power supply, BPA is making it more difficult, costly, and uncertain for Grant to meet its obligations as a Washington utility to serve its customers.

## II. Standard of Review

As discussed above, the Northwest Power Act authorizes judicial review of BPA decisions issued under Section 5 of the Act. 16 U.S.C. § 839f(e)(1)(B). The Northwest Power Act generally provides that the scope of judicial review of a BPA decision "shall be governed by section 706 of title 5" – the Administrative Procedure Act. 16 U.S.C. § 839f(e)(2).

The Administrative Procedure Act at 5 U.S.C. § 706 provides that a reviewing court shall "(2) hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" An agency action may be arbitrary and capricious where an agency changes its reasoning and does not adequately explain inconsistencies. *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1050-51 (9th Cir. 2010).

On questions of law, courts reviewing an agency decision under the Administrative Procedure Act "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Loper Bright v. Raimondo*, 144 S.Ct. 2244, 2273, 603 U.S. 369, 219 L.Ed.2d 832 (2024). This Court "will not defer to BPA's judgment" in circumstances "[w]here

33

Congress has spoken to an issue and BPA acts inconsistent with Congress's directions[.]" *Portland Gen. Elec. Co.,* 501 F.3d at 1031 (citing *M-S-R Public Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 844 (9th Cir. 2002) ("refusing to extend deference to BPA's statutory interpretation where Congress had clearly spoken to the issue")). BPA cannot construe and exercise its statutory authority in a manner that is contrary to the clearly expressed intent of Congress. *Portland Gen. Elec. Co.*, 501 F.3d at 1025-26.

In the past, this Court used to defer to BPA on BPA's reasonable interpretation of ambiguous statutes under the *Chevron* doctrine that was overruled in *Loper Bright*. *See*, *e.g.*, *Pac. Nw. Generating Co-op. v. Dep't of Energy*, 580 F.3d 792, 808, 810 (9th Cir. 2009); *Ass'n of Pub. Agency Customers*, 733 F.3d at 963 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 & n.11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Accordingly, *Chevron* deference on legal questions related to ambiguous statutes is no longer appropriate. *Lopez v. Garland*, 116 F.4th 1032, 1036, 1040 (9th Cir. 2024). On questions of policy and fact, courts may still afford the agency some deference. 144 S.Ct. at 2261; *see also Alcoa v. Central Lincoln PUD*, 467 U.S. 380, 390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984) (affording BPA deference for "technical and complex" decisions within its expertise).

34

## III.  Argument

Again, this case is deceptively simple and straightforward:  BPA cannot forcibly dedicate a customer resource to the customer's load.  There are two ways a resource can be dedicated to load.  One of them requires history that does not apply to the 112 aMW "relicensing" figure challenged by Grant (the resource must have served the customer's load prior to 1980).  Section 5(b)(1)(A); 16 U.S.C. § 839c(b)(1)(A).  The other requires the customer's consent as memorialized in a contract, which never occurred for the challenged 112 aMW or any other amount of "relicensing" power.  Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B).  Accordingly, the forcible dedication was unlawful.

Even if the Court holds, contrary to the plain language of the Northwest Power Act, that BPA was within its right to force Grant to dedicate the Priest Rapids Project, the manner by which BPA chose to do so was arbitrary and capricious and an abuse of discretion.  BPA originally determined the amount of "relicensing power" that was dedicated to Grant's load by reference to a factually erroneous read of Grant's 2008 License for Priest Rapids.  When made aware of that error during this appeal, BPA issued a revised ROD that applied a *post hoc* justification to reach the same erroneous conclusion.  This methodology is arbitrary and capricious and constitutes an abuse of discretion.  It also underscores why resource dedication (aside from pre-1980 actual resource outputs) is voluntary

35

under the Northwest Power Act and not unilateral on BPA's part – when BPA departs from its usual collaborative approach (which is ultimately memorialized in agreed upon contract terms), it is easy to get things wrong.

## A. BPA's Forced Dedication of the Priest Rapids Project Was Unlawful

### 1. The Northwest Power Act Does Not Allow Forced Dedication

BPA acted unlawfully in violation of the Northwest Power Act and the Administrative Procedure Act when it dedicated the 112 aMW "relicensing" portion of the Priest Rapids Project to Grant's load without Grant's having agreed to the dedication in a contract under the Act.

Specifically, under Section 5(b)(1) of the Northwest Power Act, a resource counts against a customer's entitlement to federal power only if the customer determines in a contract that the resource will be used to serve its firm load (except for pre-1980 resources). Section 5(b)(1); 16 U.S.C. § 839c(b)(1). BPA has explicitly conceded that Grant never made such a determination for the 112 aMW "relicensing" portion of the Priest Rapids Project. 1-GrantER-0082. Accordingly, BPA's forced dedication of "relicensing" power was in excess of BPA's statutory authority.

Fundamentally, forced dedication is an issue of statutory interpretation. When faced with "any question of statutory interpretation," this Court's "analysis begins with the plain language of the statute." *United States v. Wells*, 156 F.4th

36

907, 912 (9th Cir. 2025) (quoting *Jimenez v. Quarterman*, 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009)). The Court will look to the meaning of words and phrases in light of "the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Wells*, 156 F.4th at 912 (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006)). "If the statutory language lacks a plain meaning," the Court may then "employ other tools, such as legislative history, to construe the meaning of ambiguous terms." *Wells*, 156 F.4th at 912 (quoting *United States v. Lillard*, 935 F.3d 827, 834 (9th Cir. 2019) (internal quotation marks omitted)).

Accordingly, the Court must first consider the language and structure of Section 5(b)(1) of the Northwest Power Act. Section 5(b)(1) requires BPA to offer contracts for power to eligible customers in an amount equal to the customer's firm power load net of the customer's own non-federal resources dedicated to load. 16 U.S.C. § 839c(b)(1). The Northwest Power Act at 16 U.S.C § 839c(b)(1)(A) and (B) offers two ways to reduce a customer's entitlement to federal power by means of resource dedications. This section will discuss both ways.

First, a resource is automatically dedicated to the extent it was actually used to serve retail loads prior to 1980. Section 5(b)(1)(A); 16 U.S.C. § 839c(b)(1)(A). BPA's CHWM Policy and ROD suggest that prior to 1980 Grant had the right to

37

36.5% of the output of the Priest Rapids Project. Accordingly, BPA's forced dedication starts with a figure derived from the original 36.5% right – 235 aMW as memorialized in the final year of Grant's Subscription contract.[17] Grant is not disputing that Grant's right to 235 aMW in the Priest Rapids Project was and should continue to be dedicated to Grant's load. But it does not end there. BPA ultimately relies on additional values to increase that figure to 401 aMW. 3-GrantER-0558-59. Accordingly, the Court must look to Section 5(b)(1)(B). 16 U.S.C. § 839c(b)(1)(B).

Second, a resource may be dedicated if and only if a BPA customer (here, Grant) determines, in a contract under the Northwest Power Act, to declare that the resource will be used to serve the customer's firm retail loads. Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B). Consider the meanings of the words "determine" and "contract". Determine means "to find out or calculate precisely" or "to settle, to decide," especially "to decide firmly[.]" "Determine," Oxford American Dictionary (1980). In plain English, "contract" means "a formal agreement between people or groups or countries" or "a document setting out the terms of such an agreement." "Contract", Oxford American Dictionary (1980). In legal English, Black's Law Dictionary defines "contract" as "[a]n agreement between

---

[17] Because the output of the Priest Rapids Project was not absolutely constant over time, Grant and BPA agreed to updates to contract exhibits prior to the Regional Dialogue contract period, including the 235 aMW number.

38

two or more persons which creates an obligation to do or not to do a particular thing[.]" "Contract", Black's Law Dictionary (5th Ed. 1979). This Court has suggested that BPA contracts must be executed, at which point they become final agency actions subject to challenge – additional layers of formality demonstrating unequivocal assent on the part of both parties to the contract, including an agreement to be bound. *Portland Gen. Elec.*, 501 F.3d at 1023.

Nothing Grant did with respect to the Priest Rapids Project after the Subscription contract period reflects an executed, enforceable agreement between multiple parties. There was no subsequent determination and no contract reflecting a dedication of the Priest Rapids Project to Grant's load. Instead, BPA points to un-executed, non-binding letters – not contracts – as the documents supporting a dedication of "relicensing" power. 1-GrantER-0079-80. These are legally insufficient to support a determination under the Northwest Power Act.

Not only is the forced dedication unlawful under the Northwest Power Act, but BPA's reliance on evidence that does not reflect a "rational connection between the facts found and the choice made" is arbitrary and capricious under the Administrative Procedure Act. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (internal quotation marks omitted); *Waterkeeper All. v. United States Env't Prot. Agency*, 140 F.4th 1193, 1214 (9th Cir. 2025) (applying

39

*State Farm* and holding action by Environmental Protection Agency was arbitrary and capricious).

Moreover, the 112 aMW of "relicensing" power BPA identified has *never* been dedicated to load pursuant to a contract under the Northwest Power Act. Grant has chosen not to challenge BPA's dedication of the 89 aMW "recalled" power primarily to make this point crystal clear: Two of the three components of BPA's determination to dedicate the Priest Rapids Project to Grant's load were previously dedicated to load in contracts under the Northwest Power Act, but Grant has *never* "determine[d], pursuant to contracts under this chapter" that the so-called "relicensing" power "will be used to serve its firm load in the region." Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B). Because Grant did not have the right to the 112 aMW of "relicensing" power prior to 1980 by definition, and because Grant never dedicated "relicensing" power to load in a contract, this power is not and cannot lawfully be dedicated to Grant's load within the meaning of the Northwest Power Act without explicit contractual assent by Grant.

This interpretation is consistent with the purpose of the Northwest Power Act. Congress provided explicitly that the purposes of the Act included "to encourage … the development of … resources within the Pacific Northwest" and "to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply[.]" Section 1(1) & (2); 16 U.S.C. § 839(1) & (2). Congress also

40

expressed its intent that the Act "not be construed to limit or restrict the ability of customers to take actions … to plan, develop, and operate resources[.]"  Section 1(5)(B); 16 U.S.C. § 839(5)(B).  Grant's interpretation of the Northwest Power Act honors these purposes – it supports Grant's continued investment in the Priest Rapids Project without the penalty of losing access to low-cost federal power.  If BPA can force resource dedication without a COU agreeing to that dedication in a contract, COUs will have a strong disincentive to invest in new resources knowing that they could lose their entitlements to federal power under the Bonneville Project Act, Preference Act, and Northwest Power Act.  If BPA acts unpredictably and out of line with these statutes and BPA's own policies and can make non-contractual adjustments to resource dedications after the fact, then COUs will be unable to make reasonable projections of the net costs and net benefits of potential investments in new resources, because of the risk associated with BPA's behavior.

This interpretation is supported by the legislative history of the Northwest Power Act.  Section 5(b)(1) was designed against the practical backdrop that power supply in the Northwest was worrisomely low (a situation reflected again in current projections of rapid increases in regional demand for power paired with limited supply).  *See* H.9864 (Sept. 29, 1980) (discussing a "power shortage problem").  In addition to the explicit statements adopted as part of the Northwest Power Act, the legislative history of the Act shows that Congress sought to

41

encourage COUs to invest in additional resources. H.9864 (Sept. 29, 1980) (expressing the intent to "encourage[e] independent … resource programs on the part of individual utilities so that they will be able to meet their loads in the manner they wish"). Again, Grant's interpretation of the Act honors this intent, while BPA's would disincentivize resource investment by COUs due to the risk associated with BPA's decision-making.

Finally, BPA's own past interpretations of the Act align with Grant's interpretation. BPA's past interpretations shed light on how the Act was commonly understood prior to the challenged CHWM Policy and ROD. BPA's 5(b)/9(c) Policy provides that "[o]nly resources specifically named as committed to load in section 2(a) of Exhibit C of the customer's BPA Power Sales Agreement will be expected to be committed to load in subscription and follow-on contracts" and that "[t]he use of undeclared resources to serve the customer's firm load is not a declaration under section 5(b)(l) of the Northwest Power Act." 2003 Clarifications at 2. BPA reiterated in the 2003 clarifications that "a resource is *only* declared as dedicated to serving the customer's load under section 5(b) of the [NWPA] when it is named as so used in section 2(a) of Exhibit C of the BPA Power Sales Agreement." 2003 Clarifications at 1 (emphasis added). Again, this past interpretation is one hundred percent consistent with Grant's read of the statute, but it cannot be squared with the CHWM Policy and ROD. Because Grant

42

never dedicated the 112 aMW of "relicensing" power to load in a contract, this power cannot be forcibly dedicated to Grant's load under the plain language, purpose, history, and past implementation of the Northwest Power Act.

To the extent BPA has departed from its own Revised 5(b)/9(c) Policy, this in itself is a violation of the Administrative Procedure Act. As discussed in the previous paragraph, BPA released a series of formal policies that explain how to effectuate a dedication, culminating in the Revised 5(b)/9(c) Policy. The Revised 5(b)/9(c) Policy provides that a dedication occurs when a resource is listed in a contract, consistent with the Northwest Power Act. In the CHWM Policy and ROD, BPA has departed from that formal policy without acknowledging or explaining the departure. This type of reversal is unlawful under the Administrative Procedure Act. *See Organized Village of Kake v. Dept. of Agriculture*, 795 F.3d 956, 966 (9th Cir. 2015) (providing that a change in policy without displaying awareness of the change or articulating good reasons violates the Administrative Procedure Act); *see also Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067-68 (9th Cir. 2021) (applying *Organized Village of Kake* to overturn Fish and Wildlife Service decision). More fundamentally, BPA's departure from its own policy demonstrates that it has *also* departed from a longstanding, sector-wide understanding, which is that dedication under the

43

Northwest Power Act cannot happen without a COU and BPA agreeing to the dedication in a contract.

BPA raised two main counterpoints in its CHWM ROD, neither of which is sufficient to establish a resource dedication under the Northwest Power Act.

### 2. The Northwest Power Act Does Not Allow Forced Dedication Even if a COU Indicates Without a Contract that It Will Use a Resource to Serve Load

First, BPA indicates that Grant informed BPA that *as a matter of fact* it intended to use Priest Rapids Project power for its firm loads. 1-GrantER-0081-84. However, Grant said in two letters – not a contract – that it would use Priest Rapids Project power for its load. 3-GrantER-0525-26, 2-GrantER-0389. This is insufficient under the Act.[18]

Neither letter bears any of the hallmarks of a contract. The 2006 letter is a multi-part proposal cast in the subjunctive voice (Grant "would" use the Priest Rapids Project to serve load, not "shall" or even "will"). 3-GrantER-0525-26. The 2008 letter is a three-paragraph clarification that does not come anywhere near the

---

[18] Actual use of the resource to serve firm load is also insufficient to effectuate a dedication under the Northwest Power Act. Not only is this clear under the plain language of the Act, but also BPA made this specific point explicitly in the 2003 Clarifications to the 5(b)/9(c) Policy: "The use of undeclared resources to serve the customer's firm load is not a declaration under section 5(b)(l) of the Northwest Power Act." 2003 Clarifications at 2. And the Revised 5(b)/9(c) Policy makes clear that the 2003 Clarifications "will apply to BPA's CHWM contracts and other subsequent power sales contracts". Revised 5(b)/9(c) Policy at 3.

specifics or complexities one would expect from a power contract between a sophisticated utility and a federal power marketing agency.[19] 2-GrantER-0389. Both come solely from Grant. Neither is countersigned by BPA. Neither constitutes a challengeable final agency action. *Cf. Portland Gen. Elec. Co.*, 501 F.3d at 1023 ("BPA's final actions include the execution of settlement agreements and other contracts, 16 U.S.C. §§ 839f(e)(3), 839f(e)(1)(B), which are final only upon execution of such agreements."). Neither contains the hallmarks of dedication in a contract: extensive tables of specific amounts of power on a subannual basis that are agreed and formally executed by both parties. If any interested party had filed a petition for review of either letter, naming BPA as the agency making the final action being reviewed, BPA (rightfully) would have moved to dismiss for lack of jurisdiction and this Court (rightfully) would have dismissed the petition.

The actual Regional Dialogue contracts between BPA and over one hundred customers form a direct counterpoint to the brief and nonspecific letters. These Regional Dialogue contracts were proper contracts that addressed complex details and were executed by both the affected COU and BPA. In these contracts – including Grant's City of Grand Coulee contract – the Priest Rapids Project was

---

[19] In fact, the record includes a draft "Provider of Choice Final Master Contract Template" that runs hundreds of pages – significantly more than three paragraphs.

45

*not* listed as an Exhibit A dedicated resource.  Importantly, BPA executed the City of Grand Coulee contract without a listing or explicit dedication of any Grant resources.  Listing the resource in a contract is required by the Northwest Power Act itself and by BPA's own 5(b)/9(c) Policy implementing the Act.  Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B); 2003 Clarifications at 1 ("[A] resource is only declared as dedicated to serving the customer's load under section 5(b) of the Northwest Power Act when it is named as so used in section 2(a) of Exhibit C of the BPA Power Sales Agreement.").

Under BPA's analysis, therefore, BPA has suggested that Grant is unique in that its contract was the one regional contract that *implicitly* dedicated resources without identifying the dedication in a contract as required by both the Northwest Power Act and BPA's own Revised 5(b)/9(c) Policy.  BPA acknowledges that there was no contract that dedicated (or as used in the statute, determined) the Priest Rapids Project but suggests this is not fatal under the Northwest Power Act.  Grant respectfully suggests that both the statute and BPA's own prior implementation of the statute in the Revised 5(b)/9(c) Policy – and all other BPA power sales contracts – speak for themselves.

Grant also expects that NRU will continue to press its argument that Grant indicated in letters in 2006 and 2008 that it would use the Priest Rapids Project to serve load, thereby effectuating a dedication.  As discussed above, the letters do

46

not effectuate a dedication, and in any event neither letter comes anywhere near to being a contract. The Culbertson letters are insufficient as a matter of law to establish a dedication.

3. *The Preference Act's Requirement to Not Sell Power Outside of the Northwest Is Irrelevant to Resource Dedication*

BPA also relies on a second argument based on the Preference Act. The Preference Act requires that Grant not sell Northwest hydroelectric power outside the region. 16 U.S.C. §§ 837a-837c. This provision is also echoed in Section 9(c) of the Northwest Power Act. Section 9(c); 16 U.S.C. § 839f(c). BPA concludes in the CHWM ROD that:

> regardless of a Grant determination pursuant to section 5(b)(1)(B) to use its increased share of output during a [BPA] contract – which during the [Regional Dialogue] contract period it appears Grant has physically been using to serve its load irrespective of having a [Regional Dialogue] CHWM Contract – the determination of [BPA]'s obligation to supply firm power under a [Provider of Choice] CHWM Contract must also consider whether Grant has conserved and kept available such amount of Priest Rapids Project to serve its load pursuant to section 3(d) of the Preference Act.

3-GrantER-0565-66 (citing 16 U.S.C. § 837b(d)). However, the parties agree that Grant complied with the Preference Act and did *not* sell power outside the region. 3-GrantER-0566. BPA's *ex post* determination in the CHWM ROD that Grant actually complied with the Preference Act during the Regional Dialogue period is completely different and separate from a determination that Grant contractually dedicated a resource at any time. The Preference Act does not actually supply any

47

support for BPA's forced dedication.  Compliance with the Preference Act governs where a resource may be delivered, not whether it becomes a Section 5(b)(1)(B) dedication.

Moreover, BPA does not draw any discernible line between the Preference Act and its forced dedication decision.  Rather, BPA uses oblique phrasing such as "[i]t is important for [BPA] to apply section 3(d) of the Preference Act when it comes to hydroelectric resources and to be consistent in this application to avoid this type of issue in the future."  3-GrantER-0566.  The plain purpose of the cited section of the Preference Act is to ensure that certain resources are not exported, whether or not those resources are dedicated under the Northwest Power Act.  Grant did not engage in such exports, which BPA acknowledges.  3-GrantER-0566.  Thus, the invocation of the Preference Act by BPA appears to be a self-evident red herring.

BPA's discussion of these counterarguments contains some telling language that effectively make Grant's point.  After discussing whether Grant actually used the Priest Rapids Project to serve load, and thus met its obligation under the Preference Act not to sell outside the region, BPA says that its discussion "effectively applies the … relicensed share of the PRP resource to serving Grant's load *notwithstanding sections 5(b)(1)(A) and (B)*."  1-GrantER-0081 (emphasis added).  It acknowledges explicitly that "[t]his amount was *never officially*

*dedicated in any public customer's power service contract* with Bonneville." 1-GrantER-0082 (emphasis added). Because it cannot actually apply the Northwest Power Act to the "relicensing" power, it concludes squishily that "[t]hrough the operation of section 9(c) of the Northwest Power Act Bonneville finds it is reasonable to treat the relicensed amount for CHWM purposes as either a section 5(b)(1)(A) or (B) resource since Grant is using that amount of PRP to serve its regional firm power load." 1-GrantER-0083-84. If BPA had identified a lawful path to accomplish its forced dedication, presumably it would have explained that path rather than invoking two alternative statutory provisions, each of which self-evidently does not apply.

### B. BPA's Erroneous Analysis Regarding Grant's Entitlement to Priest Rapids Project Power Was Arbitrary, Capricious, and an Abuse of Discretion

BPA abused its discretion in violation of the Northwest Power Act and the Administrative Procedure Act when it calculated the 112 aMW "relicensing" amount of the forced dedication of the Priest Rapids Project to Grant's load in reliance on a misread of the 2008 License and then, when it realized its error, applied a *post hoc* justification that it wrongfully said did not represent a change. *See Locke*, 626 F.3d at 1051 (finding an agency action arbitrary and capricious due to inadequately explained inconsistent reasoning). If this Court concludes, contrary to the language, purpose, and history of the Northwest Power Act, that

49

BPA may forcibly dedicate "relicensing" power from the Priest Rapids Project, it must remand to BPA to make a rational determination of how much "relicensing" power may actually be dedicated. As explained below, the only rational way to do this is to focus on Grant's entitlement to the project in 2008.

Again, the CHWM ROD explains that the 401 aMW forced-dedication number is derived from a combination of Grant's original 235 aMW dedication in its Subscription contract, plus the 89 aMW Grant recalled from other COUs, plus an additional 112 aMW that BPA believed Grant had used to serve its own load following its receipt of the 2008 License from FERC ("relicensing power"). 1-GrantER-0077-85.

The 112 aMW figure that Grant challenges was derived from an erroneous reading of the FERC decision granting the 2008 License. BPA indicated that the 2008 License gave Grant a right to 63.5% of the firm output of the Priest Rapids Project. 1-GrantER-0076. However, the only reference to 63.5% in the 2008 License is a discussion of how much of the project Grant *sold to third parties* under the *original* license. 123 FERC ¶ 61,049 at ¶ 132. The 2008 License simply does not say that Grant has a right to 63.5% of the Priest Rapids Project's output. Because BPA has since acknowledged the error, Grant will not belabor the point.

As a result of its error, BPA overhauled its discussion of "relicensing power" in the CHWM ROD. *Compare* 1-GrantER-0076-77 and 1-GrantER-0083 with 3-

50

GrantER-0559-61 and 3-GrantER-0568; *see also* 3-GrantER-0587 (explaining that "Bonneville identified an error") and 3-GrantER-0587-602 (redlined version of ROD). Nevertheless, BPA did not change its conclusion, wrongly declaring in the process that its revision to the ROD "does not change the CHWM Policy's reasoning[.]" *See* 3-GrantER-0587-602. An agency cannot change the factual basis for its decision while insisting that nothing has changed.

The redline version of the ROD included in the record demonstrates that, contrary to BPA's bald statement, it did change its reasoning. As discussed above, the original ROD BPA started with the 2009 PNCA Final Regulation, which identified the physical capability of the Priest Rapids Project as 708.5 aMW. 1-GrantER-0083. BPA took the incorrect 63.5% figure from a misreading of the 2008 License and apparently (it never explicitly says so) derived Grant's physical right to the Priest Rapids Project as approximately 450 aMW by taking 63.5% of 708.5 aMW. 1-GrantER-0083. BPA then performed some subtractions outlined above and arrived at a "relicensing power" figure of 112 aMW. 1-GrantER-0084. In the amended ROD, BPA did roughly the same math but used the figure 63.3% instead of 63.5%. 3-GrantER-0600. Unable to lean on the 2008 License itself to explain "relicensing" power, BPA inserted several paragraphs of entirely new material to explain its view that Grant has a right to 63.3% of the Priest Rapids Project, primarily a 2010 letter from Cowlitz, bond documents from 2013 and

51

2024, and Grant's Integrated Resource Plan from 2024. 3-GrantER-0592-93. But Grant's FERC license is a forty-four-year document that formally governs Grant's right to and operation of the Priest Rapids Project, while its bond declarations and other evidence cited by BPA present only snapshots in time. Other evidence could easily have supported other numbers.

Again, this confusion is a good reason for BPA to follow its Revised 5(b)/9(c) Policy – and the Northwest Power Act – and only recognize dedications memorialized in formal contracts. When parties agree on a dedication and reflect that agreement in a contract, there is no confusion. BPA does not have to resort to misreading a FERC license or digging up decade-old bond declarations to support its conclusions. Either way, under Ninth Circuit precedent, it is an abuse of discretion for BPA to make a decision, modify that decision, and fail to "offer a 'satisfactory explanation' for its decision in light of the earlier findings." *Locke*, 626 F.3d at 1051 (finding an agency action arbitrary and capricious due to inadequately explained inconsistent reasoning).

Notwithstanding the plain language of the Northwest Power Act and the preceding argument, if this Court were to conclude that the Culbertson letters did effectuate a dedication – even though they were never memorialized in a contract as the Northwest Power Act requires – then BPA's cited evidence from 2010,

52

2013, and 2024 is *still* irrelevant. The latest Culbertson letter is from 2008.[20] 2-GrantER-0389. Culbertson could not have dedicated resources Grant did not have in 2008 or know with certainty it would have at some discrete point in the future.[21] The 2010 Cowlitz letter does not explain Grant's entitlement to the project in 2008. In fact, the Cowlitz letter discusses a change in Grant's entitlement that would not take place until *October 2011*, more than three years after the 2008 Culbertson letter. 4-GrantER-0756-57. Additionally, Cowlitz is not Grant, and its letter cannot provide the missing detail necessary to effectuate a dedication under the Northwest Power Act. The 2013 and 2024 bond declarations do not explain Grant's entitlement to the Priest Rapids Project in 2008. 4-GrantER-0604-755. Grant's 2024 Integrated Resource Plan does not explain Grant's entitlement to the Priest Rapids Project in 2008. 2-GrantER-0113-214.

---

[20] In the Amended ROD, BPA also points to a separate 2010 Culbertson letter. 3-GrantER-0592, 4-GrantER-0758-59. That letter is explicitly intended to explain Cowlitz's entitlement to the Priest Rapids Project. 4-Grant-ER-0754-55. It does not speak to Grant's entitlement to the project *at the time of the 2008 Culbertson letter* BPA cites in support of its dedication argument; it does not speak to Grant's entitlement to the project in 2010; and it speaks of what Culbertson anticipates will happen "based on the current load forecast." 4-GrantER-0758-59. It is not evidence of the amount of the project that was *dedicated* to Grant's load under the Northwest Power Act.

[21] Some material in the record references Grant's anticipated resources in "FY 2010" – the reference year used to determine Regional Dialogue contract rights – but the record is not clear as to how to quantify the amount of the Priest Rapids Project available to Grant in that reference year. *See, e.g.*, 2-GrantER-0389. In any event, BPA did not determine Grant's "relicensing" power with specific reference to FY 2010.

53

BPA's own Regional Dialogue Policy explained the years that BPA focused on during the Regional Dialogue process: "BPA will use the FY 2010 resource amounts *as of September 30, 2006*, identified in the customer's Subscription contracts but with specific adjustments[.]" 3-GrantER-0478 (emphasis added). BPA explained the reason for this approach: "FY 2010 resource amounts will be used because they are known and certain, which provides stability and predictability[.]" 3-GrantER-0478. Thus, under BPA's own policy, *if* this Court were to find that Grant dedicated the Priest Rapids Project by letter (not by contract), the relevant reference year is FY2010 – not 2011, 2013, or 2024. In fact, the Regional Dialogue Policy specifically notes that Grant would be recalling power from other COUs in FY2012 – outside the policy's frame of reference – and it does not attempt to quantify that power. 3-GrantER-0478. The Regional Dialogue Policy does *not* say Grant's decision amounts to a dedication, and it does *not* mention "relicensing" power. Both BPA's decision to apply an irrelevant frame of reference and its departure from past policy are grounds for this Court to hold that the CHWM Policy and ROD are arbitrary and capricious. These discrepancies also suggest that BPA's decision was nothing more than a *post hoc* rationalization of a predetermined outcome, not reasoned decisionmaking.

The closest the Administrative Record comes to demonstrating Grant's entitlement to the Priest Rapids Project in 2008 may be the 2009 PNCA Final

54

Regulation, since it addresses Operating Year 2008-09. *See*, *e.g.*, 3-GrantER-0393.

In any event, it is certainly closer to contemporaneous with the Culbertson letters

than the 2010, 2013, or 2024 documents BPA relied on. Moreover, it is a source

that BPA explicitly indicated it would rely on in the ROD. 1-GrantER-0083. If

this Court remands for a more reasonable determination of "relicensing" power

dedicated to Grant's firm load, it should direct BPA to focus on what Grant

actually could have dedicated in 2008. The 2009 PNCA Final Regulation may be a

reasonable starting point.

To the extent BPA relied on the 2010, 2013, and 2024 documents to

determine Grant's actual reliance on the Priest Rapids Project to serve load, that

reliance also constitutes an abuse of discretion. The 2003 Clarifications to the

5(b)/9(c) Policy and re-adopted as part of the Revised 5(b)/9(c) Policy explicitly

provide that "[a] customer can use an undeclared resource to serve its load with no

long-term consequences to its 5(b) entitlements" and "[t]he use of undeclared

resources to serve the customer's firm load is not a declaration under section

5(b)(l) of the Northwest Power Act." 2003 Clarifications at 2; Revised 5(b)/9(c)

Policy at 3. The 2003 Clarifications also establish that part of the Priest Rapids

Project can be declared without the whole being declared. 2003 Clarifications at 3

("A customer may declare as dedicated to its load … a part of a resource by

naming that part in section 2(a) of Exhibit C, without causing the remainder of the

resource to be dedicated[.]").  Departing from its own Policy without acknowledging or explaining the departure also constitutes an abuse of discretion under Ninth Circuit precedent.  *Organized Village of Kake*, 795 F.3d at 966.  It is *only* the dedication in a contract that affects a COU's entitlement, *not* its actual use of a resource.

The erroneous discussion in the original ROD, the incorrect assertion that BPA's reasoning remained unchanged in the Amended ROD, and the calculation of "relicensing" power by reference to irrelevant materials are arbitrary and capricious and an abuse of discretion.  Once again, these issues also demonstrate why the Northwest Power Act's requirement that a dedication occur via contract is so important.  However, if this Court holds that BPA may forcibly dedicate the "relicensing" portion of the Priest Rapids Project without a dedication by contract, it should remand for a reasonable calculation based on Grant's actual entitlement to the project in 2008.

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, Grant respectfully requests that this Court hold unlawful and set aside BPA's CHWM Policy and ROD to the extent they forcibly dedicate the 112 aMW of the Priest Rapids Project to Grant's load, wrongly reducing Grant's entitlement to purchase power from BPA under the Northwest Power Act.  Because the ultimate outcome Grant seeks is a power contract with

56

BPA, Grant requests that the Court remand the matter to BPA to issue a CHWM Policy and ROD that do not dedicate the "relicensing" portion of the Priest Rapids Project and instead reflect the full scope of Grant's entitlement to federal power. Grant seeks only the federal power Congress guaranteed it – no more and no less.

Date: April 29, 2026

/s/ Irion A. Sanger
Irion Sanger
John Maxwell Greene
SANGER GREENE PC
4031 SE Hawthorne Boulevard
Portland, OR 97214
(503) 756-7533
irion@sanger-law.com

*Counsel for Petitioner Public Utility District No. 2 of Grant County, Washington*

57

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,306 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

As required by Circuit Rule 32-1(e), this Opening Brief is further accompanied by Form 8 certifying compliance with the foregoing rules.

Date: April 29, 2026

*/s/ John Maxwell Greene*
John Maxwell Greene
SANGER GREENE PC
4031 SE Hawthorne Boulevard
Portland, OR 97214
(401) 339-2990
max@sanger-law.com

CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-7137, 25-7142

I am the attorney or self-represented party.

**This brief contains** | 12,306 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/John Maxwell Greene | **Date** | 4/29/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*

# CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on April 29, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Date: April 29, 2026

/s/ *John Maxwell Greene*
John Maxwell Greene
Irion Sanger
SANGER GREENE PC
4031 SE Hawthorne Boulevard
Portland, OR 97214
(401) 339-2990
max@sanger-law.com

*Counsel for Petitioner Public Utility District No. 2 of Grant County, Washington*

CERTIFICATE OF SERVICE