**Nos. 25-7137 and 25-7142 (Consolidated)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, WASHINGTON,
*Petitioner*,

and

NORTHWEST REQUIREMENTS UTILITIES,
*Petitioner,*

v.

BONNEVILLE POWER ADMINISTRATION,
*Respondent*.

On Petition for Review Under the Northwest Power Act

**RESPONDENT'S ANSWERING BRIEF**

MARCUS H. CHONG TIM
*General Counsel*

TIMOTHY A. JOHNSON
*Asst. General Counsel*

MARY C. BODINE-WATTS
*Attorney*

Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208
503-230-5085

SCOTT E. BRADFORD
*U.S. Attorney*
*District of Oregon*

SEAN E. MARTIN
*Asst. U.S. Attorney*

1000 SW Third Ave.
Suite 600
Portland, OR 97201-2902
503-727-1000

J. COURTNEY OLIVE
*Special Asst. U.S. Attorney*
*Attorneys for Respondent*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii
GLOSSARY OF ABBREVIATIONS AND ACRONYMS .......... v
INTRODUCTION .......... 1
JURISDICTIONAL STATEMENT .......... 4
STATEMENT OF THE ISSUES .......... 5
STATEMENT PURSUANT TO CIRCUIT RULE 28-2.7 .......... 6
STATEMENT OF THE CASE .......... 6
A. BPA's role in the Pacific Northwest. .......... 6
B. The decision at issue. .......... 7
C. BPA examined the FERC relicensing issue and determined that, for CHWM purposes, it was reasonable to account for the fact that FERC increased Grant's right to output of Priest Rapids. .......... 11
D. BPA's final determination of Grant's "Attachment A" amount in the CHWM Policy. .......... 15
SUMMARY OF ARGUMENT .......... 16
STANDARD OF REVIEW .......... 19
ARGUMENT .......... 20
I. GRANT'S FIRST ARGUMENT IS BASELESS; BPA'S DECISION HAS NOT DENIED GRANT ACCESS TO ANY POWER, BECAUSE THE CHWM POLICY RELATES ONLY TO PRICE. .......... 20
A. The statutory provision Grant relies on does not govern BPA's CHWM Policy decision. .......... 21
B. Grant's statutory interpretation of section 5(b)(1) is irrelevant. .......... 24
C. In reality, Grant's argument seeks special price treatment—to which no customer is entitled. .......... 25
II. GRANT'S SECOND ARGUMENT IS A DISTRACTION; BPA'S CORRECTION TO THE CHWM ROD DID NOT VIOLATE THE APA. .......... 27

A. Grant's inconsistency argument is moot; the correction in the ROD had no impact on Grant's CHWM amount. .......... 28

B. During the administrative process Grant was well aware BPA planned to use 63.3% to represent Grant's relicensing right and Grant never contested it. .......... 29

C. There was no change in position or inconsistency in BPA's reasoning. .......... 31

III. NRU'S TRAETOW DECLARATION IS IMPERMISSIBLE; THE COURT SHOULD DISREGARD ALL PORTIONS OF NRU'S BRIEF THAT RELY ON IT. .......... 33

IV. NRU'S FIRST ARGUMENT IS UNFOUNDED; BPA HAD AMPLE AND WELL-EXPLAINED REASONS FOR ITS APPROACH TO GRANT. .......... 36

V. NRU'S SECOND ARGUMENT IS REPETITIVE; BPA WAS JUSTIFIED IN DEVELOPING A DIFFERENT APPROACH FOR GRANT AS COMPARED TO OTHER CUSTOMERS. .......... 41

VI. THE COURT SHOULD DECLINE TO CONSIDER NRU'S THIRD ARGUMENT. .......... 43

A. NRU's third argument relies entirely on impermissible extra-record material. .......... 43

B. Even if BPA applied the PNCA value proposed by NRU, the result would not change Grant's CHWM. .......... 44

C. If the Court is inclined to consider NRU's third argument, BPA requests the opportunity to submit supplemental briefing and a counter-declaration. .......... 45

VII. VACATUR WOULD BE PREMATURE. .......... 45

CONCLUSION .......... 46

STATEMENT OF RELATED CASES, CIRCUIT RULE 28-2.6 .......... 46

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Alcoa v. Cent. Lincoln People's Util. Dist.*, 467 U.S. 380 (1984)........ 25

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009).......................................................................................... 36

*Ass'n of Am. R.Rs. v. ICC*, 846 F.2d 1465 (D.C. Cir. 1988)............... 32

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir. 1997)................................................................ 6

*Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. Zinke*, 889 F.3d 584 (9th Cir. 2018)........................................... 43

*Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101 (9th Cir. 1984)...........................................................................7, 25, 26

*Fla. Power & Light v. Lorion,* 470 U.S. 729 (1985) ......................34, 35

*Food and Drug Admin. v. Wages and White Lion Investments, LLC*, 604 U.S. 542 (2025).............................................19, 20, 29, 32

*Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037 (9th Cir. 2007) ...............................................................7, 17, 25

*Humane Society of U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010)...... 28

*Idaho Conservation League v. Bonneville Power Admin.*, 142 F.4th 636 (9th Cir. 2025) ................................................................... 6

*Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 767 F.3d 912 (9th Cir. 2014)................................................................ 19

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005).............35, 36

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .......................................................................................................... 20

*Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147 (D.C. Cir. 1990).........................................................................31, 32

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014) ........................................................................... 35

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,* 513 U.S. 18 (1994)................................................................................................ 46

*Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312-13 (1982) ........... 46

**Statutes**

5 U.S.C. § 706 .......................................................................... 19
16 U.S.C. §§ 832-832l .......................................................................... 6, 8
16 U.S.C. § 832c.......................................................................... 6
16 U.S.C. § 832d .......................................................................... 26
16 U.S.C. § 837b .......................................................................... 14
16 U.S.C. § 839a .......................................................................... 44
16 U.S.C. § 839c..........................................................................9, 21, 22
16 U.S.C. § 839f.......................................................................... 5, 19
Wash. Rev. Code § 19.280.030.......................................................................... 31

**Rules**

9th Cir. R. 15-3.2 .......................................................................... 47

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BPA | Bonneville Power Administration |
| CHWM | Contract High Water Mark |
| CHWM Policy | BPA's Contract High Water Mark Implementation Policy, August 14, 2025 |
| FERC | Federal Energy Regulatory Commission |
| Grant | Petitioner Public Utility District No. 2 of Grant County, Washington |
| NLSL | New Large Single Load |
| NRU | Petitioner Northwest Requirements Utilities |
| NWPA | Pacific Northwest Electric Power Planning and Conservation Act of 1980 ("Northwest Power Act"), 16 U.S.C. § 839 *et seq*. |
| PNCA | Pacific Northwest Coordination Agreement |
| POC Policy | BPA's Provider of Choice Policy, March 2024 |
| ROD | BPA's Contract High Water Mark Implementation Policy Record of Decision, August 14, 2025 |
| 5(b)9(c) Policy | BPA's Revised Policy on Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act, October 1, 2011 |

## INTRODUCTION

In these consolidated cases Petitioners present diametrically-opposed arguments challenging a power-pricing policy; the cases involve no statutory interpretation and present only a question of whether the court should adopt either Petitioner's position, or, uphold the middle ground that Bonneville Power Administration (BPA) set forth in its rational, fact-driven decision.

BPA is a federal power marketing administration that sells power to various customers, the primary group of which are called "preference" customers because they have a statutory right of preference and priority over others wishing to buy power from BPA. This court has held that preference customers are entitled to preference and priority to the *supply* of federal power, but not at a particular *price*. Thus, the *amount* of power to which a preference customer is entitled is a statutory matter; the *price* of that power, however, is a policy matter. No customer has been denied access to the supply of federal power in this case; the only issue is the amount of power the customer may purchase at the lower rate versus the higher rate.

BPA's power is priced at different rate "tiers." Power purchased at the Tier 1 rate is typically lower cost than at Tier 2. Thus, BPA's preference customers generally want as much of their power priced at Tier 1 as possible. However, the total amount of power sold at the Tier 1 rate is finite—the more that's sold to one customer at Tier 1, the less is available for all the others.

The tier that a BPA customer may purchase from depends on that customer's "Contract High Water Mark" or "CHWM," a value that is driven by BPA's CHWM Implementation Policy (CHWM Policy)—the subject of these petitions. The CHWM is a customer-specific limit established by BPA to define how much power a customer may purchase at the Tier 1 rate. CHWM is influenced (in part) by the amount of power a customer can draw from its *own* power resources to serve its *own* needs. The more power a customer has available from its own resources, the lower their CHWM will be and the less Tier 1-priced power they can buy from BPA. Consequently, each customer has an obvious interest in minimizing its own resources for CHWM purposes.

Petitioners are Public Utility District No. 2 of Grant County, Washington (Grant), a BPA preference customer, and Northwest

Requirements Utilities (NRU), a trade group representing many of BPA's other preference customers. They both challenge how BPA applied the CHWM Policy to Grant.

Grant wants more of the power it purchases from BPA to be priced at the lower cost Tier 1 rate. In contrast, NRU, which represents many of BPA's other preference customers, asserts that Grant is entitled to less Tier 1 priced power than BPA originally calculated. The determining factor in this struggle, and the focus of both Petitioners' briefs, is the amount that BPA attributed to Grant's Priest Rapids hydro resource in the CHWM Policy. Grant argues that more of Priest Rapids was counted against it than should have been; NRU contends not enough. But the record supports BPA's reasonable and fair assessment of Priest Rapids in its CHWM calculation for Grant.

Grant asserts legal arguments that conflate the statutory preference right to supply of federal power with price. Grant contends the CHWM Policy deprived Grant of access to power to which it is entitled. But the CHWM Policy dealt only with the price of power. A preference customer's entitlement to BPA power is a statutory matter and one that the CHWM Policy did not decide. Grant's statutory

argument is therefore inapposite; it applies only to the statutory process of determining how much power a customer is entitled to access—not to the policy determination of what price applies.

NRU's legal arguments—which are heavily dependent on an improper extra-record declaration—are also unpersuasive. NRU contends BPA arbitrarily set aside a governing methodology, but the standards NRU invokes did not establish a methodology for the situation at hand. Additionally, BPA explained Grant's situation was unique and would require individualized treatment.

The record shows that BPA thoroughly considered the relevant factors and explained its reasoning to support its reasonable and fair accounting of Grant's Priest Rapids resource for Grant's CHWM. BPA's approach avoids giving Grant a windfall of Tier 1 priced power at the expense of all of BPA's other preference customers. The Court should deny these petitions and affirm BPA's CHWM Policy.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction. Section 9(e)(5) of the Northwest Power Act (NWPA) vests this Court with original jurisdiction to review

challenges to BPA final actions taken pursuant to its authorities. 16 U.S.C. § 839f(e)(5).

## STATEMENT OF THE ISSUES

1. Grant Issue 1: Did BPA wrongly deny Grant access to power when it determined Grant's Priest Rapids amount for purposes of the CHWM Policy?
2. Grant Issue 2: Did BPA engage in an arbitrary "inconsistency" by issuing a revised ROD to correct a figure that (1) did not impact Grant's CHWM, (2) was consistent with parties' understanding, and (3) maintained BPA's prior reasoning?
3. NRU Issue 1: Should NRU's Traetow declaration be disregarded as improper extra-record material?
4. NRU Issue 2: Did BPA arbitrarily depart from an existing methodology?
5. NRU Issue 3: Did BPA arbitrarily treat Grant differently than other customers?
6. NRU Issue 4: Should the Court decline to consider NRU's third argument given that it is based entirely on the extra-record declaration rather than the administrative record?

## STATEMENT PURSUANT TO CIRCUIT RULE 28-2.7

The full NWPA and the Regional Preference Act of 1964 (Preference Act) are included in the addendum.

## STATEMENT OF THE CASE

### A. BPA's role in the Pacific Northwest.

BPA is a federal power marketing agency created by Congress in 1937 to market electric power from the Federal Columbia River Power System. 16 U.S.C. § 832c(a); *see generally* 16 U.S.C. §§ 832–832*l*; *Idaho Conservation League v. Bonneville Power Admin.*, 142 F.4th 636, 638 (9th Cir. 2025). BPA sells power throughout the Pacific Northwest, accounting for about a third of the power generated in the region. *Id.*

BPA's primary customers are "public utilities and other public entities who purchase power for resale to the ultimate consumer." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1164 (9th Cir. 1997). These entities are often called BPA's "preference customers" because they have a statutory right of priority and preference over non-preference entities when there are competing requests for power from BPA. *See* 16 U.S.C. § 832c(a) (requiring BPA to "give preference and priority to public bodies and cooperatives.").

This Court has established that preference is about access to power supply; it does not give customers a right to a particular price. *Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037, 1046 (9th Cir. 2007) ("[we have] rejected the premise that preference customers were entitled to purchase not just available power, but the cheapest available power.") (citing *Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1125 (9th Cir. 1984) (internal quotation omitted)); *see also* SER-31 (POC ROD, Mar. 2024).

**B. The decision at issue.**

Petitioners name BPA's CHWM Policy, and its associated ROD, as the subject of their petitions. Grant Petition at 1; NRU Petition at 1. But their challenges are only to the portion of the Policy dealing with Grant's Priest Rapids resource, specifically "Attachment A" of the Policy, which is titled "Resources for FY 2026 CHWM Calculation." 1-GrantER-20. As that title implies, Attachment A is the key document where BPA listed the resource amounts that it would use in calculating all its customers' CHWMs (and thus the amount of Tier 1-priced power they would have access to). 1-GrantER-20–30.

Attachment A contains the single number Petitioners seek to overturn: the resource amount BPA used for Grant's Priest Rapids Project, 400.836 aMW (average megawatts). 1-GrantER-23.

BPA explained how it arrived at this resource amount in the ROD. 1-NRUER-0045–119. The explanation is labeled "Issue 13," and is by far the most extensive issue discussed in the ROD. 1-NRUER-71–86.

Importantly, Issue 13 begins by pointing out there are two distinct reasons why BPA looks at a customer's resource amount: (1) "to determine the customer's net requirement," and (2) "to determine their CHWM for the purpose of applying tiered rates." 1-NRUER-74–75; 1-NRUER-78.

The first, determination of net requirements, is a statutory matter. A customer's net requirement determines the "*amount* of firm power a customer can purchase from Bonneville." 1-NRUER-75 (emphasis added). Various statutory provisions apply to this determination. 1-NRUER-74–75 (citing NWPA sections 5(b)(1) and 9(c), and Preference Act section 3(d)). Because it is a statutory determination

that must be memorialized in a contract,[1] this amount is reflected in a customer's Exhibit A to their contract.

The second, determination of CHWM, is a policy matter. A customer's CHWM determines "the amount of power the customer can purchase *at a PF Tier 1 rate*." 1-NRUER-75 (emphasis added). There are no statutory provisions that apply to this determination. *See id.* (citing no statutes). Since it is a policy determination (a decision as to what rate will apply), customers' resource amounts used in the CHWM calculation are reflected in Attachment A to the CHWM Policy. 1-NRUER-83 (describing the difference between Attachment A and Exhibit A, and explaining "the CHWM Policy and this ROD will focus on the [Priest Rapids] resource application *for purposes of the CHWM*." (emphasis added)). Ultimately, the CHWM drives what rate will apply because "the larger the [Attachment A] amount of PRP Bonneville considers as serving Grant's . . . load, the smaller Grant's CHWM will

[1] *See* 16 U.S.C. § 839c(b)(1)(B). The customer determines which resources they wish to commit to use to serve their load and such resource amounts (energy and capacity) are determined and identified in their contract with BPA.

be and its eligibility to purchase firm power at the PF Tier 1 rate." 1-NRUER-75.

Grant's situation was "a unique position compared to other customers . . . ," *id.*, because it was BPA's only customer that did not have a preceding contract with BPA (known as the Regional Dialogue, or RD, contract).[2] For all other customers, those preceding contracts were where BPA had determined each customer's resource amounts. Since Grant had no such contract, BPA would need to construct a new determination of Grant's Priest Rapids resource amount to use in the CHWM calculation. *See*, *e.g.*, SER-9.[3]

In making this determination, BPA explained that "[t]hree factual developments have occurred which impact how Bonneville accounts for the size of the PRP . . . ." 1-NRUER-75. The developments were: (1) the

---

[2] Technically, Grant did have a small Regional Dialogue contract, but all parties recognize it is not relevant here since it was for a small, isolated, and uniquely situated portion of Grant's system. SER-39 (discussing load at the base of Grand Coulee dam).

[3] SER-9 is a letter from Grant's CEO to the BPA Administrator acknowledging that "Grant is a returning utility and did not have a Regional Dialogue contract, and thus not a common baseline for Grant's CHWM calculation compared to other BPA . . . customers . . . ."

way Grant had treated Priest Rapids the last time it held a contract[4] with BPA; (2) the fact that Grant recalled (for its own use) a portion of Priest Rapids output that it had previously sold to other BPA customers; and—central to this case—(3) the fact that "FERC relicensed the [Priest Rapids] facility in 2008, increasing Grant's physical rights to the output of the facility." *Id.*

### C. BPA examined the FERC relicensing issue and determined that, for CHWM purposes, it was reasonable to account for the fact that FERC increased Grant's right to output of Priest Rapids.

BPA explained that,"[s]ignificantly, Grant went through a successful [Priest Rapids] relicensing at FERC which resulted in an increase in its share of [Priest Rapids] . . . ." 1-NRUER-78. BPA found it "cannot ignore these facts" and would need to take them into account for the policy purpose of calculating Grant's CHWM. 1-NRUER-78. Thus, BPA determined it would include the relicensed amount of Priest Rapids in CHWM Attachment A.

---

[4] This was two contracts ago. That is, Grant did not have a "Regional Dialogue" contract (i.e. the one BPA had used for other customers to establish their CHWMs), but it did have a contract before that, known as a "Subscription" contract. BPA did not have tiered rates at the time, and thus did not establish CHWMs under the Subscription contract.

Two factors provided guidance in reaching that determination. *First*, BPA had a related policy (known as the 5(b)9(c) Policy) that addressed the inverse situation—*i.e.*, it established that, in examining a customer's resource amounts, BPA would account for a FERC relicensing order that *reduced* a customer's access to resources. 1-NRUER-83. Thus, BPA found it was "reasonable to apply the same logic to this inverse situation." *Id*. That is, it was reasonable to account for "any *increase* in the proportional amount/share of output to a resource a customer has the right to receive . . . ." *Id*. (emphasis added).

*Second*, BPA found it reasonable to look at Grant's actual use of Priest Rapids, namely, the fact that Grant had been using the increased FERC relicensing amount to serve its customers. *Id*. ("Bonneville is cognizant of the increase in Grant's share of PRP [due to relicensing] and that Grant is using that increased share to serve its load . . . ."). BPA pointed to various reasons why it was reasonable to consider this actual use.

For one, BPA had "clearly established" that, if it had calculated a CHWM for Grant in 2008 (*i.e.*, when calculating CHWMs for all its other customers), BPA would have treated Grant's actual use of the

Priest Rapids relicensing amount as part of the total. 1-NRUER-85. Indeed, BPA's Tiered Rates Methodology, originally issued November 2008, specifically addressed the fact that Grant would be using Priest Rapids and, as a result, there would be a "zero CHWM for Grant PUD . . . ." SER-35 (TRM, 2011 version). As a part of calculating CHWMs in 2008, BPA asked Grant for information on whether Grant planned to buy power from BPA and, if not, what Grant planned to do with Priest Rapids. Grant's General Manager responded with a formal letter to BPA "to reinforce Bonneville's understanding of Grant's intention to use the PRP to serve its own load." 1-NRUER-85; 2-GrantER-389. The letter "affirmed that [Grant] would declare 100% of the output of the PRP [*i.e.*, including the relicensing increase] to serve its retail load." 1-NRUER-85; 2-GrantER-0389 ("Grant PUD agrees with BPA . . . in that we will use 100% of the output from Priest Rapids . . . to serve retail load."). Thus, although BPA did not calculate a CHWM for Grant in 2008, BPA had "clearly established" that it would have treated Grant's actual use of the Priest Rapids relicensing amount as part of the total. 1-NRUER-85. It was consistent with this logic to do

the same thing for present purposes of determining Grant's CHWM. 1-NRUER-86.

Another reason BPA provided for why it considered Grant's actual use of Priest Rapids was section 3(d) of the Regional Preference Act of 1964 (Preference Act). 16 U.S.C. § 837b(d). This statute directs that if Northwest utilities, like Grant, have hydro resources which "could have been conserved or otherwise kept available for the utility's own needs . . ." but which the utility instead sold outside the Pacific Northwest, then BPA may only sell the utility surplus energy as replacement therefor (and surplus is generally less desirable). 16 U.S.C. § 837b(d). This means, to avoid being allowed to purchase only surplus energy, Grant had a statutory incentive to "conserve[] or otherwise ke[ep] available" Priest Rapids for its own needs, which Grant in fact did. BPA took this reality into account when determining the Priest Rapids amount for purposes of the CHWM. BPA thus concluded it was reasonable and factually accurate to assume Grant was using Priest Rapids, including the relicensing amount, to serve its own consumers' electricity needs. 1-NRUER-83.

### D. BPA's final determination of Grant's "Attachment A" amount in the CHWM Policy.

Based on its reasoning in Issue 13 of the ROD, BPA concluded it would count the FERC relicensing amount toward Grant's total Priest Rapids figure in Attachment A of the CHWM Policy. 1-NRUER-86. BPA made clear it was doing this only "for purposes of determining Grant's CHWM," *i.e.*, the policy purpose of determining what rate would apply. *Id.*

For the statutory purpose of determining what amount of power BPA is obligated to sell to Grant, BPA made no decision in the CHWM Policy or ROD relative to the Priest Rapids relicensed amount.[5] 1-NRUER-83. Instead, BPA planned to "work with Grant ahead of its POC CHWM Contract offer to determine its Exhibit A . . . resource amounts." *Id.*

[5] Grant challenges only BPA's determination on the PRP relicensed amount. Grant Br. at 30 ("Grant focuses its challenge on the additional 112 aMW that BPA determined Grant had used to serve its own load following [Grant's] receipt of the 2008 License from FERC . . . ."). Grant does not challenge BPA's determinations on the "subscription contract" amount of 234.869 aMW and the "recalled amount" of 88.930. *Id.* at 13 ("Grant is not challenging these two numbers – 235 aMW and 89 aMW . . . .").

## SUMMARY OF ARGUMENT

The Court should deny both of these diametrically-opposed Petitions and uphold BPA's reasonable decision, which articulated a rational connection between the facts found and the choice made.

Sifting through Grant's brief reveals just two issues: (1) that BPA deprived Grant access to BPA power because it "forced" Grant to "dedicate" (i.e. use) its Priest Rapids resource to serve Grant's load (its end use consumers); and (2) that BPA acted arbitrarily by acknowledging and correcting an immaterial error in its CHWM Policy Record of Decision (ROD).

Grant's first argument is baseless because BPA has not denied Grant access to any power; the CHWM Policy relates only to the price of power. *Supra* Statement of The Case, part B. Therefore, the statutory provision that Grant's petition depends on, NWPA section 5(b)(1), does not apply. That provision relates only to BPA's determination of *how much* power Grant is entitled to purchase. It does not govern the CHWM decision on review here, which deals only with *the price* of power.

Moreover, Grant's argument seeks special price treatment. But as this Court long ago established, no BPA customer has a right to the cheapest available power. *Golden Nw.*, 501 F.3d at 1046. Grant's petition seeks a windfall for itself at the expense of BPA's other customers and should be denied.

Grant's second argument is a distraction that tries to create an issue out of an immaterial correction BPA made to the ROD. The argument is moot and can be disregarded because the correction was to a minor percentage that did not impact Grant's CHWM amount. Moreover, throughout the administrative process Grant was aware of the percentage that BPA intended to use and took no issue with it, so it was not arbitrary for BPA to correct the ROD to reflect that percentage. Lastly, Grant's suggestion that BPA changed its position or engaged in *post hoc* rationalization falls flat. The issue is whether BPA was correct to consider the fact that FERC provided Grant with an increased right to the output of Priest Rapids. The revised ROD did not alter BPA's position or reasoning on that issue.

Turning to NRU, its Opening Brief should be viewed with skepticism because of its heavy reliance on an extra-record declaration

submitted along with the brief. The declaration contains extensive new analysis and witness testimony on how NRU believes BPA should have reached its decision. Judicial review is limited to the administrative record, not some new record made through NRU's reliance on the declaration—which is pervasive.

On the merits, NRU's first argument is unfounded because it is not arbitrary to depart from a methodology if that methodology does not apply to the situation at hand. The methodology NRU invokes does not even mention the subject of this petition—the CHWM. Further, BPA made clear throughout the administrative process that Grant's situation was unique, and BPA would therefore have to develop a customized treatment that was different than for other customers. If NRU felt that applying a tailored approach to a unique circumstance was unwarranted, it could have argued for that at the administrative level but chose not to. Finally, it was reasonable for BPA to draw on corollary logic from an existing policy as guidance.

NRU's second merits argument repackages its first and fails for the same reasons. NRU also provided no record support for it.

Lastly, the Court should decline to consider NRU's third argument because it relies entirely on the impermissible declaration. In any event, that argument is moot because even if BPA applied the number NRU argues for, it would not change Grant's CHWM.

The Court should deny both petitions. Additionally, per BPA's Statement of Related Cases, the Court should handle these petitions together with Ninth Circuit Case No. 26-5.

## STANDARD OF REVIEW

This Court's review is governed by the NWPA's judicial review provision, which incorporates § 706 of the APA, 5 U.S.C. § 706. *See* 16 U.S.C. § 839f(e)(2). Under the APA, BPA's decision is upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In reviewing BPA's fact-finding and policy decisions, this Court does "not second-guess [BPA's] policy judgments," but asks only "whether [BPA] considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 767 F.3d 912, 922 (9th Cir. 2014); *see also Food and Drug Admin. v. Wages and*

*White Lion Investments, LLC*, 604 U.S. 542, 567 (2025) ("The scope of this review is narrow, and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." (quotation omitted)).[6]

## ARGUMENT

### I. GRANT'S FIRST ARGUMENT IS BASELESS; BPA'S DECISION HAS NOT DENIED GRANT ACCESS TO ANY POWER, BECAUSE THE CHWM POLICY RELATES ONLY TO PRICE.

The bulk of Grant's brief (the first 44 pages, at least) boils down to one fundamentally incorrect premise: that BPA denied Grant access to some amount of power to which it is entitled. This fallacy is repeated throughout, from the first page, "[BPA] require[d] Grant to 'dedicate' a portion of [Priest Rapids] to Grant's retail load, wrongfully *reducing Grant's entitlement to federal hydropower* under the Northwest Power Act," Grant Br. at 1 (emphasis added), to the last page, "BPA's CHWM Policy and ROD . . . wrongly *reduc[ed] Grant's entitlement to purchase power* from BPA . . . [so the Court should remand to] *reflect the full*

[6] As explained below, there is no issue of statutory interpretation. Therefore the *de novo* standard of review articulated in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) does not apply.

*scope of Grant's entitlement to federal power*." *Id.* at 56-57 (emphasis added).

The fundamental problem with this claim is that the decision Grant has challenged here (BPA's determination of the Priest Rapids relicensing amount for purposes of the CHWM) did not impact the amount of power Grant can purchase—it did not "reduce Grant's entitlement to federal power." The decision impacts only the price Grant will pay for that power, and Grant has no entitlement as to price. *Supra* Statement of The Case, part B. Once this is understood, Grant's main argument collapses. *See* Grant Br. at 1-49.

### A. The statutory provision Grant relies on does not govern BPA's CHWM Policy decision.

The foundation of Grant's argument is that BPA unlawfully reduced Grant's entitlement to power under section 5(b)(1) of the NWPA, 16 U.S.C. § 839c(b)(1). Grant Br. at 36-44. This provision is commonly known as BPA's statutory obligation to meet a customer's "net requirements," because BPA is obligated to supply power net of what the customer's own resources can provide. *Id.* Thus, to determine the size of Grant's net requirement, BPA must first determine what resources Grant has "dedicated" to serve its own load. *Id.* at 37-38.

Grant correctly identifies the two ways a resource can be dedicated: either it existed and was used by the customer prior to 1980 to serve its firm load in the region, or the customer dedicated it in their contract with BPA. *See* 16 U.S.C. § 839c(b)(1)(A), (B).

But Grant is *incorrect* that section 5(b)(1) governs the CHWM Policy and ROD that they have challenged here. While the CHWM Policy and ROD examined Grant's Priest Rapids resource amount, they did so "to determine [Grant's] CHWM *for the purpose of applying tiered rates*." 1-NRUER-75. This is a policy matter concerning the *price* of power, not an issue of Grant's statutory entitlement to an *amount* of power under section 5(b)(1).

Specifically, the CHWM Policy addressed "the amount of power the customer can purchase *at a PF Tier 1 rate*." *Id*; 1-GrantER-4 ("CHWMs set PF customers' maximum eligibility to access power *priced at a PF Tier 1 rate* . . . ." (emphasis added)). BPA repeatedly emphasized the distinction between this matter and the separate, statutory process of determining Grant's section 5(b)(1) net requirements. 1-NRUER-74–75; 1-NRUER-78; *supra* Statement of the Case, part B. Accordingly,

Grant's net requirement and resource dedication arguments under section 5(b)(1) are beside the point.

Naturally, the ROD does discuss net requirements and section 5(b)(1) because BPA needed to look at Priest Rapids for that purpose too. 1-NRUER-78 ("At issue is how Bonneville should apply the PRP to (1) determine Grant's net requirement and (2) calculate Grant's CHWM . . . ."). But BPA was clear these were separate inquiries, 1-NRUER-74–75, 1-NRUER-78, and "the CHWM Policy and this ROD will focus on the [PRP] resource application *for purposes of the CHWM*." 1-NRUER-83 (emphasis added).

Importantly, the CHWM Policy and ROD made no final decision on Grant's net requirement—BPA expressly saved that determination for later. *Id*. ("Bonneville will work with Grant ahead of its . . . Contract offer to determine its Exhibit A [Priest Rapids] resource amounts."). As Grant repeatedly notes, a net requirement determination requires dedication via a contract—which is exactly why BPA said it would work with Grant in its contract offer to memorialize the dedication in Exhibit A of Grant's contract. *Id*. Thus, although BPA discussed the topics of net requirements and CHWM together, BPA was clear that "the CHWM

Policy and this ROD will focus on the [PRP] resource application for purposes of the CHWM." *Id.*

Since the CHWM unequivocally did not "reduce Grant's entitlement to federal power," all of Grant's arguments based on section 5(b)(1) and the statutory determination of net requirements should be rejected. *See* Grant Br. 36-49.

### B. Grant's statutory interpretation of section 5(b)(1) is irrelevant.

Grant presents its legal theory as an issue of statutory interpretation. Grant Br. at 36-37. But, as explained, the CHWM Policy and ROD do not address the amount of power Grant can purchase from BPA under section 5(b)(1). Accordingly, Grant's petition presents no question as to the meaning of section 5(b)(1). BPA made no net requirement determination, so there is nothing to interpret regarding section 5(b)(1).

For this same reason, all of Grant's lesser arguments regarding the interpretation of section 5(b)(1) are simply irrelevant. *See id.* at 40-41 (arguing Grant's interpretation is consistent with NWPA statutory purposes), 41-42 (arguing Grant's interpretation is supported by

legislative history), 42-43 (arguing BPA departed from its prior interpretations of section 5(b)(1)).

### C. In reality, Grant's argument seeks special price treatment—to which no customer is entitled.

Grant's interest in this petition is clear: Grant wants more of BPA's affordable Tier 1-priced power to use *in place of* its Priest Rapids resource. But it is well-settled that no statutory provision gives Grant any right to a particular price. *Golden Nw.*, 501 F.3d at 1046 ("[we have] rejected the premise that preference customers were entitled to purchase not just available power, but the cheapest available power.") (citing *Cent. Lincoln*, 735 F.2d at 1125 (internal quotation omitted)); *see also Alcoa v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 393 (1984) (noting that "the preference system merely determines the priority of different customers when the Administrator receives 'conflicting or competing' applications for power . . . ."); SER-31 (POC ROD, Mar. 2024, explaining that preference applies to access, not price). The rate directives governing BPA's wholesale power rates simply provide that

BPA's rates must be "cost based"—and there is no allegation here that BPA has violated that provision.[7]

Simply put, if Grant did not like the amount of Tier 1-priced power it would get as a result of the CHWM, it did not have to execute a contract to buy from BPA.[8] Grant just wants more of BPA's affordable Tier 1-priced power to use *in place of* Priest Rapids. But as this Court long ago established, Grant has no right to the cheapest available power, *Cent. Lincoln*, 735 F.2d at 1125, and thus no right to demand more of it to use in place of its own resources (or in place of purchases priced at Tier 2).

Indeed, validating Grant's position that it is *entitled* to more Tier 1-priced power would not only violate the ironclad principle that BPA customers have no right to a particular price, it would also be a

[7] It is undisputed that Tier 1 and Tier 2 are cost-based rates. Both are levels of BPA's "Priority Firm" or "PF" rate, which is the cost-based rate applicable to preference customers like Grant. SER-14.

[8] Parties purchasing power from BPA must be prepared to accept the standardized contract terms BPA offers, including the rates applicable to those contracts. 16 U.S.C. § 832d(a) (stating BPA's contracts for the sale of electricity "shall contain such terms and conditions . . . as *the administrator* may deem necessary . . . ." (emphasis added)).

windfall for Grant at the expense of BPA's other customers. There is a finite amount of power available at the Tier 1 rate, so if Grant gets more at this rate, then all of BPA's other customers will get less. 2-GrantER-329 (explaining "proportional share" adjustment).[9] BPA's CHWM Policy avoids this fundamental unfairness by accounting for Grant's Priest Rapids resource in a reasonable manner. The Court should uphold it and deny Grant's petition.

## II. GRANT'S SECOND ARGUMENT IS A DISTRACTION; BPA'S CORRECTION TO THE CHWM ROD DID NOT VIOLATE THE APA.

Grant attempts to create a claim by taking issue with a correction BPA made to the CHWM ROD. Grant Br. at 49-56. Grant's argument here mostly rehashes the incorrect "forced dedication" theory from its first argument and the assertion that Grant was denied some entitlement to power. *Id.* at 49-50 ("If this Court concludes . . . that BPA may forcibly dedicate 'relicensing' power from the Priest Rapids Project, it must remand to BPA . . . ."), 56 ("It is *only* the dedication in a contract that affects [Grant's] entitlement . . . ." (emphasis in original)). Since

[9] If the Court were to remand, BPA would have to recalculate the CHWMs for all its customers, because the CHWMs are interdependent.

the thrust of this argument merely repeats Grant's prior incorrect points, the Court should reject it for the same reasons.

But, to the extent Grant is arguing some independent procedural violation, based on *Humane Society of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010), that fails too because BPA's revised ROD did not constitute "inadequately explained inconsistent reasoning." Grant Br. at 52 (describing *Locke*). As discussed below, (1) this issue is moot because the revised ROD did not impact Grant's CHWM amount; (2) correcting the percentage to 63.3% is not arbitrary or an abuse of discretion because Grant knew that was the percentage BPA intended to use and Grant accepted it throughout the administrative process; and (3) there is no APA "inconsistency" because BPA's reasoning remained the same in the revised ROD.

### A. Grant's inconsistency argument is moot; the correction in the ROD had no impact on Grant's CHWM amount.

While BPA's ROD originally stated that Grant's right to Priest Rapids as a result of relicensing was 63.5%, the revised ROD acknowledged the correct percentage was 63.3% and added roughly five

paragraphs explaining that figure. 3-GrantER-591–93 (revised ROD, redline). Grant's argument about this correction is moot.

If there was any APA violation (which, as discussed below, there was not) it would have amounted to harmless error because the corrected percentage had no impact on the Priest Rapids amount in Attachment A of the CHWM Policy. *See Food and Drug Admin.*, 604 U.S. at 590 ("When it is clear that the agency's error had no bearing on the procedure used or the substance of the decision reached, a remand would be pointless." (internal quotation omitted)). The percentage difference, when run through the methodology outlined in the CHWM ROD, was too small to impact the Attachment A number. Since Attachment A of the CHWM Policy was entirely unchanged, the change in percentage had no impact on Grant's CHWM. 1-GrantER-23. It is therefore moot that BPA changed five paragraphs of the ROD to explain the corrected relicensing percentage. Those paragraphs and the corrected percentage had no impact on Grant.

### B. During the administrative process Grant was well aware BPA planned to use 63.3% to represent Grant's relicensing right and Grant never contested it.

The 63.3% figure is no surprise to Grant. During the administrative process, BPA and Grant worked together on how Priest Rapids should be treated for purposes of CHWM. Throughout this months-long process BPA repeatedly shared its calculations with Grant, in which BPA was plainly using 63.3% as the figure for Grant's relicensing amount. SER-15–16;[10] SER-17–19.[11] In fact, Grant even provided a proposal to BPA with their own version of a calculation table showing "our 63%," with a line on the table labeled "63% PRP." SER-11. Far from contesting this percentage, Grant acknowledged it[12] and used it in their own proposals for how BPA should account for Priest Rapids.

[10] This is a BPA email to Grant on March 13, 2025, with a spreadsheet attached that was labeled "Grant CHWM Attachment A Amounts_Breakdown.xlsx." SER-15. Near the lower, right of the spreadsheet is a table called "PRP Amounts" with a line describing the "Grant Right at 63.31%." SER-16.

[11] This is a BPA email to Grant on March 10, 2025, with a spreadsheet attached labeled "Attachment A Calc.xlsx." SER-17. In the second table of the spreadsheet, BPA discusses "Grant's Physical Rights" to the Priest Rapids Project and, twice, describes them as "63.31%." SER-19.

[12] As they must. Clear evidence has been in the record all along (even before BPA corrected the ROD) where Grant acknowledges: "Grant County PUD holds the physical rights to 63.31% of this [PRP] development." SER-23. This statement is from Grant's 2024 Integrated Resource Plan, a legal document that Grant is required to file with the

Grant was hardly caught off guard by "entirely new material to explain [BPA's] view that Grant has a right to 63.3% of the Priest Rapids Project . . . ." Grant Br. at 51. Although BPA made an error in its original ROD by describing the percentage as 63.5%, it was not arbitrary or an abuse of discretion for BPA to correct that since the record plainly shows BPA intended to use 63.3% all along, and Grant was well aware of this figure and agreed with it.

### C. There was no change in position or inconsistency in BPA's reasoning.

The issue Grant has presented in this case is that BPA, for purposes of the CHWM, should not have included Grant's increased right to Priest Rapids resulting from the FERC relicensing. *See* Grant Br. at 1-2, 30. BPA did not change its position or reasoning on that issue in the revised ROD, so Grant's attempt to cast this as a procedural "inconsistency" falls flat.

Agencies are allowed to correct mistakes, and should be encouraged to do so, not penalized for it. Only when an agency "has opened the issue up anew" will its action become "substantively

---

Washington State Department of Commerce. *See* Wash. Rev. Code § 19.280.030.

reviewable." *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990) (quoting *Ass'n of Am. R.Rs. v. ICC*, 846 F.2d 1465, 1473 (D.C. Cir. 1988)). Similarly, under the "change in position" doctrine, the first question is "whether an agency changed existing policy." *Food and Drug Admin.*, 604 U.S. at 569.

Before and after the revised ROD, BPA's position and reasoning remained exactly the same. *Compare* 1-NRUER-75 (revised ROD) *with* 3-GrantER-590 (redline of original ROD, showing no change to reasoning); *compare* 1-NRUER-78 (revised ROD) *with* 3-GrantER-594 (redline of original ROD, showing no change); *compare* 1-NRUER-83 (revised ROD) *with* 3-GrantER-598 (redline of original ROD, showing no change). These unchanged pages are where BPA explained its reasoning on the FERC relicensing issue.

Namely, that Grant was in "a unique position compared to other customers," since it was BPA's only customer that did not have a preceding contract with BPA, so for purposes of CHWM, BPA would have to determine the Priest Rapids amount from scratch. 1-NRUER-75. One key part to that determination was the fact that "FERC relicensed the PRP facility in 2008, increasing Grant's physical rights to

the output of the facility." *Id.* BPA explained this was a "significant" fact which BPA "cannot ignore" in calculating Grant's CHWM. 1-NRUER-78. BPA then explained why it was reasonable to take this significant fact into account. 1-NRUER-83.

In short, nothing about BPA's position or reasoning changed on the issue Grant has presented in this case (that BPA should not have included Grant's increased right to Priest Rapids resulting from the FERC relicensing). Accordingly, there is no APA "inconsistency" violation. BPA merely corrected the *percentage* that derived from relicensing, and pointed to Grant's own statements in official legal documents to explain that percentage. 3-GrantER-591–93 (revised ROD, redline).

## III. NRU'S TRAETOW DECLARATION IS IMPERMISSIBLE; THE COURT SHOULD DISREGARD ALL PORTIONS OF NRU'S BRIEF THAT RELY ON IT.

NRU's Opening Brief relies heavily on a post-decisional, extra-record declaration filed along with the brief (Traetow declaration). The declaration goes far beyond any permissible purpose of establishing NRU's standing. It offers the declarant's opinion on the issues in the

case, and contains extensive new analysis and advocacy regarding how BPA should have reached its decision.

Petitioner Grant filed a motion to strike the Traetow declaration and portions of NRU's brief that rely on it. *See* Motion to Strike the Declaration of Emily Traetow (May 26, 2026), Dkt. Nos. 35, 36. BPA agrees with Grant that the declaration is improper extra-record material, and BPA generally agrees with Grant's detailed descriptions of why individual paragraphs in the declaration are improper.[13] *Id.* at 9-14. Because of Grant's coverage of this topic, BPA adds only two points.

*First*, NRU's brief pervasively relies on the post-decisional Traetow declaration to attack the merits of the CHWM Policy decision. The brief cites the declaration 46 times, spanning well over half the pages of the brief. *See* NRU Br. at 1-4, 13-15, 17, 20-24, 31-39, 43. This is prejudicial and irrelevant to this Court's review of the administrative record for the decision. NRU cannot create "some new record made initially in the reviewing court." *Fla. Power & Light v.*

[13] While BPA agrees with the thrust of Grant's motion (that the Traetow declaration is improper extra-record material), BPA does not agree with certain background statements in the motion which repeat Grant's position that BPA denied Grant access to power.

*Lorion,* 470 U.S. 729, 743-44 (1985). "[P]ost-decision information . . . may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) (internal quotation omitted). Because NRU's brief uses the declaration so extensively as affirmative support for NRU's position, the Court should view the entire brief with skepticism.

*Second*, NRU is effectively asking the Court to proceed *de novo* by substituting NRU's preferred analysis for BPA's. But NRU had ample opportunity to develop its position in the administrative process that led to the CHWM Policy. NRU participated and commented extensively in that process—indeed, the declarant Ms. Traetow served as NRU's lead analyst throughout the process. SER-4–8. The Traetow declaration simply continues that role, attempting to build a new record of post-decisional evidence before the Court.

"Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions . . . the federal courts would be proceeding, in effect, *de novo* rather than with the proper deference to agency processes, expertise, and decision-making." *Lands Council v.*

*Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) ("The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively *de novo* review." (internal quotation omitted)). The Court should ignore NRU's belated attempt to engage in *de novo* factual and policy analysis.

## IV. NRU'S FIRST ARGUMENT IS UNFOUNDED; BPA HAD AMPLE AND WELL-EXPLAINED REASONS FOR ITS APPROACH TO GRANT.

BPA thoroughly explained the unique circumstance and justifications for its determination of Grant's Priest Rapids resource amount used in the CHWM Policy. *See* 1-NRUER-71–86 (Issue 13 of CHWM Policy ROD). Despite this, NRU's goal is to have more of the Priest Rapids resource applied to Grant, resulting in a lower CHWM, and therefore less of Grant's power purchase from BPA would be priced at a Tier 1 rate. There are several problems with NRU's argument, and the ROD shows BPA considered the relevant factors and articulated a rational connection between the facts found and the choice made.

*First*, NRU is simply incorrect that the POC Standards[14] are the methodology that BPA should have used, *see* NRU Br. at 23, because they do not establish a methodology for use in Attachment A. Instead, the POC Standards expressly state that they apply to: "population of *Exhibit A*." 2-NRUER-260 (emphasis added); *see also* 2-NRUER-259 (POC Standards, stating they are to be used for "resources included in customers' *Exhibit A*." (emphasis added)).[15] Exhibit A of a customer's contract is distinct from Attachment A to the CHWM Policy.

As explained *supra*, Statement of the Case part B, the determination at issue in this case is the Priest Rapids resource value included in *Attachment A* and used for purposes of determining Grant's CHWM. The POC Standards that NRU relies on established a

---

[14] The Provider of Choice Contract Exhibit A Standards for Resource Declarations (POC Standards) provide the metric, by resource category, that BPA will use to establish the amount of power for a customer's non-federal resources in Exhibit A of the customer's contract. *See* 2-NRUER-259–64.

[15] BPA also made this point in a presentation at a public workshop when discussing the POC Standards: "The Standards: Establish the amount of power from customers' 5(b)(1) resources included in customers' Exhibit A." SER-21.

methodology only as to Exhibit A of the contract; they did not speak to Attachment A of the CHWM Policy.[16]

Indeed, BPA concluded that CHWM Attachment A and Contract Exhibit A could reflect different amounts. 1-NRUER-83. The CHWM Policy stated: "Bonneville will not require that Grant's CHWM Policy Attachment A and POC CHWM Contract Exhibit A non-federal resources be applied in the same manner, which may result in different amounts. Rather the CHWM Policy and this ROD will focus on the non-federal resource application *for purposes of the CHWM*." *Id*. (emphasis added).

Nowhere in the POC Standards do they purport to bind BPA's determination of CHWM Attachment A values. In fact, the POC Standards do not even mention the terms "CHWM" or "Contract High Water Mark." *See* 2-NRUER-259–64. BPA did not "depart" from the POC Standards here; those standards simply do not establish a

---

[16] NRU admits, throughout its brief, that the POC Standards apply to Exhibit A. NRU Br. at 1, 16-17 ("This [POC Standard] is the standard BPA applies when populating PNCA-resource customers' Exhibit A for the POC contract . . . ."), 26, 28, 30, 33, 36-37, 40.

methodology for determining resource values for the calculation for CHWMs.

*Second*, BPA's decision not to apply inapplicable standards was not arbitrary because BPA expressly stated throughout the administrative process that Grant's unique history would warrant unique treatment. NRU was well aware of, and did not challenge, BPA's policy decision that Grant's CHWM determination would not be performed in a manner identical to other customers. BPA explained early in the multi-year POC process that Grant would need unique treatment because it had a limited "Regional Dialogue contract for service only to a discrete part of its retail load." 2-NRUER-294 (POC Policy, Mar. 2024[17]). BPA explained in the March 2024 POC Policy: "Grant presents a unique exception as a returning public customer, and Bonneville will establish Grant's CHWM for the first time." *Id*.

In the POC Policy BPA determined it would "apply a *similar* CHWM calculation methodology for Grant as all other PF customers. However, there will be some unique considerations based on Grant's

[17] The March 2024 POC Policy was a foundational document that laid the groundwork for the later CHWM Implementation Policy being challenged here. 1-GrantER-4.

status as a returning utility." *Id.* (emphasis added). BPA specified that the calculation of Grant's CHWM would be *similar* to all other PF customers, but did not require it be identical in all respects—an important policy point that NRU ignores. If NRU had wanted the calculation to be *identical* to other customers, NRU could have challenged the POC Policy after it became final in March 2024. Neither NRU nor any other party raised any challenge to that Policy—indeed, NRU specifically commented that it "had no objection" to it. SER-26.

*Third*, BPA's custom approach to Grant's CHWM was not arbitrary because it was informed by analogous guidance in the 5(b)9(c) Policy and applied logic consistent with that guidance to the situation at hand. NRU and BPA both acknowledge that the 5(b)9(c) Policy does not address how BPA will treat a resource *increase* due to FERC relicensing. 2-NRUER-268; 1-NRUER-83. However, the Policy does address what happens when a resource is *decreased* due to a FERC relicensing: "any reduction in firm rights from a FERC relicensing order would be netted against the firm non-federal resource amounts dedicated in a customer's contract." 1-NRUER-83. BPA applied this same logic for purposes of establishing Grant's CHWM, finding it was

reasonable to treat an increase to a resource due to FERC relicensing in a similar manner as a decrease. *Id.* BPA explained such treatment was reasonable because it is "consistent with the 5(b)9(c) Policy ROD to determine that any increase . . . would be used to serve a utility's load in a similar fashion to historically dedicated resource amounts." *Id.*

*Finally*, NRU contends BPA also violated the APA because it failed to "acknowledge the departure from its established approach and provide a reasoned explanation for that departure . . . ." NRU Br. at 29. As explained above, the POC Standards did not establish a methodology for determining the amount of Priest Rapids to include in the calculation of CHWMs, therefore there was no "departure" to explain and BPA was not arbitrary when it gave unique consideration to the Priest Rapids resource for CHWM purposes.

## V. NRU'S SECOND ARGUMENT IS REPETITIVE; BPA WAS JUSTIFIED IN DEVELOPING A DIFFERENT APPROACH FOR GRANT AS COMPARED TO OTHER CUSTOMERS.

NRU's second issue is that "BPA used unverified, internally constructed amounts rather than the PNCA Final regulation data for Grant PUD – contrary to what its own POC Standards require . . . ." NRU Br. at 30-31. This is the same point as NRU's first issue discussed

in Argument, Section A of their brief. Both sections of argument (A and B) argue that the POC Standards applied "to every other PNCA-resource customer," *id.* at 24, and both assert that the question at issue is "whether BPA applied its own methodology to Grant PUD on the same terms it applied it to every other PNCA-resource customer." *Id.* at 25. Although NRU endeavors to make this a separate issue in their brief at 30-33, it is functionally the same as the first issue and fails for the same reasons discussed above.

Further, NRU's argument fails because NRU has provided no record evidence to support its position that the POC Standards apply to the determination of Attachment A values. NRU asserts "[t]he record establishe[d] that BPA applied the PNCA resource page methodology to all other applicable POC customers with PNCA resources . . ." yet NRU cites only to the improper Traetow declaration. *Id.* at 31. Neither NRU's brief nor the Traetow declaration cite to record material where BPA purported to bind itself to apply the POC Standards to Grant's unique situation. As discussed above, the POC Standards do not apply and thus BPA was not required to explain a departure from a standard that did not apply.

## VI. THE COURT SHOULD DECLINE TO CONSIDER NRU'S THIRD ARGUMENT.

### A. NRU's third argument relies entirely on impermissible extra-record material.

NRU's third argument is that "[e]ven if the Court rejects NRU's primary argument[s] . . . vacatur and remand remain necessary because BPA relied on the wrong PNCA figure." NRU Br. at 33. This argument is improper because it relies completely on the impermissible Traetow declaration. NRU repeatedly cites the Traetow declaration to explain and substantiate its claim that BPA used the wrong figure. *Id.* at 33-39. Indeed, NRU readily admits the declaration is *the* basis for the third claim: "Ms. Traetow's calculation proves that BPA's use of 708.5 aMW for PRP firm resource amounts is incorrect, and that the correct number is 756.585 aMW."[18] *Id.* at 36.

---

[18] In addition to being post-decisional and extra-record analysis, this is improper rebuttal—not explanation. *Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018) (upholding District Court decision to strike when the "Declaration was provided to *rebut* [the agency's analysis], not to explain it." (emphasis in original)).

BPA has explained why the Traetow declaration should be ignored as improper extra-record material. *Supra*, Argument III. This third argument relies entirely on it and should likewise be ignored.

### B. Even if BPA applied the PNCA value proposed by NRU, the result would not change Grant's CHWM.

Even if BPA applied the total capability amount that NRU proposes for Priest Rapids, this would not change Grant's CHWM. *See* NRU Br. at 34 (arguing that "[t]he correct figure is 756.585 aMW."). BPA's methodology for determining Grant's Attachment A value for Priest Rapids does not presume that every aMW of the relicensed portion of Priest Rapids would be used to serve Grant's general requirements. The Northwest Power Act distinguishes another category of customer load, known as New Large Single Load (NLSL), from a customer's general requirements. 16 U.S.C. § 839a(13). Grant has the flexibility to use a portion of Priest Rapids for its NLSL loads. 1-NRUER-86 ("The remaining [12.304 aMW] will be counted as serving NLSL loads in Attachment A."). This flexibility negates NRU's argument because the range of flexibility is larger than the increase to Priest Rapids resource capability that NRU is arguing for. So even if

BPA applied the PNCA value proposed by NRU, that would not change Grant's CHWM.

### C. If the Court is inclined to consider NRU's third argument, BPA requests the opportunity to submit supplemental briefing and a counter-declaration.

BPA staff have reviewed the Traetow declaration and are prepared to submit a counter-declaration on the new issues raised therein. BPA will not do so at this time, since it would be the same type of extra-record material as NRU has offered.[19] But if the Court wishes to consider NRU's third argument, fairness dictates that BPA be afforded the opportunity to file limited supplemental briefing on that issue and to submit a counter-declaration.

## VII. VACATUR WOULD BE PREMATURE.

The reasons above demonstrate BPA has not violated the NWPA or APA. However, if the Court rules in any respect for either Petitioner, the Court's equitable inquiry into remedy would be informed by the

[19] For this reason, BPA also does not support Grant's declaration attached to its motion to strike. Grant's declaration only serves to illustrate the "battle of extra-record material" that unfolds when judicial review is not properly confined to the administrative record.

scope of its ruling on the merits, so the Court should decline NRU's premature request for vacatur. *See* NRU Br. at 42-43.

A party seeking vacatur must demonstrate "equitable entitlement to the extraordinary remedy of vacatur." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,* 513 U.S. 18, 26 (1994). Any remedy here would involve an exercise of the Court's equity jurisdiction and must be carefully tailored to the circumstances. *See Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312-13 (1982).

## CONCLUSION

For the foregoing reasons, the Court should deny both petitions.

## STATEMENT OF RELATED CASES, CIRCUIT RULE 28-2.6

Ninth Circuit Case No. 26-5, *Public Utility District No. 2 Of Grant County, Washington v. Bonneville Power Administration*, is closely related to these two consolidated cases. *See* Petition in Case No. 26-5, at 2 (identifying Case Nos. 25-7137 and 25-7142 as related petitions). Case No. 26-5 seeks review of the contract offer that BPA provided to Grant shortly after BPA finalized the CHWM Policy. *See* Petition in Case No. 26-5, at 1. That contract implements Grant's CHWM (hence the name,

Contract High Water Mark), which is of course the subject of Grant's and NRU's challenges in these consolidated petitions.

Because of this close relationship, BPA requests that Case No. 26-5 be assigned to the same panel as these consolidated cases, and that all three cases be scheduled for oral argument together. This is consistent with the Court's Rules for BPA cases and will greatly benefit the parties and the Court by promoting efficient resolution of the overall dispute. *See* 9th Cir. R. 15-3.2 ("Petitions from related final actions or decisions may be scheduled for hearing before a single panel."). Argument time for Case No. 26-5 (beyond the time allotted to Nos. 25-7137 and 25-7142) may or may not be necessary, depending on the issues Grant raises in its opening brief in that case.

To make it easier for the same merits panel to handle all three cases, BPA paginated the administrative record in Case No. 26-5 sequentially with the administrative record for Case Nos. 25-7137 and 25-7142, so the first page of the record in No. 26-5 picks up on the page number where the prior record left off. The parties also agreed on a briefing schedule for No. 26-5 that begins immediately after briefing concludes in Case Nos. 25-7137 and 25-7142 (Grant's Opening Brief in

Case No. 26-5 is due August 5, 2026; BPA's Answering brief is due September 11, 2026; Grant's Optional Reply is due October 2, 2026).

DATE: June 26, 2026

Respectfully submitted,

MARCUS H. CHONG TIM
*General Counsel*

TIMOTHY A. JOHNSON
*Asst. General Counsel*

MARY BODINE-WATTS
*Attorney*

Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208
503-230-5085

SCOTT E. BRADFORD
*U.S. Attorney*
*District of Oregon*

SEAN E. MARTIN
*Asst. U.S. Attorney*

1000 SW Third Ave.
Suite 600
Portland, OR 97201-2902
503-727-1000

*/s/ J. Courtney Olive*
J. COURTNEY OLIVE
Special Asst. U.S. Attorney
Attorney for Respondent

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** 25-7137; 25-7142

I am the attorney or self-represented party.

**This brief contains** 8,858 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties.
[X] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *\/s\/ J. Courtney Olive*_____ **Date** _____6/26/2026_____

# ADDENDUM

# Addendum

Pacific Northwest Consumer Power Preference Act, 16 U.S.C. § 837 *et seq*. ............... A-1

Pacific Northwest Electric Power Planning and Conservation Act,

16 U.S.C. § 839 *et seq*.......................................................................................... A-6

# Pacific Northwest Consumer Power Preference; Reciprocal Priority in Other Regions

**16 United States Code** Chapter 12F (2006).
Act of Aug. 31, 1964, 78 Stat. 756.
Public Law No. 88-552, S. 1007.

Definitions

**837. Definitions**
As used in this chapter—

**837(a)**. "Secretary" means the Secretary of Energy.
[Pub. L. 88-552, §1(a), Aug. 31, 1964, (Preference Act), 78 Stat. 756, as amended by DOE Act, §302(a), 91 Stat. 578, Aug. 4, 1977.]

**837(b)**. "Pacific Northwest" means (1) the region consisting of the States of Oregon and Washington, the State of Montana west of the Continental Divide, and such portions of the States of Nevada, Utah, and Wyoming within the Columbia drainage basin and of the State of Idaho as the Secretary may determine to be within the marketing area of the Federal Columbia River power system, and (2) any contiguous areas, not in excess of seventy-five airline miles from said region, which are a part of the service area of a rural electric cooperative served by the Administrator on Dec. 5, 1980 which has a distribution system from which it serves both within and without said region.
[Preference Act, §1(b), 78 Stat. 756, as amended by Pacific Northwest Electric Power Planning and Conservation Act, §8(e), 94 Stat. 2729.]

**837(c)**. "Surplus energy" means electric energy generated at Federal hydroelectric plants in the Pacific Northwest which would otherwise be wasted because of the lack of a market therefor in the Pacific Northwest at any established rate.
[Preference Act, §1(c), 78 Stat. 756.]

**837(d)**. "Surplus peaking capacity" means electric peaking capacity at Federal hydroelectric plants in the Pacific Northwest for which there is no demand in the Pacific Northwest at any established rate.
[Preference Act, §1(d), 78 Stat. 756.]

**837(e)**. "Non-Federal utility" means any utility not owned or controlled by the United States, including any entity (1) which such a utility owns or controls, in whole or in part, or is controlled by, (2) which is controlled by those controlling such utility, or (3) of which such utility is a member.
[Preference Act, §1(e), 78 Stat. 756.]

**837(f)**. "Energy requirements of any Pacific Northwest customer" means the full requirements for electric energy of (1) any purchaser from the United States for direct consumption in the Pacific Northwest, and (2) any non-Federal utility in that region in excess of (i) the hydroelectric energy available for its own use from its generating plants in the Pacific Northwest, and (ii) any additional energy available for use in the Pacific Northwest which, under

a then existing contract, the utility (A) can obtain at no higher incremental cost than the rate charged by the United States, or (B) is required to accept.
[Preference Act, §1(f), 78 Stat. 756.]

**837(g)**. Terms not defined herein shall, unless the context requires otherwise, have the meaning given them in the March 1949 Glossary of Important Power and Rate Terms prepared under the supervision of the Federal Power Commission.
[Preference Act, §1(g), 78 Stat. 756.]

**837a. Limitation of sale, delivery, and exchange of electric energy and electric peaking capacity for use outside Pacific Northwest to surplus energy and surplus peaking capacity; notice to customers; inspection of contract drafts**

Sale of energy limited

Subject to the provisions of this chapter, the sale, delivery, and exchange of electric energy generated at, and peaking capacity of, Federal hydroelectric plants in the Pacific Northwest for use outside the Pacific Northwest shall be limited to surplus energy and surplus peaking capacity. At least 30 days prior to the execution of any contract for the sale, delivery, or exchange of surplus energy or surplus peaking capacity for use outside the Pacific Northwest, the Secretary shall give the then customers of the Bonneville Power Administration written notice that negotiations for such a contract are pending, and thereafter, at any customer's request, make available for its inspection current drafts of the proposed contract.
[Preference Act, §2, 78 Stat. 756.]

**837b. Contract terms and conditions for use of electric energy outside Pacific Northwest**

Deliveries

**837b(a)**. Any contract for the sale or exchange of surplus energy for use outside the Pacific Northwest, or as replacement, directly or indirectly, within the Pacific Northwest for hydroelectric energy delivered for use outside that region by a non-Federal utility, shall provide that the Secretary, after giving the purchaser notice not in excess of sixty days, will not deliver electric energy under such contract whenever it can reasonably be foreseen that such delivery would impair his ability to meet, either at or after the time of such delivery, the energy requirement of any Pacific Northwest customer. The purchaser shall obligate himself not to take delivery of or use any such energy to supply any load under such conditions that discontinuance of deliveries from the Pacific Northwest in sixty days would cause undue hardship to the purchaser or in his territory, and, further, the purchaser shall acknowledge full responsibility if any such hardship occurs. Deliveries by a non-Federal utility from its generating plants in the Pacific Northwest for use on its own distribution system in an area outside but contiguous to the Pacific Northwest (not including any extension of its outside service area by merger or acquisition after August 31, 1964) shall not be deemed deliveries by such utility for use outside the Pacific Northwest.
[Preference Act, §3(a), 78 Stat. 756-7.]

Future demand

**837b(b)**. Electric energy generated at Federal hydroelectric plants in the Pacific Northwest which can be conserved, for which there is no immediate demand in the Pacific Northwest at any established rate, but for which the Secretary determines there may be a demand in meeting the future requirements of the Pacific Northwest, may be delivered for use outside that region only on a provisional basis under contracts providing that if the Secretary determines at a subsequent time that, by virtue of prior deliveries under such contract, the Secretary is or will be unable to meet the energy requirements of any Pacific Northwest customer, the purchaser will return the full amount of energy delivered to him, or such portion or portions thereof as may be required, at such time or times as may be specified by the Secretary, except that the Secretary shall not require return during the purchaser's daily peak periods. The Secretary shall require the return of the energy provisionally delivered hereunder, to such extent and at such times, as may be necessary to meet demands at any established rate for use within the Pacific Northwest.
[Preference Act, §3(b), 78 Stat. 757.]

Contract for surplus capacity

**837b(c)**. Any contract for the disposition of surplus peaking capacity shall provide that (1) the Secretary may terminate the contract upon notice not in excess of sixty months, and (2) the purchaser shall advance or return the energy necessary to supply the peaking capacity, except that the Secretary shall not require such advance or return during the purchaser's daily peak periods. The Secretary may contract for the sale of such energy to the purchaser, in lieu of its return, under the conditions prescribed in subsection (a) of this section.
[Preference Act, §3(c), 78 Stat. 757.]

**837b(d)**. The Secretary, in making any determination of the energy requirements of any Pacific Northwest customer which is a non-Federal utility having hydroelectric generating facilities, shall exclude any amounts of hydroelectric energy generated in the Pacific Northwest and disposed of outside the Pacific Northwest by the utility which, through reasonable measures, could have been conserved or otherwise kept available for the utility's own needs in the Pacific Northwest. The Secretary may sell the utility as a replacement therefor only what would otherwise be surplus energy.
[Preference Act, §3(d), 78 Stat. 757.]

Limitations

**837c. Contract limitations and conditions for use of electric energy and peaking capacity of plants in other marketing areas for use within Pacific Northwest**

Any contract of the Secretary for the sale or exchange of electric energy generated at, or peaking capacity of, Federal hydroelectric plants in marketing areas outside the Pacific Northwest for use within the Pacific Northwest shall be subject to limitations and conditions corresponding to those provided in sections 837a and 837b of this title for any contract for the sale or exchange of hydroelectric energy or peaking capacity generated within the Pacific Northwest for use outside the Pacific Northwest.
[Preference Act, §4, 78 Stat. 757-8.]

**837d. Exchange contracts**

Without regard to the limitations specified in sections 837a and 837b of this title, the Secretary may enter into contracts for the exchange with areas other than the Pacific Northwest of (1) surplus energy during the Pacific Northwest storage refill period, (2) any hydroelectric energy during the Pacific Northwest storage refill period which will be returned to the Pacific Northwest in equal amounts during the same Pacific Northwest refill period or the succeeding storage drawdown period, (3) any hydroelectric energy which will be returned to the Pacific Northwest in equal amounts during the same Pacific Northwest storage drawdown period, (4) hydroelectric peaking capacity, or (5) surplus peaking capacity for energy. All benefits from such exchanges, including resulting increases of firm power, shall be shared equitably by the areas involved, having regard to the secondary energy and other contributions made by each.

[Preference Act, §5, 78 Stat. 758.]

**837e. Transmission lines for other electric energy; rates**

Transmission lines

Any capacity in Federal transmission lines connecting, either by themselves or with non-Federal lines, a generating plant in the Pacific Northwest or Canada with the other area or with any other area outside the Pacific Northwest, which is not required for the transmission of Federal energy or the energy described in section 837h of this title, shall be made available as a carrier for transmission of other electric energy between such areas. The transmission of other electric energy shall be at equitable rates determined by the Secretary, but such rates shall be subject to equitable adjustment at appropriate intervals not less frequently than once in every five years as agreed to by the parties. No contract for the transmission of non-Federal energy on a firm basis shall be affected by any increase, subsequent to the execution of such contract, in the requirements for transmission of Federal energy, the energy described in section 837h of this title, or other electric energy.

[Preference Act, §6, 78 Stat. 758.]

**837f. Purchaser priority on Pacific Northwest power; amendment of existing contracts and new contracts to include priority provisions**

The Secretary shall offer to amend, without imposing any other requirement as a condition to such amendment, all existing contracts for the sale or exchange of electric power generated at Federal hydroelectric plants in the Pacific Northwest to include, and shall include in all new contracts, provisions giving the purchaser priority on electric power generated at such plants in conformity with the provisions of this chapter.

[Preference Act, §7, 78 Stat. 758.]

**837g. Transmission lines between Pacific Northwest and the Pacific Southwest; prohibition against construction of lines and facilities recommended by Secretary or authorized by Congress; authority of Secretary to construct other transmission lines unaffected**

No electric transmission lines or related facilities shall be constructed by any Federal agency outside the Pacific Northwest for the purpose of transmitting electric energy between the Pacific Northwest and Pacific Southwest, nor shall

any arrangement for transmission capacity be executed by any Federal agency for the purpose of financing such lines and related facilities to be constructed by non-Federal entities, except those lines and facilities recommended for Federal construction in the Report of the Secretary of the Interior submitted to Congress on June 24, 1964, as supplemented on July 27, 1964, or as hereafter specifically authorized by Congress: Provided, That, except with respect to electric transmission lines and related facilities for the purpose of transmitting electric energy between the two regions above mentioned, nothing herein shall be construed as expanding or diminishing in any way the present authority of the Secretary of Energy to construct transmission lines to market power and energy.

[Preference Act, §8, 78 Stat. 758, as amended by DOE Act, §302(a), 91 Stat. 578, Aug. 4, 1977.]

**837g-1. Construction of additional facilities by Secretary of Energy for mutually beneficial power sales between Pacific Northwest and California; contribution of funds by non-Federal entities**

Notwithstanding the provisions of section 837g of this title, the Secretary of Energy is authorized to construct or participate in the construction of such additional facilities as he deems necessary to allow mutually beneficial power sales between the Pacific Northwest and California and to accept funds contributed by non-Federal entities for that purpose.

[Energy and Water Development Appropriations Act of 1984, Pub. L. 98-360, title III, §300, July 16, 1984, 98 Stat. 360.]

**837h. Provisions not applicable to Canyon Ferry project or benefits and exchanges under Treaty between Canada and United States; preference of power users in Montana not modified**

The provisions of this chapter shall not be applicable to (1) the Canyon Ferry project and (2), except as provided in section 837e of this title, downstream power benefits to which Canada is entitled under the treaty between Canada and the United States relating to the cooperative development of the water resources of the Columbia River Basin, signed at Washington, July 17, 1961, nor to energy or capacity disposed of to Canada in any exchange pursuant to paragraph 1 or 2 of article VIII thereof. Nothing in this chapter shall be construed to modify the geographical preference of power users in the State of Montana which is established by the Hungry Horse Dam Act (Act of June 4, 1944, 58 Stat. 270), as amended.

[Preference Act, §9, 78 Stat. 758-9.]

# Pacific Northwest Electric Power Planning and Conservation Act

**16 United States Code** Chapter 12H (2006).
Act of Dec. 5, 1980, 94 Stat. 2697.
Public Law No. 96-501, S. 885.

Purposes

**839. Congressional declaration of purpose**
The purposes of this chapter, together with the provisions of other laws applicable to the Federal Columbia River Power System, are all intended to be construed in a consistent manner. Such purposes are also intended to be construed in a manner consistent with applicable environmental laws. Such purposes are:

**839(1)**. to encourage, through the unique opportunity provided by the Federal Columbia River Power System—

**839(1)(A)**. Conservation and efficiency in the use of electric power, and
[Pacific Northwest Electric Power Planning and Conservation Act, (Northwest Power Act), §2(1)(A), Dec. 5, 1980, 94 Stat. 2697.]

**839(1)(B)**. the development of renewable resources within the Pacific Northwest;
[Northwest Power Act, §2(1)(B), 94 Stat. 2697.]

**839(2)**. to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply;
[Northwest Power Act, §2(2), 94 Stat. 2697.]

**839(3)**. to provide for the participation and consultation of the Pacific Northwest States, local governments, consumers, customers, users of the Columbia River System (including Federal and State fish and wildlife agencies and appropriate Indian tribes), and the public at large within the region in—

**839(3)(A)**. the development of regional plans and programs related to energy conservation, renewable resources, other resources, and protecting, mitigating, and enhancing fish and wildlife resources.
[Northwest Power Act, §2(3)(A), 94 Stat. 2697.]

**839(3)(B)**. facilitating the orderly planning of the region's power system, and
[Northwest Power Act, §2(3)(B), 94 Stat. 2698.]

**839(3)(C)**. providing environmental quality;
[Northwest Power Act, §2(3)(C), 94 Stat. 2698.]

**839(4)**. to provide that the customers of the Bonneville Power Administration and their consumers continue to pay all costs necessary to produce, transmit, and conserve resources to meet the region's electric power requirements,

including the amortization on a current basis of the Federal investment in the Federal Columbia River Power System;
[Northwest Power Act, §2(4), 94 Stat. 2698.]

**839(5)**. to insure, subject to the provisions of this chapter—

**839(5)(A)**. that the authorities and responsibilities of State and local governments, electric utility systems, water management agencies, and other non-Federal entities for the regulation, planning, conservation, supply, distribution, and use of electric power shall be construed to be maintained, and
[Northwest Power Act, §2(5)(A), 94 Stat. 2698.]

**839(5)(B)**. that Congress intends that this chapter not be construed to limit or restrict the ability of customers to take actions in accordance with other applicable provisions of Federal or State law, including, but not limited to, actions to plan, develop, and operate resources and to achieve conservation, without regard to this chapter; and
[Northwest Power Act, §2(5)(B), 94 Stat. 2698.]

**839(6)**. to protect, mitigate and enhance the fish and wildlife, including related spawning grounds and habitat, of the Columbia River and its tributaries, particularly anadromous fish which are of significant importance to the social and economic well-being of the Pacific Northwest and the Nation and which are dependent on suitable environmental conditions substantially obtainable from the management and operation of Federal Columbia River Power System and other power generating facilities on the Columbia River and its tributaries.
[Northwest Power Act, §2(6), 94 Stat. 2698.]

**839a. Definitions**
As used in this chapter, the term—

**839a(1)**. "Acquire" and "acquisition" shall not be construed as authorizing the Administrator to construct, or have ownership of, under this chapter or any other law, any electric generating facility.
[Northwest Power Act, §3(1), 94 Stat. 2698.]

**839a(2)**. "Administrator" means the Administrator of the Bonneville Power Administration.
[Northwest Power Act, §3(2), 94 Stat. 2698.]

**839a(3)**. "Conservation" means any reduction in electric power consumption as a result of increases in the efficiency of energy use, production, or distribution.
[Northwest Power Act, §3(3), 94 Stat. 2698.]

Cost-effective

**839a(4)(A)**. "Cost-effective", when applied to any measure or resource referred to in this chapter, means that such measure or resource must be forecast—

Reliable

**839a(4)(A)(i)**. to be reliable and available within the time it is needed, and
[Northwest Power Act, §3(4)(A)(i), 94 Stat. 2698.]

Meet or reduce electric power demand

**839a(4)(A)(ii)**. to meet or reduce the electric power demand, as determined by the Council or the Administrator, as appropriate, of the consumers of the customers at an estimated incremental system cost no greater than that of the least-cost similarly reliable and available alternative measure or resource, or any combination thereof.
[Northwest Power Act, §3(4)(A)(ii), 94 Stat. 2698.]

System cost

**839a(4)(B)**. For purposes of this paragraph, the term "system cost" means an estimate of all direct costs of a measure or resource over its effective life, including, if applicable, the cost of distribution and transmission to the consumer and, among other factors, waste disposal costs, end-of-cycle costs, and fuel costs (including projected increases), and such quantifiable environmental costs and benefits as the Administrator determines, on the basis of a methodology developed by the Council as part of the plan, or in the absence of the plan by the Administrator, are directly attributable to such measure or resource.
[Northwest Power Act, §3(4)(B), 94 Stat. 2698-9.]

**839a(4)(C)**. In determining the amount of power that a conservation measure or other resource may be expected to save or to produce, the Council or the Administrator, as the case may be, shall take into account projected realization factors and plant factors, including appropriate historical experience with similar measures or resources.
[Northwest Power Act, §3(4)(C), 94 Stat. 2699.]

Conservation favored

**839a(4)(D)**. For purposes of this paragraph, the "estimated incremental system cost" of any conservation measure or resource shall not be treated as greater than that of any non-conservation measure or resource unless the incremental system cost of such conservation measure or resource is in excess of 110 per centum of the incremental system cost of the nonconservation measure or resource.
[Northwest Power Act, §3(4)(D), 94 Stat. 2699.]

**839a(5)**. "Consumer" means any end user of electric power.
[Northwest Power Act, §3(5), 94 Stat. 2699.]

**839a(6)**. "Council" means, unless otherwise specifically provided, the members appointed to the Pacific Northwest Electric Power and Conservation Planning Council established pursuant to section 839b of this title.
[Northwest Power Act, §3(6), 94 Stat. 2699.]

## Pacific NW Power Act (continued)

**839a(7)**. "Customer" means anyone who contracts for the purchase of power from the Administrator pursuant to this chapter.
[Northwest Power Act, §3(7), 94 Stat. 2699.]

**839a(8)**. "Direct service industrial customer" means an industrial customer that contracts for the purchase of power from the Administrator for direct consumption.
[Northwest Power Act, §3(8), 94 Stat. 2699.]

**839a(9)**. "Electric power" means electric peaking capacity, or electric energy, or both.
[Northwest Power Act, §3(9), 94 Stat. 2699.]

**839a(10)**. "Federal base system resources" means—

**839a(10)(A)**. the Federal Columbia River Power System hydroelectric projects;
[Northwest Power Act, §3(10)(A), 94 Stat. 2699.]

**839a(10)(B)**. resources acquired by the Administrator under long-term contracts in force on December 5, 1980; and
[Northwest Power Act, §3(10)(B), 94 Stat. 2699.]

**839a(10)(C)**. resources acquired by the Administrator in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.
[Northwest Power Act, §3(10)(C), 94 Stat. 2699.]

**839a(11)**. "Indian tribe" means any Indian tribe or band which is located in whole or in part in the region and which has a governing body which is recognized by the Secretary of the Interior.
[Northwest Power Act, §3(11), 94 Stat. 2699.]

**839a(12)**. "Major resource" means any resource that— Major resource

**839a(12)(A)**. has a planned capability greater than fifty average megawatts, and
[Northwest Power Act, §3(12)(A), 94 Stat. 2699.]

**839a(12)(B)**. if acquired by the Administrator, is acquired for a period of more than five years.
[Northwest Power Act, §3(12)(B), 94 Stat. 2699.]

**839a(12) [cont.]**. Such term does not include any resource acquired pursuant to section 838i(b)(6) of this title.
[Northwest Power Act, §3(12), 94 Stat. 2699.]

**839a(13)**. "New large single load" means any load associated with a new facility, an existing facility, or an expansion of an existing facility—

**839a(13)(A)**. which is not contracted for, or committed to, as determined by the Administrator, by a public body, cooperative, investor-owned utility, or Federal agency customer prior to September 1, 1979, and
[Northwest Power Act, §3(13)(A), 94 Stat. 2699-2700.]

**839a(13)(B)**. which will result in an increase in power requirements of such customer of ten average megawatts or more in any consecutive twelve-month period.
[Northwest Power Act, §3(13)(B), 94 Stat. 2700.]

Region

**839a(14)**. "Pacific Northwest", "region", or "regional" means—

**839a(14)(A)**. the area consisting of the States of Oregon, Washington, and Idaho, the portion of the State of Montana west of the Continental Divide, and such portions of the States of Nevada, Utah, and Wyoming as are within the Columbia River drainage basin; and
[Northwest Power Act, §3(14)(A), 94 Stat. 2700.]

**839a(14)(B)**. any contiguous areas, not in excess of seventy-five air miles from the area referred to in subparagraph (A), which are a part of the service area of a rural electric cooperative customer served by the Administrator on December 5, 1980, which has a distribution system from which it serves both within and without such region.
[Northwest Power Act, §3(14)(B), 94 Stat. 2700.]

**839a(15)**. "Plan" means the Regional Electric Power and Conservation plan (including any amendments thereto) adopted pursuant to this chapter and such plan shall apply to actions of the Administrator as specified in this chapter.
[Northwest Power Act, §3(15), 94 Stat. 2700.]

**839a(16)**. "Renewable resource" means a resource which utilizes solar, wind, hydro, geothermal, biomass, or similar sources of energy and which either is used for electric power generation or will reduce the electric power requirements of a consumer, including by direct application.
[Northwest Power Act, §3(16), 94 Stat. 2700.]

**839a(17)**. "Reserves" means the electric power needed to avert particular planning or operating shortages for the benefit of firm power customers of the Administrator and available to the Administrator (A) from resources or (B) from rights to interrupt, curtail, or otherwise withdraw, as provided by specific contract provisions, portions of the electric power supplied to customers.
[Northwest Power Act, §3(17), 94 Stat. 2700.]

**839a(18)**. "Residential use" or "residential load" means all usual residential, apartment, seasonal dwelling and farm electrical loads or uses, but only the first four hundred horsepower during any monthly billing period of farm irrigation and pumping for any farm.
[Northwest Power Act, §3(18), 94 Stat. 2700.]

**839a(19)**. "Resource" means—

**839a(19)(A)**. electric power, including the actual or planned electric power capability of generating facilities, or
[Northwest Power Act, §3(19)(A), 94 Stat. 2700.]

**839a(19)(B)**. actual or planned load reduction resulting from direct application of a renewable energy resource by a consumer, or from a conservation measure.
[Northwest Power Act, §3(19)(B), 94 Stat. 2700.]

**839a(20)**. "Secretary" means the Secretary of Energy.
[Northwest Power Act, §3(20), 94 Stat. 2700.]

**839b. Regional planning and participation**

**839b(a). Pacific Northwest Electric Power and Conservation Planning Council; establishment and operation as regional agency**

Establishment of Pacific Northwest Electric Power and Conservation Planning Council

**839b(a)(1)**. The purposes of this section are to provide for the prompt establishment and effective operation of the Pacific Northwest Electric Power and Conservation Planning Council, to further the purposes of this chapter by the Council promptly preparing and adopting (A) a regional conservation and electric power plan and (B) a program to protect, mitigate, and enhance fish and wildlife, and to otherwise expeditiously and effectively carry out the Council's responsibilities and functions under this chapter.
[Northwest Power Act, §4(a)(1), 94 Stat. 2700.]

**839b(a)(2)**. To achieve such purposes and facilitate cooperation among the States of Idaho, Montana, Oregon, and Washington, and with the Bonneville Power Administration, the consent of Congress is given for an agreement described in this paragraph and not in conflict with this chapter, pursuant to which—

**839b(a)(2)(A)**. there shall be established a regional agency known as the "Pacific Northwest Electric Power and Conservation Planning Council" which (i) shall have its offices in the Pacific Northwest, (ii) shall carry out its functions and responsibilities in accordance with the provisions of this chapter, (iii) shall continue in force and effect in accordance with the provisions of this chapter, and (iv) except as otherwise provided in this chapter, shall not be considered an agency or instrumentality of the United States for the purpose of any Federal law; and
[Northwest Power Act, §4(a)(2)(A), 94 Stat. 2701.]

**839b(a)(2)(B)**. two persons from each State may be appointed, subject to the applicable laws of each such State, to undertake the functions and duties of members of the Council.
[Northwest Power Act, §4(a)(2)(B), 94 Stat. 2701.]

Member appointment

**839b(a)(2)**. The State may fill any vacancy occurring prior to the expiration of the term of any member. The appointment of six initial members, subject to applicable State law, by June 30, 1981, by at least three of such States shall constitute an agreement by the States establishing the Council and such agreement is hereby consented to by the Congress. Upon request of the Governors of two of the States, the Secretary shall extend the June 30, 1981, date for six additional months to provide more time for the States to make such appointments.

[Northwest Power Act, §4(a)(2), 94 Stat. 2701.]

Term

Compensation

**839b(a)(3)**. Except as otherwise provided by State law, each member appointed to the Council shall serve for a term of three years, except that, with respect to members initially appointed, each Governor shall designate one member to serve a term of two years and one member to serve a term of three years. The members of the Council shall select from among themselves a chairman. The members and officers and employees of the Council shall not be deemed to be officers or employees of the United States for any purpose. The Council shall appoint, fix compensation, and assign and delegate duties to such executive and additional personnel as the Council deems necessary to fulfill its functions under this chapter, taking into account such information and analyses as are, or are likely to be, available from other sources pursuant to provisions of this chapter. The compensation of the members shall be fixed by State law. The compensation of the members and officers shall not exceed the rate prescribed for Federal officers and positions at step 1 of level GS-18 of the General Schedule.

[Northwest Power Act, §4(a)(3), 94 Stat. 2701.]

**839b(a)(4)**. For the purpose of providing a uniform system of laws, in addition to this chapter, applicable to the Council relating to the making of contracts, conflicts-of-interest, financial disclosure, open meetings of the Council, advisory committees, disclosure of information, judicial review of Council functions and actions under this chapter, and related matters, the Federal laws applicable to such matters in the case of the Bonneville Power Administration shall apply to the Council to the extent appropriate, except that with respect to open meetings, the Federal laws applicable to open meetings in the case of the Federal Energy Regulatory Commission shall apply to the Council to the extent appropriate. In applying the Federal laws applicable to financial disclosure under the preceding sentence, such laws shall be applied to members of the Council without regard to the duration of their service on the Council or the amount of compensation received for such service. No contract, obligation, or other action of the Council shall be construed as an obligation of the United States or an obligation secured by the full faith and credit of the United States. For the purpose of judicial review of any action of the Council or challenging any provision of this chapter relating to functions and responsibilities of the Council, notwithstanding any other provision of law, the courts of the United States shall have exclusive jurisdiction of any such review.

[Northwest Power Act, §4(a)(4), 94 Stat. 2701-2.]

**839b(b). Alternative establishment of Council as Federal agency**

**839b(b)(1)**. If the Council is not established and its members are not timely appointed in accordance with subsection (a) of this section, or if, at any time after such Council is established and its members are appointed in accordance with subsection (a)—

**839b(b)(1)(A)**. any provision of this chapter relating to the establishment of the Council or to any substantial function or responsibility of the Council (including any function or responsibility under subsection (d) or (h) of this section or under section 839d(c) of this title) is held to be unlawful by a final determination of any Federal court, or
[Northwest Power Act, §4(b)(1)(A), 94 Stat. 2702.]

**839b(b)(1)(B)**. the plan or any program adopted by such Council under this section is held by a final determination of such a court to be ineffective by reason of subsection (a)(2)(B) of this section,
[Northwest Power Act, §4(b)(1)(B), 94 Stat. 2702.]

**839b(b)(1) [cont.]**. the Secretary shall establish the Council pursuant to this subsection as a Federal agency. The Secretary shall promptly publish a notice thereof in the Federal Register and notify the Governors of each of the States referred to in subsection (a) of this section.
[Northwest Power Act, §4(b)(1), 94 Stat. 2702.]

**839b(b)(2)**. As soon as practicable, but not more than thirty days after the publication of the notice referred to in paragraph (1) of this subsection, and thereafter within forty-five days after a vacancy occurs, the Governors of the States of Washington, Oregon, Idaho, and Montana may each (under applicable State laws, if any) provide to the Secretary a list of nominations from such State for each of the State's positions to be selected for such Council. The Secretary may extend this time an additional thirty days. The list shall include at least two persons for each such position. The list shall include such information about such nominees as the Secretary may request. The Secretary shall appoint the Council members from each Governor's list of nominations for each State's positions, except that the Secretary may decline to appoint for any reason any of a Governor's nominees for a position and shall so notify the Governor. The Governor may thereafter make successive nominations within forty-five days of receipt of such notice until nominees acceptable to the Secretary are appointed for each position. In the event the Governor of any such State fails to make the required nominations for any State position on such Council within the time specified for such nominations, the Secretary shall select from such State and appoint the Council member or members for such position. The members of the Council shall select from among themselves one member of the Council as Chairman.
[Northwest Power Act, §4(b)(2), 94 Stat. 2702.]

**839b(b)(3)**. The members of the Council established by this subsection who are not employed by the United States or a State shall receive compensation

at a rate equal to the rate prescribed for offices and positions at level GS-18 of the General Schedule for each day such members are engaged in the actual performance of duties as members of such Council, except that no such member may be paid more in any calendar year than an officer or employee at step 1 of level GS-18 is paid during such year. Members of such Council shall be considered officers or employees of the United States for purposes of title II of the Ethics in Government Act of 1978 (5 U.S.C. app.) and shall also be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in Government service are allowed expenses under section 5703 of title 5. Such Council may appoint, and assign duties to, an executive director who shall serve at the pleasure of such Council and who shall be compensated at the rate established for GS-18 of the General Schedule. The executive director shall exercise the powers and duties delegated to such director by such Council, including the power to appoint and fix compensation of additional personnel in accordance with applicable Federal law to carry out the functions and responsibilities of such Council.
[Northwest Power Act, §4(b)(3), 94 Stat. 2702-3.]

**839b(b)(4)**. When a Council is established under this subsection after a Council was established pursuant to subsection (a) of this section, the Secretary shall provide, to the greatest extent feasible, for the transfer to the Council established by this subsection of all funds, books, papers, documents, equipment, and other matters in order to facilitate the Council's capability to achieve the requirements of subsections (d) and (h) of this section. In order to carry out its functions and responsibilities under this chapter expeditiously, the Council shall take into consideration any actions of the Council under subsection (a) and may review, modify, or confirm such actions without further proceedings.
[Northwest Power Act, §4(b)(4), 94 Stat. 2703.]

**839b(b)(5)(A)**. At any time beginning one year after the plan referred to in such subsection (d) of this section and the program referred to in such subsection (h) of this section are both finally adopted in accordance with this chapter, the Council established pursuant to this subsection shall be terminated by the Secretary 90 days after the Governors of three of the States referred to in this subsection jointly provide for any reason to the Secretary a written request for such termination. Except as provided in subparagraph (B), upon such termination all functions and responsibilities of the Council under this chapter shall also terminate.
[Northwest Power Act, §4(b)(5)(A), 94 Stat. 2703.]

**839b(b)(5)(B)**. Upon such termination of the Council, the functions and responsibilities of the Council set forth in subsection (h) of this section shall be transferred to, and continue to be funded and carried out, jointly, by the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service, in the same manner and to the same extent as required by such subsection and in cooperation with the Federal and the region's State fish and wildlife agencies and Indian tribes referred

to in subsection (h) of this section and the Secretary shall provide for the transfer to them of all records, books, documents, funds, and personnel of such Council that relate to subsection (h) matters. In order to carry out such functions and responsibilities expeditiously, the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service shall take into consideration any actions of the Council under this subsection, and may review, modify, or confirm such actions without further proceedings. In the event the Council is terminated pursuant to this paragraph, whenever any action of the Administrator requires any approval or other action by the Council, the Administrator may take such action without such approval or action, except that the Administrator may not implement any proposal to acquire a major generating resource or to grant billing credits involving a major generating resource until the expenditure of funds for that purpose is specifically authorized by Act of Congress enacted after such termination.
[Northwest Power Act, §4(b)(5)(B), 94 Stat. 2703.]

**839b(c). Organization and operation of Council**

**839b(c)(1)**. The provisions of this subsection shall, except as specifically provided in this subsection, apply to the Council established pursuant to either subsection (a) or (b) of this section.
[Northwest Power Act, §4(c)(1), 94 Stat. 2703.]

**839b(c)(2)**. A majority of the members of the Council shall constitute a quorum. Except as otherwise provided specifically in this chapter, all actions and decisions of the Council shall be by majority vote of the members present and voting. The plan or any part thereof and any amendment thereto shall not be approved unless such plan or amendment receives the votes of—

**839b(c)(2)(A)**. a majority of the members appointed to the Council, including the vote of at least one member from each State with members on the Council; or

Quorum

[Northwest Power Act, §4(c)(2)(A), 94 Stat. 2704.]

**839b(c)(2)(B)**. at least six members of the Council.
[Northwest Power Act, §4(c)(2)(B), 94 Stat. 2704.]

**839b(c)(3)**. The Council shall meet at the call of the Chairman or upon the request of any three members of the Council. If any member of the Council disagrees with respect to any matter transmitted to any Federal or State official or any other person or wishes to express additional views concerning such matter, such member may submit a statement to accompany such matter setting forth the reasons for such disagreement or views.
[Northwest Power Act, §4(c)(3), 94 Stat. 2704.]

**839b(c)(4)**. The Council shall determine its organization and prescribe its practices and procedures for carrying out its functions and responsibilities under this chapter. The Council shall make available to the public a statement of its organization, practices, and procedures, and make available to the

public its annual work program budget at the time the President submits his annual budget to Congress.
[Northwest Power Act, §4(c)(4), 94 Stat. 2704.]

**839b(c)(5)**. Upon request of the Council established pursuant to subsection (b) of this section, the head of any Federal agency is authorized to detail or assign to the Council, on a reimbursable basis, any of the personnel of such agency to assist the Council in the performance of its functions under this chapter.
[Northwest Power Act, §4(c)(5), 94 Stat. 2704.]

**839b(c)(6)**. At the Council's request, the Administrator of the General Services Administration shall furnish the Council established pursuant to subsection (b) of this section with such offices, equipment, supplies, and services in the same manner and to the same extent as such Administrator is authorized to furnish to any other Federal agency or instrumentality such offices, supplies, equipment, and services.
[Northwest Power Act, §4(c)(6), 94 Stat. 2704.]

Report to Congress

**839b(c)(7)**. Upon the request of the Congress or any committee thereof, the Council shall promptly provide to the Congress, or to such committee, any record, report, document, material, and other information which is in the possession of the Council.
[Northwest Power Act, §4(c)(7), 94 Stat. 2704.]

**839b(c)(8)**. To obtain such information and advice as the Council determines to be necessary or appropriate to carry out its functions and responsibilities pursuant to this chapter, the Council shall, to the greatest extent practicable, solicit engineering, economic, social, environmental, and other technical studies from customers of the Administrator and from other bodies or organizations in the region with particular expertise.
[Northwest Power Act, §4(c)(8), 94 Stat. 2704.]

**839b(c)(9)**. The Administrator and other Federal agencies, to the extent authorized by other provisions of law, shall furnish the Council all information requested by the Council as necessary for performance of its functions, subject to such requirements of law concerning trade secrets and proprietary data as may be applicable.
[Northwest Power Act, §4(c)(9), 94 Stat. 2704.]

**839b(c)(10)(A)**. At the request of the Council, the Administrator shall pay from funds available to the Administrator the compensation and other expenses of the Council as are authorized by this chapter, including the reimbursement of those States with members on the Council for services and personnel to assist in preparing a plan pursuant to subsection (d) of this section and a program pursuant to subsection (h) of this section, as the Council determines are necessary or appropriate for the performance of its functions and responsibilities. Such payments shall be included by the Administrator in his annual budgets submitted to Congress pursuant to the Federal Columbia

River Transmission System Act [16 U.S.C. 838 et seq.] and shall be subject to the requirements of that Act, including the audit requirements of section 11(d) of such Act [16 U.S.C. 838i(d)]. The records, reports, and other documents of the Council shall be available to the Comptroller General for review in connection with such audit or other review and examination by the Comptroller General pursuant to other provisions of law applicable to the Comptroller General. Funds provided by the Administrator for such payments shall not exceed annually an amount equal to 0.02 mill. multiplied by the kilowatthours of firm power forecast to be sold by the Administrator during the year to be funded. In order to assist the Council's initial organization, the Administrator after Dec. 5 1980, shall promptly prepare and propose an amended annual budget to expedite payment for Council activities.
[Northwest Power Act, §4(c)(10)(A), 94 Stat. 2704-5.]

**839b(c)(10)(B)**. Notwithstanding the limitation contained in the fourth sentence of subparagraph (A) of this paragraph, upon an annual showing by the Council that such limitation will not permit the Council to carry out its functions and responsibilities under this chapter the Administrator may raise such limit up to any amount not in excess of 0.10 mill. multiplied by the kilowatt hours of firm power forecast to be sold by the Administrator during the year to be funded.
[Northwest Power Act, §4(c)(10)(B), 94 Stat. 2705.]

**839b(c)(11)**. The Council shall establish a voluntary scientific and statistical advisory committee to assist in the development, collection, and evaluation of such statistical, biological, economic, social, environmental, and other scientific information as is relevant to the Council's development and amendment of a regional conservation and electric power plan.
[Northwest Power Act, §4(c)(11), 94 Stat. 2705.]

**839b(c)(12)**. The Council may establish such other voluntary advisory committees as it determines are necessary or appropriate to assist it in carrying out its functions and responsibilities under this chapter.
[Northwest Power Act, §4(c)(12), 94 Stat. 2705.]

**839b(c)(13)**. The Council shall ensure that the membership for any advisory committee established or formed pursuant to this section shall, to the extent feasible, include representatives of, and seek the advice of, the Federal, and the various regional, State, local, and Indian Tribal Governments, consumer groups, and customers.
[Northwest Power Act, §4(c)(13), 94 Stat. 2705.]

**839b(d). Regional conservation and electric power plan**

**839b(d)(1)**. Within two years after the Council is established and the members are appointed pursuant to subsection (a) or (b) of this section, the Council shall prepare, adopt, and promptly transmit to the Administrator a regional conservation and electric power plan. The adopted plan, or any portion thereof, may be amended from time to time, and shall be reviewed

Electric power plan to administrator

by the Council not less frequently than once every five years. Prior to such adoption, public hearings shall be held in each Council member's State on the plan or substantial, nontechnical amendments to the plan proposed by the Council for adoption. A public hearing shall also be held in any other State of the region on the plan or amendments thereto, if the Council determines that the plan or amendments would likely have a substantial impact on that State in terms of major resources which may be developed in that State and which the Administrator may seek to acquire. Action of the Council under this subsection concerning such hearings shall be subject to section 553 of title 5, and such procedure as the Council shall adopt.
[Northwest Power Act, §4(d)(1), 94 Stat. 2705.]

**839b(d)(2)**. Following adoption of the plan and any amendment thereto, all actions of the Administrator pursuant to section 839d of this title shall be consistent with the plan and any amendment thereto, except as otherwise specifically provided in this chapter.
[Northwest Power Act, §4(d)(2), 94 Stat. 2705.]

**839b(e). Plan priorities and requisite features; studies**

Plan priority

**839b(e)(1)**. The plan shall, as provided in this paragraph, give priority to resources which the Council determines to be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources.
[Northwest Power Act, §4(e)(1), 94 Stat. 2705.]

Conservation measures

**839b(e)(2)**. The plan shall set forth a general scheme for implementing conservation measures and developing resources pursuant to section 839d of this title to reduce or meet the Administrator's obligations with due consideration by the Council for (A) environmental quality, (B) compatibility with the existing regional power system, (C) protection, mitigation, and enhancement of fish and wildlife and related spawning grounds and habitat, including sufficient quantities and qualities of flows for successful migration, survival, and propagation of anadromous fish, and (D) other criteria which may be set forth in the plan.
[Northwest Power Act, §4(e)(2), 94 Stat. 2706.]

**839b(e)(3)**. To accomplish the priorities established by this subsection, the plan shall include the following elements which shall be set forth in such detail as the Council determines to be appropriate:

**839b(e)(3)(A)**. an energy conservation program to be implemented under this chapter, including, but not limited to, model conservation standards;
[Northwest Power Act, §4(e)(3)(A), 94 Stat. 2706.]

**839b(e)(3)(B)**. recommendation for research and development;
[Northwest Power Act, §4(e)(3)(B), 94 Stat. 2706.]

**839b(e)(3)(C)**. a methodology for determining quantifiable environmental costs and benefits under section 839a(4) of this title;
[Northwest Power Act, §4(e)(3)(C), 94 Stat. 2706.]

**839b(e)(3)(D)**. a demand forecast of at least twenty years (developed in consultation with the Administrator, the customers, the States, including State agencies with ratemaking authority over electric utilities, and the public, in such manner as the Council deems appropriate) and a forecast of power resources estimated by the Council to be required to meet the Administrator's obligations and the portion of such obligations the Council determines can be met by resources in each of the priority categories referred to in paragraph (1) of this subsection which forecast (i) shall include regional reliability and reserve requirements, (ii) shall take into account the effect, if any, of the requirements of subsection (h) of this section on the availability of resources to the Administrator, and (iii) shall include the approximate amounts of power the Council recommends should be acquired by the Administrator on a long-term basis and may include, to the extent practicable, an estimate of the types of resources from which such power should be acquired;
[Northwest Power Act, §4(e)(3)(D), 94 Stat. 2706.]

Twenty-year demand forecast

**839b(e)(3)(E)**. an analysis of reserve and reliability requirements and cost-effective methods of providing reserves designed to insure adequate electric power at the lowest probable cost;
[Northwest Power Act, §4(e)(3)(E), 94 Stat. 2706.]

**839b(e)(3)(F)**. the program adopted pursuant to subsection (h); of this section and
[Northwest Power Act, §4(e)(3)(F), 94 Stat. 2706.]

**839b(e)(3)(G)**. if the Council recommends surcharges pursuant to subsection (f) of this section, a methodology for calculating such surcharges.
[Northwest Power Act, §4(e)(3)(G), 94 Stat. 2706.]

**839b(e)(4)**. The Council, taking into consideration the requirement that it devote its principal efforts to carrying out its responsibilities under subsections (d) and (h) of this section, shall undertake studies of conservation measures reasonably available to direct service industrial customers and other major consumers of electric power within the region and make an analysis of the estimated reduction in energy use which would result from the implementation of such measures as rapidly as possible, consistent with sound business practices. The Council shall consult with such customers and consumers in the conduct of such studies.
[Northwest Power Act, §4(e)(4), 94 Stat. 2706.]

**839b(f). Model conservation standards; surcharges**

**839b(f)(1)**. Model conservation standards to be included in the plan shall include, but not be limited to, standards applicable to (A) new and existing structures, (B) utility, customer, and governmental conservation

Model conservation standards

programs, and (C) other consumer actions for achieving conservation. Model conservation standards shall reflect geographic and climatic differences within the region and other appropriate considerations, and shall be designed to produce all power savings that are cost-effective for the region and economically feasible for consumers, taking into account financial assistance made available to consumers under section 839d(a) of this title. These model conservation standards shall be adopted by the Council and included in the plan after consultation, in such manner as the Council deems appropriate, with the Administrator, States, and political subdivisions, customers of the Administrator, and the public.
[Northwest Power Act, §4(f)(1), 94 Stat. 2706-7.]

**839b(f)(2)**. The Council by a majority vote of the members of the Council is authorized to recommend the Administrator a surcharge and the Administrator may thereafter impose such a surcharge, in accordance with the methodology provided in the plan, on customers for those portions of their loads within the region that are within States or political subdivisions which have not, or on the Administrator's customers which have not, implemented conservation measures that achieve energy savings which the Administrator determines are comparable to those which would be obtained under such standards. Such surcharges shall be established to recover such additional costs as the Administrator determines will be incurred because such projected energy savings attributable to such conservation measures have not been achieved, but in no case may such surcharges be less than 10 per centum or more than 50 per centum of the Administrator's applicable rates for such load or portion thereof.
[Northwest Power Act, §4(f)(2), 94 Stat. 2707.]

**839b(g). Public information; consultation; contracts and technical assistance**

**839b(g)(1)**. To insure widespread public involvement in the formulation of regional power policies, the Council and Administrator shall maintain comprehensive programs to—

**839b(g)(1)(A)**. inform the Pacific Northwest public of major regional power issues,
[Northwest Power Act, §4(g)(1)(A), 94 Stat. 2707.]

**839b(g)(1)(B)**. obtain public views concerning major regional power issues, and
[Northwest Power Act, §4(g)(1)(B), 94 Stat. 2707.]

**839b(g)(1)(C)**. secure advice and consultation from the Administrator's customers and others.
[Northwest Power Act, §4(g)(1)(C), 94 Stat. 2707.]

**839b(g)(2)**. In carrying out the provisions of this section, the Council and the Administrator shall—

**839b(g)(2)(A)**. consult with the Administrator's customers;
[Northwest Power Act, §4(g)(2)(A), 94 Stat. 2707.]

**839b(g)(2)(B)**. include the comments of such customers in the record of the Council's proceedings; and
[Northwest Power Act, §4(g)(2)(B), 94 Stat. 2707.]

**839b(g)(2)(C)**. recognize and not abridge the authorities of State and local governments, electric utility systems, and other non-Federal entities responsible to the people of the Pacific Northwest for the planning, conservation, supply, distribution, and use of electric power and the operation of electric generating facilities.
[Northwest Power Act, §4(g)(2)(C), 94 Stat. 2707.]

Plan preparation

**839b(g)(3)**. In the preparation, adoption, and implementation of the plan, the Council and the Administrator shall encourage the cooperation, participation, and assistance of appropriate Federal agencies, State entities, State political subdivisions, and Indian tribes. The Council and the Administrator are authorized to contract, in accordance with applicable law, with such agencies, entities, tribes, and subdivisions individually, in groups, or through associations thereof to (A) investigate possible measures to be included in the plan, (B) provide public involvement and information regarding a proposed plan or amendment thereto, and (C) provide services which will assist in the implementation of the plan. In order to assist in the implementation of the plan, particularly conservation, renewable resource, and fish and wildlife activities, the Administrator, when requested and subject to available funds, may provide technical assistance in establishing conservation, renewable resource, and fish and wildlife objectives by individual States or subdivisions thereof or Indian tribes. Such objectives, if adopted by a State or subdivision thereof or Indian tribes, may be submitted to the Council and the Administrator for review, and upon approval by the Council, may be incorporated as part of the plan.
[Northwest Power Act, §4(g)(3), 94 Stat. 2707-8.]

**839b(h). Fish and wildlife**

Fish and wildlife program

**839b(h)(1)(A)**. The Council shall promptly develop and adopt, pursuant to this subsection, a program to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, on the Columbia River and its tributaries. Because of the unique history, problems, and opportunities presented by the development and operation of hydroelectric facilities on the Columbia River and its tributaries, the program, to the greatest extent possible, shall be designed to deal with that river and its tributaries as a system.
[Northwest Power Act, §4(h)(1)(A), 94 Stat. 2708.]

**839b(h)(1)(B)**. This subsection shall be applicable solely to fish and wildlife, including related spawning grounds and habitat, located on the Columbia River and its tributaries. Nothing in this subsection shall alter, modify, or

affect in any way the laws applicable to rivers or river systems, including electric power facilities related thereto, other than the Columbia River and its tributaries, or affect the rights and obligations of any agency, entity, or person under such laws.
[Northwest Power Act, §4(h)(1)(B), 94 Stat. 2708.]

**839b(h)(2)**. The Council shall request, in writing, promptly after the Council is established under either subsection (a) or (b) of this section and prior to the development or review of the plan, or any major revision thereto, from the Federal and the region's State fish and wildlife agencies and from the region's appropriate Indian tribes, recommendations for—

**839b(h)(2)(A)**. measures which can be expected to be implemented by the Administrator, using authorities under this chapter and other laws, and other Federal agencies to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by the development and operation of any hydroelectric project on the Columbia River and its tributaries;
[Northwest Power Act, §4(h)(2)(A), 94 Stat. 2708.]

**839b(h)(2)(B)**. establishing objectives for the development and operation of such projects on the Columbia River and its tributaries in a manner designed to protect, mitigate, and enhance fish and wildlife; and
[Northwest Power Act, §4(h)(2)(B), 94 Stat. 2708.]

**839b(h)(2)(C)**. fish and wildlife management coordination and research and development (including funding) which, among other things, will assist protection, mitigation, and enhancement of anadromous fish at, and between, the region's hydroelectric dams.
[Northwest Power Act, §4(h)(2)(C), 94 Stat. 2708.]

**839b(h)(3)**. Such agencies and tribes shall have 90 days to respond to such request, unless the Council extends the time for making such recommendations. The Federal and the region's water management agencies, and the region's electric power producing agencies, customers, and public may submit recommendations of the type referred to in paragraph (2) of this subsection. All recommendations shall be accompanied by detailed information and data in support of the recommendations.
[Northwest Power Act, §4(h)(3), 94 Stat. 2708.]

Notice

**839b(h)(4)(A)**. The Council shall give notice of all recommendations and shall make the recommendations and supporting documents available to the Administrator, to the Federal and the region's, State fish and wildlife agencies, to the appropriate Indian tribes, to Federal agencies responsible for managing, operating, or regulating hydroelectric facilities located on the Columbia River or its tributaries, and to any customer or other electric utility which owns or operates any such facility. Notice shall also be given to the public. Copies of such recommendations and supporting documents shall be

made available for review at the offices of the Council and shall be available for reproduction at reasonable cost.
[Northwest Power Act, §4(h)(4)(A), 94 Stat. 2708.]

**839b(h)(4)(B).** The Council shall provide for public participation and comment regarding the recommendations and supporting documents, including an opportunity for written and oral comments, within such reasonable time as the Council deems appropriate.
[Northwest Power Act, §4(h)(4)(B), 94 Stat. 2709.]

Comments

**839b(h)(5).** The Council shall develop a program on the basis of such recommendations, supporting documents, and views and information obtained through public comment and participation, and consultation with the agencies, tribes, and customers referred to in subparagraph (A) of paragraph (4). The program shall consist of measures to protect, mitigate, and enhance fish and wildlife affected by the development, operation, and management of such facilities while assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply. Enhancement measures shall be included in the program to the extent such measures are designed to achieve improved protection and mitigation.
[Northwest Power Act, §4(h)(5), 94 Stat. 2709.]

Protect and enhance

**839b(h)(6).** The Council shall include in the program measures which it determines, on the basis set forth in paragraph (5), will—

Measures

**839b(h)(6)(A).** complement the existing and future activities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes;
[Northwest Power Act, §4(h)(6)(A), 94 Stat. 2709.]

**839b(h)(6)(B).** be based on, and supported by, the best available scientific knowledge;
[Northwest Power Act, §4(h)(6)(B), 94 Stat. 2709.]

**839b(h)(6)(C).** utilize, where equally effective alternative means of achieving the same sound biological objective exist, the alternative with the minimum economic cost;
[Northwest Power Act, §4(h)(6)(C), 94 Stat. 2709.]

**839b(h)(6)(D).** be consistent with the legal rights of appropriate Indian tribes in the region; and
[Northwest Power Act, §4(h)(6)(D), 94 Stat. 2709.]

**839b(h)(6)(E).** in the case of anadromous fish—

**839b(h)(6)(E)(i).** provide for improved survival of such fish at hydroelectric facilities located on the Columbia River system; and
[Northwest Power Act, §4(h)(6)(E)(i), 94 Stat. 2709.]

**839b(h)(6)(E)(ii)**. provide flows of sufficient quality and quantity between such facilities to improve production, migration, and survival of such fish as necessary to meet sound biological objectives.
[Northwest Power Act, §4(h)(6)(E)(ii), 94 Stat. 2709.]

Recommendations

**839b(h)(7)**. The Council shall determine whether each recommendation received is consistent with the purposes of this chapter. In the event such recommendations are inconsistent with each other, the Council, in consultation with appropriate entities, shall resolve such inconsistency in the program giving due weight to the recommendations, expertise, and legal rights and responsibilities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes. If the Council does not adopt any recommendation of the fish and wildlife agencies and Indian tribes as part of the program or any other recommendation, it shall explain in writing, as part of the program, the basis for its finding that the adoption of such recommendation would be—

**839b(h)(7)(A)**. inconsistent with paragraph (5) of this subsection;
[Northwest Power Act, §4(h)(7)(A), 94 Stat. 2709.]

**839b(h)(7)(B)**. inconsistent with paragraph (6) of this subsection; or
[Northwest Power Act, §4(h)(7)(B), 94 Stat. 2709.]

**839b(h)(7)(C)**. less effective than the adopted recommendations for the protection, mitigation, and enhancement of fish and wildlife.
[Northwest Power Act, §4(h)(7)(C), 94 Stat. 2709.]

Principles

**839b(h)(8)**. The Council shall consider, in developing and adopting a program pursuant to this subsection, the following principles:

**839b(h)(8)(A)**. Enhancement measures may be used, in appropriate circumstances, as a means of achieving offsite protection and mitigation with respect to compensation for losses arising from the development and operation of the hydroelectric facilities of the Columbia River and its tributaries as a system.
[Northwest Power Act, §4(h)(8)(A), 94 Stat. 2709.]

**839b(h)(8)(B)**. Consumers of electric power shall bear the cost of measures designed to deal with adverse impacts caused by the development and operation of electric power facilities and programs only.
[Northwest Power Act, §4(h)(8)(B), 94 Stat. 2710.]

**839b(h)(8)(C)**. To the extent the program provides for coordination of its measures with additional measures (including additional enhancement measures to deal with impacts caused by factors other than the development and operation of electric power facilities and programs), such additional measures are to be implemented in accordance with agreements among

the appropriate parties providing for the administration and funding of such additional measures.
[Northwest Power Act, §4(h)(8)(C), 94 Stat. 2710.]

**839b(h)(8)(D)**. Monetary costs and electric power losses resulting from the implementation of the program shall be allocated by the Administrator consistent with individual project impacts and system wide objectives of this subsection.
[Northwest Power Act, §4(h)(8)(D), 94 Stat. 2710.]

**839b(h)(9)**. The Council shall adopt such program or amendments thereto within one year after the time provided for receipt of the recommendations. Such program shall also be included in the plan adopted by the Council under subsection (d) of this section.
[Northwest Power Act, §4(h)(9), 94 Stat. 2710.]

Expenditures

**839b(h)(10)(A)**. The Administrator shall use the Bonneville Power Administration fund and the authorities available to the Administrator under this chapter and other laws administered by the Administrator to protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries in a manner consistent with the plan, if in existence, the program adopted by the Council under this subsection, and the purposes of this chapter. Expenditures of the Administrator pursuant to this paragraph shall be in addition to, not in lieu of, other expenditures authorized or required from other entities under other agreements or provisions of law.
[Northwest Power Act, §4(h)(10)(A), 94 Stat. 2710.]

**839b(h)(10)(B)**. The Administrator may make expenditures from such fund which shall be included in the annual or supplementary budgets submitted to the Congress pursuant to the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.]. Any amounts included in such budget for the construction of capital facilities with an estimated life of greater than 15 years and an estimated cost of at least $1,000,000 shall be funded in the same manner and in accordance with the same procedures as major transmission facilities under the Federal Columbia River Transmission System Act.
[Northwest Power Act, §4(h)(10)(B), 94 Stat. 2710.]

**839b(h)(10)(C)**. The amounts expended by the Administrator for each activity pursuant to this subsection shall be allocated as appropriate by the Administrator, in consultation with the Corps of Engineers and the Water and Power Resources Service, among the various hydroelectric projects of the Federal Columbia River Power System. Amounts so allocated shall be allocated to the various project purposes in accordance with existing accounting procedures for the Federal Columbia River Power System.
[Northwest Power Act, §4(h)(10)(C), 94 Stat. 2710.]

Scientific Review Panel

**839b(h)(10)(D)(i)**. The Northwest Power Planning Council (Council) shall appoint an Independent Scientific Review Panel (Panel), which shall be comprised of eleven members, to review projects proposed to be funded through that portion of Bonneville Power Administration's (BPA) annual fish and wildlife budget that implements the Council's fish and wildlife program. Members shall be appointed from a list of no fewer than 20 scientists submitted by the National Academy of Sciences (Academy), provided that Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Panel. The Academy shall provide such nominations within 90 days of the date of this enactment, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(i), September 30, 1996, 110 Stat. 3005.]

Peer Review Groups

**839b(h)(10)(D)(ii)**. The Council shall establish Scientific Peer Review Groups (Peer review Groups), which shall be comprised of the appropriate number of scientists, from a list submitted by the Academy to assist the Panel in making its recommendations to the Council for projects to be funded through BPA's annual fish and wildlife budget, provided that the Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Peer Review Groups. The Academy shall provide such nominations within 90 days of the date of this enactment, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(ii), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(iii)**. Panel and Peer Review Group members may be compensated and shall be considered subject to the conflict of interest standards that apply to scientists performing comparable work for the National Academy of Sciences; provided that a Panel or Peer Review Group member with a direct or indirect financial interest in a project, or projects, shall recuse himself or herself from review of, or recommendations associated with, such project or projects. All expenses of the Panel and the Peer Review Groups shall be paid by BPA as provided for under paragraph (vii). Neither the Panel nor the Peer Review Groups shall be deemed advisory committees within the meaning of the Federal Advisory Committee Act.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(iii), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(iv)**. The Peer Review Groups, in conjunction with the Panel, shall review projects proposed to be funded through BPA's annual fish and wildlife budget and make recommendations on matters related to such projects to the Council no later than June 15 of each year. If the recommendations are not received by the Council by this date, the Council may proceed to make final recommendations on funding to BPA, relying on the best information available. The Panel and Peer Review Groups shall review a sufficient number of projects to adequately ensure that the list of prioritized projects recommended is consistent with the Council's program. Project recommendations shall be based on a determination that projects: are based on sound scientific principles; benefit fish and wildlife; and have a clearly defined objective and outcome with provisions for monitoring and evaluation of results. The Panel, with assistance from the Peer Review Groups, shall review, on an annual basis, the results of prior year expenditures based upon these criteria and submit its findings to the Council for review.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(iv), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(v)**. Upon completion of the review of projects to be funded through BPA's annual fish and wildlife budget, the Peer Review Groups shall submit its findings to the Panel. The Panel shall analyze the information submitted by the Peer Review Groups and submit recommendations on project priorities to the Council. The Council shall make the Panel's findings available to the public and subject to public comment.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, §512(4)(h)(10)(D)(v), September 30, 1996, 110 Stat. 3005.]

Council consideration of Panel recommendations

**839b(h)(10)(D)(vi).** The Council shall fully consider the recommendations of the Panel when making its final recommendations of projects to be funded through BPA's annual fish and wildlife budget, and if the Council does not incorporate a recommendation of the Panel, the Council shall explain in writing its reasons for not accepting Panel recommendations. In making its recommendations to BPA, the Council shall consider the impact of ocean conditions on fish and wildlife populations and shall determine whether the projects employ cost-effective measures to achieve program objectives. The Council, after consideration of the recommendations of the Panel and other appropriate entities, shall be responsible for making the final recommendations of projects to be funded through BPA's annual fish and wildlife budget.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(vi), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(vii)**. Cost limitation. The annual cost of this provision shall not exceed $500,000 in 1997 dollars.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(vii), September 30, 1996, 110 Stat. 3005; Pub.L. 106-60, § 610, Sept. 29, 1999, 113 Stat. 502.]

Managing, operating and regulating facilities

**839b(h)(11)(A)**. The Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall—

**839b(h)(11)(A)(i)**. exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated;
[Northwest Power Act, §4(h)(11)(A)(i), 94 Stat. 2710.]

**839b(h)(11)(A)(ii)**. exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.
[Northwest Power Act, §4(h)(11)(A)(ii), 94 Stat. 2711.]

Consultation between agencies

**839b(h)(11)(B)**. The Administrator and such Federal agencies shall consult with the Secretary of the Interior, the Administrator of the National Marine Fisheries Service, and the State fish and wildlife agencies of the region, appropriate Indian tribes, and affected project operators in carrying out the provisions of this paragraph and shall, to the greatest extent practicable, coordinate their actions.
[Northwest Power Act, §4(h)(11)(A), 94 Stat. 2711.]

Report to congressional committee

**839b(h)(12)(A)**. Beginning on October 1 of the first fiscal year after all members to the Council are appointed initially, the Council shall submit annually a detailed report to the Committee on Energy and Natural Resources of the Senate and to the Committees on Energy and Commerce and on Interior and Insular Affairs of the House of Representatives. The report shall describe the actions taken and to be taken by the Council under this chapter, including this subsection, the effectiveness of the fish and wildlife program, and potential revisions or modifications to the program to be included in the plan when adopted. At least ninety days prior to its submission of such report, the Council shall make available to such fish and wildlife agencies, and tribes, the Administrator and the customers a draft of such report. The Council shall establish procedures for timely comments thereon. The Council shall include as an appendix to such report such comments or a summary thereof.
[Northwest Power Act, §4(h)(12)(A), 94 Stat. 2711, H. Res. 549, March 25, 1980.]

**839b(h)(12)(B)**. The Administrator shall keep such committees fully and currently informed of the actions taken and to be taken by the Administrator under this chapter, including this subsection.
[Northwest Power Act, §4(h)(12)(B), 94 Stat. 2711.]

**839b(i). Review**

Council review

The Council may from time to time review the actions of the Administrator pursuant to this section and section 839d of this title to determine whether such actions are consistent with the plan and programs, the extent to which the plan and programs is being implemented, and to assist the Council in preparing amendments to the plan and programs.
[Northwest Power Act, §4(i), 94 Stat. 2711.]

**839b(j). Requests by Council for action**

Council requests

**839b(j)(1)**. The Council may request the Administrator to take an action under section 839d of this title to carry out the Administrator's responsibilities under the plan.
[Northwest Power Act, §4(j)(1), 94 Stat. 2711.]

**839b(j)(2)**. To the greatest extent practicable within ninety days after the Council's request, the Administrator shall respond to the Council in writing specifying—

**839b(j)(2)(A)**. the means by which the Administrator will undertake the action or any modification thereof requested by the Council, or
[Northwest Power Act, §4(j)(2)(A), 94 Stat. 2711.]

**839b(j)(2)(B)**. the reasons why such action would not be consistent with the plan, or with the Administrator's legal obligations under this chapter, or other provisions of law, which the Administrator shall specifically identify.
[Northwest Power Act, §4(j)(2)(B), 94 Stat. 2711.]

**839b(j)(3)**. If the Administrator determines not to undertake the requested action, the Council, within sixty days after notice of the Administrator's determination, may request the Administrator to hold an informal hearing and make a final decision.
[Northwest Power Act, §4(j)(3), 94 Stat. 2711.]

**839b(k). Review and analysis of five-year period of Council activities**

**839b(k)(1)**. Not later than October 1, 1987, or six years after the Council is established under this chapter, whichever is later, the Council shall complete a thorough analysis of conservation measures and conservation resources implemented pursuant to this chapter during the five-year period beginning on the date the Council is established under this chapter to determine if such measures or resources:

**839b(k)(1)(A)**. have resulted or are likely to result in costs to consumers in the region greater than the costs of additional generating resources or additional fuel which the Council determines would be necessary in the absence of such measures or resources;
[Northwest Power Act, §4(k)(1)(A), 94 Stat. 2711-2.]

**839b(k)(1)(B)**. have not been or are likely not to be generally equitable to all consumers in the region; or
[Northwest Power Act, §4(k)(1)(B), 94 Stat. 2712.]

**839b(k)(1)(C)**. have impaired or are likely to impair the ability of the Administrator to carry out his obligations under this chapter and other laws, consistent with sound business practices.
[Northwest Power Act, §4(k)(1)(C), 94 Stat. 2712.]

**839b(k)(2)**. The Administrator may determine that section 839a(4)(D) of this title shall not apply to any proposed conservation measure or resource if the Administrator finds after receipt of such analysis from the Council that such measure or resource would have any result or effect described in subparagraph (A), (B) or (C) of paragraph (1).
[Northwest Power Act, §4(k)(2), 94 Stat. 2712. as amended Pub.L. 106-60, § 610, Sept. 29, 1999, 113 Stat. 502.]

Sale of power

**839c. Sale of power**

Preferences and priorities

**839c(a). Preferences and priorities**
All power sales under this chapter shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. 832c and 832d]. Such sales shall be at rates established pursuant to section 839e of this title.
[Northwest Power Act, §5(a), 94 Stat. 2712.]

**839c(b). Sales to public bodies, cooperatives, and Federal agency customers**

Sales to preference customers and investor-owned utilities

**839c(b)(1)**. Whenever requested, the Administrator shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and to each requesting investor-owned utility electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region to the extent that such firm power load exceeds—

**839c(b)(1)(A)**. the capability of such entity's firm peaking and energy resources used in the year prior to December 5, 1980, to serve its firm load in the region, and
[Northwest Power Act, §5(b)(1)(A), 94 Stat. 2712.]

**839c(b)(1)(B)**. such other resources as such entity determines, pursuant to contracts under this chapter, will be used to serve its firm load in the region.
[Northwest Power Act, §5(b)(1)(B), 94 Stat. 2712.]

User of firm load resources

**839c(b)(1)[cont.]**. In determining the resources which are used to serve a firm load, for purposes of subparagraphs (A) and (B), any resources used to serve a firm load under such subparagraphs shall be treated as continuing

to be so used, unless such use is discontinued with the consent of the Administrator, or unless such use is discontinued because of obsolescence, retirement, loss of resource, or loss of contract rights.
[Northwest Power Act, §5(b)(1), 94 Stat. 2712.]

**839c(b)(2)**. Contracts with investor-owned utilities shall provide that the Administrator may reduce his obligations under such contracts in accordance with section 5(a) of the Bonneville Project Act of 1937 [16 U.S.C. 832d(a)].
[Northwest Power Act, §5(b)(2), 94 Stat. 2712.]

Sales to federal agencies

**839c(b)(3)**. In addition to his authorities to sell electric power under paragraph (1), the Administrator is also authorized to sell electric power to Federal agencies in the region.
[Northwest Power Act, §5(b)(3), 94 Stat. 2712.]

**839c(b)(4)**. Sales under this subsection shall be made only if the public body, cooperative, Federal agency or investor-owned utility complies with the Administrator's standards for service in effect on December 5, 1980, or as subsequently revised.
[Northwest Power Act, §5(b)(4), 94 Stat. 2712.]

Restrictions

**839c(b)(5)**. The Administrator shall include in contracts executed in accordance with this subsection provisions that enable the Administrator to restrict his contractual obligations to meet the loads referred to in this subsection in the future if the Administrator determines, after a reasonable period of experience under this chapter, that the Administrator cannot be assured on a planning basis of acquiring sufficient resources to meet such loads during a specified period of insufficiency. Any such contract with a public body, cooperative, or Federal agency shall specify a reasonable minimum period between a notice of restriction and the earliest date such restriction may be imposed.
[Northwest Power Act, §5(b)(5), 94 Stat. 2712-3.]

Contract requirements

**839c(b)(6)**. Contracts executed in accordance with this subsection with public body, cooperative, and Federal agency customers shall—

**839c(b)(6)(A)**. provide that the restriction referred to in paragraph (5) shall not be applicable to any such customers until the operating year in which the total of such customers' firm loads to be served by the Administrator equals or exceeds the firm capability of the Federal base system resources;
[Northwest Power Act, §5(b)(6)(A), 94 Stat. 2713.]

**839c(b)(6)(B)**. not permit restrictions which would reduce the total contractual entitlement of such customers to an amount less than the firm capability of the Federal base system resources; and
[Northwest Power Act, §5(b)(6)(B), 94 Stat. 2713.]

**839c(b)(6)(C)**. contain a formula for determining annually, on a uniform basis, each such customer's contractual entitlement to firm power during such

a period of restriction, which formula shall not consider customer resources other than those the customer has determined, as of December 5, 1980, to be used to serve its own firm loads.
[Northwest Power Act, §5(b)(6)(C), 94 Stat. 2713.]

**839c(b)(6)[cont.]**. The formula referred to in subparagraph (C) shall obligate the Administrator to provide on an annual basis only firm power needed to serve the portion of such customer's firm load in excess of the capability of such customer's own firm resources determined by such customer under paragraph (1) of this subsection to be used to serve its firm load.
[Northwest Power Act, §5(b)(6), 94 Stat. 2713.]

**839c(b)(7)**. Required sale—

**839c(b)(7) (A)**. Definition of a Joint Operating Entity—In this section, the term 'joint operating entity' means an entity that is lawfully organized under State law as a public body or cooperative prior to the date of enactment of this paragraph, and is formed by and whose members or participants are two or more public bodies or cooperatives, each of which was a customer of the Bonneville Power Administration on or before January 1, 1999.

**839c(b)(7) (B)**. Sale—Pursuant to paragraph (1), the Administrator shall sell, at wholesale to a joint operating entity, electric power solely for the purpose of meeting the regional firm power consumer loads of regional public bodies and cooperatives that are members of or participants in the joint operating entity.

**839c(b)(7) (C)**. No Resale—A public body or cooperative to which a joint operating entity sells electric power under subparagraph (B) shall not resell that power except to retail customers of the public body or cooperative or to another regional member or participant of the same joint operating entity, or except as otherwise permitted by law.
[As amended Pub. L. 106-273 (2000), § 1, Sept. 22, 2000, 114 Stat. 802.]

Purchase and exchange sales

**839c(c). Purchase and exchange sales**

**839c(c)(1)**. Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.
[Northwest Power Act, §5(c)(1), 94 Stat. 2713.]

**839c(c)(2)**. The purchase and exchange sale referred to in paragraph (1) of this subsection with any electric utility shall be limited to an amount not in excess of 50 per centum of such utility's Regional residential load in the year beginning July 1, 1980, such 50 per centum limit increasing in equal

annual increments to 100 per centum of such load in the year beginning July 1, 1985, and each year thereafter.
[Northwest Power Act, §5(c)(2), 94 Stat. 2713.]

**839c(c)(3)**. The cost benefits, as specified in contracts with the Administrator, of any purchase and exchange sale referred to in paragraph (1) of this subsection which are attributable to any electric utility's residential load within a State shall be passed through directly to such utility's residential loads within such State, except that a State which lies partially within and partially without the region may require that such cost benefits be distributed among all of the utility's residential loads in that State.
[Northwest Power Act, §5(c)(3), 94 Stat. 2713.]

**839c(c)(4)**. An electric utility may terminate, upon reasonable terms and conditions agreed to by the Administrator and such utility prior to such termination, its purchase and sale under this subsection if the supplemental rate charge provided for in section 839e(b)(3) of this title is applied and the cost of electric power sold to such utility under this subsection exceeds, after application of such rate charge, the average system cost of power sold by such utility to the Administrator under this subsection.
[Northwest Power Act, §5(c)(4), 94 Stat. 2713.]

Termination

**839c(c)(5)**. Subject to the provisions of sections 839b and 839d of this title, in lieu of purchasing any amount of electric power offered by a utility under paragraph (1) of this subsection, the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility.
[Northwest Power Act, §5(c)(5), 94 Stat. 2714.]

In lieu acquisition

**839c(c)(6)**. Exchange sales to a utility pursuant to this subsection shall not be restricted below the amounts of electric power acquired by the Administrator from, or on behalf of, such utility pursuant to this subsection.
[Northwest Power Act, §5(c)(6), 94 Stat. 2714.]

**839c(c)(7)**. The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the Council, the Administrator's customers, and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission. Such average system cost shall not include—

Average system cost

**839c(c)(7)(A)**. the cost of additional resources in an amount sufficient to serve any new large single load of the utility;
[Northwest Power Act, §5(c)(7)(A), 94 Stat. 2714.]

**839c(c)(7)(B)**. the cost of additional resources in an amount sufficient to meet any additional load outside the region occurring after December 5, 1980; and
[Northwest Power Act, §5(c)(7)(B), 94 Stat. 2714.]

**839c(c)(7)(C)**. any costs of any generating facility which is terminated prior to initial commercial operation.
[Northwest Power Act, §5(c)(7)(C), 94 Stat. 2714.]

**839c(d). Sales to existing direct service industrial customers**

DSIs, reserves

**839c(d)(1)(A)**. The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers. Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region.
[Northwest Power Act, §5(d)(1)(A), 94 Stat. 2714.]

**839c(d)(1)(B)**. After December 5, 1980, the Administrator shall offer in accordance with subsection (g) of this section to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of "industrial firm power."
[Northwest Power Act, §5(d)(1)(B), 94 Stat. 2714.]

**839c(d)(2)**. The Administrator shall not sell electric power, including reserves, directly to new direct service industrial customers.
[Northwest Power Act, §5(d)(2), 94 Stat. 2714.]

**839c(d)(3)**. The Administrator shall not sell amounts of electric power, including reserves, to existing direct service industrial customers in excess of the amount permitted under paragraph (1) unless the Administrator determines, after a plan has been adopted pursuant to section 839b of this title, that such proposed sale is consistent with the plan and that—

**839c(d)(3)(A)**. additional power system reserves are required for the region's firm loads,
[Northwest Power Act, §5(d)(3)(A), 94 Stat. 2714.]

**839c(d)(3)(B)**. the proposed sale would provide a cost-effective method of supplying such reserves,
[Northwest Power Act, §5(d)(3)(B), 94 Stat. 2714.]

**839c(d)(3)(C)**. such loads or loads of similar character cannot provide equivalent operating or planning benefits to the region if served by an electric utility under contractual arrangements providing reserves, and
[Northwest Power Act, §5(d)(3)(C), 94 Stat. 2714.]

**839c(d)(3)(D)**. the Administrator has or can acquire sufficient electric power to serve such loads, and
[Northwest Power Act, §5(d)(3)(D), 94 Stat. 2714.]

**839c(d)(3) [cont.]**. unless the Council has determined such sale is consistent with the plan. After such determination by the Administrator and by the Council, the Administrator is authorized to offer to existing direct service industrial customers power in such amounts in excess of the amount permitted under paragraph (1) of this subsection as the Administrator determines to be necessary to provide additional power system reserves to meet the region's firm loads.
[Northwest Power Act, §5(d)(3), 94 Stat. 2714-5.]

**839c(d)(4)(A)**. As used in this section, the term "existing direct service industrial customer" means any direct service industrial customer of the Administrator which has a contract for the purchase of electric power from the Administrator on December 5, 1980.
[Northwest Power Act, §5(d)(4)(A), 94 Stat. 2715.]

**839c(d)(4)(B)**. The term "new direct service industrial customer" means any industrial entity other than an existing direct service industrial customer.
[Northwest Power Act, §5(d)(4)(B), 94 Stat. 2715.]

**839c(d)(4)(C)(i)**. Where a new contract is offered in accordance with subsection (g) of this section to any existing direct service industrial customer which has not received electric power prior to December 5, 1980, from the Administrator pursuant to a contract with the Administrator existing on December 5, 1980, electric power delivered under such new contract shall be conditioned on the Administrator reasonably acquiring, in accordance with this chapter and within such estimated period of time (as specified in the contract) as he deems reasonable, sufficient resources to meet, on a planning basis, the load requirement of such customer. Such contract shall also provide that the obligation of the Administrator to acquire such resources to meet such load requirement shall, except as provided in clause (ii) of this subparagraph, apply only to such customer and shall not be sold or exchanged by such customer to any other person. New contracts
[Northwest Power Act, §5(d)(4)(C)(i), 94 Stat. 2715.]

**839c(d)(4)(C)(ii)**. Rights under a contract described in clause (i) of this subparagraph may be transferred by an existing direct service industrial customer referred to in clause (i) to a successor in interest in connection with a reorganization or other transfer of all major assets of such customer. Following such a transfer, such successor in interest (or any other subsequent successor in interest) may also transfer rights under such a contract only in connection with a reorganization or other transfer of all assets of such successor in interest. Contract rights
[Northwest Power Act, §5(d)(4)(C)(ii), 94 Stat. 2715.]

**839c(d)(4)(C)(iii)**. The limitations of clause (i) of this subparagraph shall not apply to any customer referred to in clause (i) whenever the Administrator determines that such customer is receiving electric power pursuant to a contract referred to in such clause (ii).
[Northwest Power Act, §5(d)(4)(C)(iii), 94 Stat. 2715.]

**839c(e). Contractual entitlements to firm power**

Firm power entitlement

**839c(e)(1)**. The contractual entitlement to firm power of any customer from whom, or on whose behalf, the Administrator has acquired electric power pursuant to section 839d of this title may not be restricted below the amount of electric power so acquired from, or on behalf of, such customer. If in any year such customer's requirements are less than such entitlement, any excess of such entitlement shall be first made available to increase the entitlement of other customers of the same class before being available for the entitlement of other customers. For purposes of this paragraph, the following entities shall each constitute a class:

**839c(e)(1)(A)**. public bodies and cooperatives;
[Northwest Power Act, §5(e)(1)(A), 94 Stat. 2715.]

**839c(e)(1)(B)**. Federal agencies;
[Northwest Power Act, §5(e)(1)(B), 94 Stat. 2715.]

**839c(e)(1)(C)**. direct service industrial; and
[Northwest Power Act, §5(e)(1)(C), 94 Stat. 2715.]

**839c(e)(1)(D)**. investor owned utilities.
[Northwest Power Act, §5(e)(1)(D), 94 Stat. 2715.]

**839c(e)(2)**. Any contractual entitlement to firm power which is based on electric power acquired from, or on behalf of, a customer pursuant to section 839d of this title shall be in addition to any other contractual entitlement to firm power not subject to restriction that such customer may have under this section. For the purposes of this subsection, references to amounts of power acquired by the Administrator pursuant to section 839d of this title shall be deemed to mean the amounts specified in the resource acquisition contracts exclusive of any amounts recognized in such contracts as replacement for Federal base system resources.
[Northwest Power Act, §5(e)(2), 94 Stat. 2715-6.]

**839c(e)(3)**. The Administrator shall, consistent with the provisions of this chapter, insure that any restrictions upon any particular customer class made pursuant to this subsection and subsection (b) of this section are distributed equitably throughout the region.
[Northwest Power Act, §5(e)(3), 94 Stat. 2716.]

**839c(f). Surplus power**

Surplus power

The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Project Act of 1937 (16 U.S.C. 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), and the Act of August 31, 1964 (16 U.S.C. 837-837h).
[Northwest Power Act, §5(f), 94 Stat. 2716.]

**839c(g). Long-term contracts**

Administrator shall offer contracts

**839c(g)(1)**. As soon as practicable within 9 months after December 5, 1980, the Administrator shall commence necessary negotiations for, and offer, initial long-term contracts (within the limitations of the third sentence of section 5(a) of the Bonneville Project Act [16 U.S.C. 832(a)]) simultaneously to—

**839c(g)(1)(A)**. existing public body and cooperative customers and investor-owned utility customers under subsection (b) of this section;
[Northwest Power Act, §5(g)(1)(A), 94 Stat. 2716.]

**839c(g)(1)(B)**. Federal agency customers under subsection (b) of this section;
[Northwest Power Act, §5(g)(1)(B), 94 Stat. 2716.]

**839c(g)(1)(C)**. electric utility customers under subsection (c) of this section; and
[Northwest Power Act, §5(g)(1)(C), 94 Stat. 2716.]

**839c(g)(1)(D)**. direct service industrial customers under subsection (d)(1) of this section.
[Northwest Power Act, §5(g)(1)(D), 94 Stat. 2716.]

One year to accept

**839c(g)(2)**. Each customer offered a contract pursuant to this subsection shall have one year from the date of such offer to accept such contract. Such contract shall be effective as provided in this subsection.
[Northwest Power Act, §5(g)(2), 94 Stat. 2716.]

Effective date of contracts

**839c(g)(3)**. An initial contract with a public body, cooperative or investor-owned electric utility customer or a Federal agency customer pursuant to subsection (b) of this section shall be effective on the date executed by such customer, unless another effective date is otherwise agreed to by the Administrator and the customer.
[Northwest Power Act, §5(g)(3), 94 Stat. 2716.]

**839c(g)(4)**. An initial contract with an electric utility customer pursuant to subsection (c) of this section shall be effective on the date executed by

such customer, but no earlier than the first day of the tenth month after December 5, 1980.
[Northwest Power Act, §5(g)(4), 94 Stat. 2716.]

**839c(g)(5)**. An initial contract with a direct service industrial customer pursuant to subsection (d)(1) of this section, shall be effective on the date agreed upon by the Administrator and such customer, but no later than the first day of the tenth month after December 5, 1980. When such contract is executed, it may for rate purposes be given retroactive effect to such first day.
[Northwest Power Act, §5(g)(5), 94 Stat. 2716.]

Periods of insufficiency

**839c(g)(6)**. Initial contracts offered public body, cooperative and Federal agency customers in accordance with this subsection shall provide that during a period of insufficiency declared in accordance with subsection (b) of this section each customer's contractual entitlement shall, to the extent of its requirements on the Administrator, be no less than the amount of firm power received from the Administrator in the year immediately preceding the period of insufficiency.
[Northwest Power Act, §5(g)(6), 94 Stat. 2716.]

Sufficient resources

**839c(g)(7)**. The Administrator shall be deemed to have sufficient resources for the purpose of entering into the initial contracts specified in paragraph (1)(A) through (D).
[Northwest Power Act, §5(g)(7), 94 Stat. 2716.]

**839d. Conservation and resource acquisition**

**839d(a). Conservation measures; resources**

Conservation

**839d(a)(1)**. The Administrator shall acquire such resources through conservation, implement all such conservation measures, and acquire such renewable resources which are installed by a residential or small commercial consumer to reduce load, as the Administrator determines are consistent with the plan, or if no plan is in effect with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title and, in the case of major resources, in accordance with subsection (c) of this section. Such conservation measures and such resources may include, but are not limited to—

**839d(a)(1)(A)**. loans and grants to consumers for insulation or weatherization, increased system efficiency, and waste energy recovery by direct application,
[Northwest Power Act, §6(a)(1)(A), 94 Stat. 2717.]

**839d(a)(1)(B)**. technical and financial assistance to, and other cooperation with, the Administrator's customer and governmental authorities to encourage maximum cost-effective voluntary conservation and the attainment of

any cost-effective conservation objectives adopted by individual States or subdivisions thereof,
[Northwest Power Act, §6(a)(1)(B), 94 Stat. 2717.]

**839d(a)(1)(C)**. aiding the Administrator's customers and governmental authorities in implementing model conservation standards adopted pursuant to section 839b(f) of this title, and
[Northwest Power Act, §6(a)(1)(C), 94 Stat. 2717.]

**839d(a)(1)(D)**. conducting demonstration projects to determine the cost effectiveness of conservation measures and direct application of renewable energy resources.
[Northwest Power Act, §6(a)(1)(D), 94 Stat. 2717.]

**839d(a)(2)**. In addition to acquiring electric power pursuant to section 839c(c) of this title, or on a short-term basis pursuant to section 11(b)(6)(i) of the Federal Columbia River Transmission System Act [16 U.S.C. 838i(b)(6)(i)], the Administrator shall acquire, in accordance with this section, sufficient resources—

**839d(a)(2)(A)**. to meet his contractual obligations that remain after taking into account planned savings from measures provided for in paragraph (1) of this subsection, and
[Northwest Power Act, §6(a)(2)(A), 94 Stat. 2717.]

**839d(a)(2)(B)**. to assist in meeting the requirements of section 839b(h) of this title.
[Northwest Power Act, §6(a)(2)(B), 94 Stat. 2717.]

**839d(a)(2) [cont.]**. The Administrator shall acquire such resources without considering restrictions which may apply pursuant to section 839c(b) of this title.
[Northwest Power Act, §6(a)(2), 94 Stat. 2717.]

**839d(b). Acquisition of resources**

**839d(b)(1)**. Except as specifically provided in this section, acquisition of resources under this chapter shall be consistent with the plan, as determined by the Administrator.
[Northwest Power Act, §6(b)(1), 94 Stat. 2717.]

Acquisition of resources

**839d(b)(2)**. The Administrator may acquire resources (other than major resources) under this chapter which are not consistent with the plan, but which are determined by the Administrator to be consistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(2), 94 Stat. 2717.]

**839d(b)(3)**. If no plan is in effect, the Administrator may acquire resources under this chapter which are determined by the Administrator to be consistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(3), 94 Stat. 2717.]

**839d(b)(4)**. The Administrator shall acquire any non-Federal resources to replace Federal base system resources only in accordance with the provisions of this section. The Administrator shall include in the contracts for the acquisition of any such non-Federal replacement resources provisions which will enable him to ensure that such non-Federal replacement resources are developed and operated in a manner consistent with the considerations specified in section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(4), 94 Stat. 2717.]

**839d(b)(5)**. Notwithstanding any acquisition of resources pursuant to this section, the Administrator shall not reduce his efforts to achieve conservation and to acquire renewable resources installed by a residential or small commercial consumer to reduce load, pursuant to subsection (a)(1) of this section.
[Northwest Power Act, §6(b)(5), 94 Stat. 2717-8.]

Procedure for acquiring major resources

**839d(c). Procedure for acquiring major resources, implementing conservation measures, paying or reimbursing investigation and preconstruction expenses, or granting billing credits**

Proposals

**839d(c)(1)**. For each proposal under subsection (a), (b), (f), (h) or (l) of this section to acquire a major resource, to implement a conservation measure which will conserve an amount of electric power equivalent to that of a major resource, to pay or reimburse investigation and preconstruction expenses of the sponsors of a major resource, or to grant billing credits or services involving a major resource, the Administrator shall—

Notice

**839d(c)(1)(A)**. publish notice of the proposed action in the Federal Register and provide a copy of such notice to the Council, the Governor of each State in which facilities would be constructed or a conservation measure implemented, and the Administrator's customers;
[Northwest Power Act, §6(c)(1)(A), 94 Stat. 2718.]

Hearing

**839d(c)(1)(B)**. not less than sixty days following publication of such notice, conduct one or more public hearings, presided over by a hearing officer, at which testimony and evidence shall be received, with opportunity for such rebuttal and cross-examination as the hearing officer deems appropriate in the development of an adequate hearing record;
[Northwest Power Act, §6(c)(1)(B), 94 Stat. 2718.]

Record

**839d(c)(1)(C)**. develop a record to assist in evaluating the proposal which shall include the transcript of the public hearings, together with exhibits, and

such other materials and information as may have been submitted to, or developed by, the Administrator; and
[Northwest Power Act, §6(c)(1)(C), 94 Stat. 2718.]

**839d(c)(1)(D)**. following completion of such hearings, promptly provide to the Council and make public a written decision that includes, in addition to a determination respecting the requirements of subsection (a), (b), (f), (h), (l), or (m) of this section, as appropriate—

Written decision

**839d(c)(1)(D)(i)**. if a plan is in effect, a finding that the proposal is either consistent or inconsistent with the plan or, notwithstanding its inconsistency with the plan, a finding that it is needed to meet the Administrator's obligations under this chapter, or
[Northwest Power Act, §6(c)(1)(D)(i), 94 Stat. 2718.]

**839d(c)(1)(D)(ii)**. if no plan is in effect, a finding that the proposal is either consistent or inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or notwithstanding its inconsistency, a finding that it is needed to meet the Administrator's obligations under this chapter.
[Northwest Power Act, §6(c)(1)(D)(ii), 94 Stat. 2718.]

**839d(c)(1)(D)[cont.]**. In the case of subsection (f) of this section, such decision shall be treated as satisfying the applicable requirements of this subsection and of subsection (f) of this section, if it includes a finding of probable consistency, based upon the Administrator's evaluation of information available at the time of completion of the hearing under this paragraph. Such decision shall include the reasons for such finding.
[Northwest Power Act, §6(c)(1)(D), 94 Stat. 2718.]

**839d(c)(2)**. Within sixty days of the receipt of the Administrator's decision pursuant to paragraph (1)(D) of this subsection, the Council may determine by a majority vote of all members of the Council, and notify the Administrator—

**839d(c)(2)(A)**. that the proposal is either consistent or inconsistent with the plan, or
[Northwest Power Act, §6(c)(2)(B), 94 Stat. 2718.]

**839d(c)(2)(B)**. if no plan is in effect, that the proposal is either consistent or inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(c)(2)(B), 94 Stat. 2718.]

**839d(c)(3)**. The Administrator may not implement any proposal referred to in paragraph (1) that is determined pursuant to paragraph (1) or (2) by either the Administrator or the Council to be inconsistent with the plan or, if no plan is in effect, with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title—

**839d(c)(3)(A)**. unless the Administrator finds that, notwithstanding such inconsistency, such resource is needed to meet the Administrator's obligations under this chapter, and
[Northwest Power Act, §6(c)(3)(A), 94 Stat. 2718-9.]

**839d(c)(3)(B)**. until the expenditure of funds for that purpose has been specifically authorized by Act of Congress enacted after December 5, 1980,
[Northwest Power Act, §6(c)(3)(B), 94 Stat. 2719.]

Implementation of proposals

**839d(c)(4)**. Before the Administrator implements any proposal referred to in paragraph (1) of this subsection, the Administrator shall—

**839d(c)(4)(A)**. submit to the appropriate committees of the Congress the administrative record of the decision (including any determination by the Council under paragraph (2)) and a statement of the procedures followed or to be followed for compliance with the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.],
[Northwest Power Act, §6(c)(4)(A), 94 Stat. 2719.]

**839d(c)(4)(B)**. publish notice of the decision in the Federal Register, and
[Northwest Power Act, §6(c)(4)(B), 94 Stat. 2719.]

**839d(c)(4)(C)**. note the proposal in the Administrator's annual or supplementary budget submittal made pursuant to the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following).
[Northwest Power Act, §6(c)(4)(C), 94 Stat. 2719.]

**839d(c)(4) [cont.]**. The Administrator may not implement any such proposal until ninety days after the date on which such proposal has been noted in such budget or after the date on which such decision has been published in the Federal Register, whichever is later.
[Northwest Power Act, §6(c)(4), 94 Stat. 2719.]

**839d(c)(5)**. The authority of the Council to make a determination under paragraph (2)(B) if no plan is in effect shall expire on the date two years after the establishment of the Council.
[Northwest Power Act, §6(c)(5), 94 Stat. 2719.]

Acquisition of other than major resources

**839d(d). Acquisition of resources other than major resources**
The Administrator is authorized to acquire a resource, other than a major resource, whether or not such resource meets the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title but which he determines is an experimental, developmental, demonstration, or pilot project of a type with a potential for providing cost-effective service to the region. The Administrator shall make no obligation for the acquisition of such resource until it is included in the annual budgets submitted to the Congress pursuant to the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.].

[Northwest Power Act, §6(d), 94 Stat. 2719.]

**839d(e). Effectuation of priorities; use of customers and local entities**

**839d(e)(1)**. In order to effectuate the priority given to conservation measures and renewable resources under this chapter, the Administrator shall, to the maximum extent practicable, make use of his authorities under this chapter to acquire conservation measures and renewable resources, to implement conservation measures, and to provide credits and technical and financial assistance for the development and implementation of such resources and measures (including the funding of, and the securing of debt for, expenses incurred during the investigation and preconstruction of resources, as authorized in subsection (f) of this section).
[Northwest Power Act, §6(e)(1), 94 Stat. 2719.]

**839d(e)(2)**. To the extent conservation measures or acquisition of resources require direct arrangements with consumers, the Administrator shall make maximum practicable use of customers and local entities capable of administering and carrying out such arrangements.
[Northwest Power Act, §6(e)(2), 94 Stat. 2719.]

Acquisition agreements

**839d(f). Agreements; investigation and initial development of renewable resources other than major resources; reimbursement of investigation and preconstruction expenses**

**839d(f)(1)**. For resources which the Administrator determines may be eligible for acquisition under this section and satisfy the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or, if a plan is in effect, to be consistent with the plan, the Administrator is authorized to enter into agreements with sponsors of—

Renewable resources

**839d(f)(1)(A)**. a renewable resource, other than a major resource, to fund or secure debt incurred in the investigation and initial development of such resource, or
[Northwest Power Act, §6(f)(1)(A), 94 Stat. 2719.]

**839d(f)(1)(B)**. any other resource to provide for the reimbursement of the sponsor's investigation and preconstruction expenses concerning such resource (which expenses shall not include procurement of capital equipment or construction material for such resource).
[Northwest Power Act, §6(f)(1)(B), 94 Stat. 2720.]

**839d(f)(1) [cont.]**. In the case of any resource referred to in subparagraph (B) of this paragraph, such reimbursement is authorized only if—

Reimbursement of expenses

**839d(f)(1)(B)(i)**. such resource is subsequently denied State citing approval or other necessary Federal or State permits, or approvals,
[Northwest Power Act, §6(f)(1)(B)(i), 94 Stat. 2720.]

**839d(f)(1)(B)(ii)**. such investigation subsequently demonstrates, as

determined by the Administrator, that such resource does not meet the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or is not acceptable because of environmental impacts, or

[Northwest Power Act, §6(f)(1)(B)(ii), 94 Stat. 2720.]

**839d(f)(1)(B)(iii)**. after such investigation the Administrator determines not to acquire the resource and the sponsor determines not to construct the resource.

[Northwest Power Act, §6(f)(1)(B)(iii), 94 Stat. 2720.]

**839d(f)(2)**. The Administrator may exercise the authority of this subsection only after he determines that the failure to do so would result in inequitable hardship to the consumers of such sponsors. The Administrator may provide reimbursement under this subsection only for expenses incurred after December 5, 1980.

[Northwest Power Act, §6(f)(2), 94 Stat. 2720.]

**839d(f)(3)**. Any agreement under paragraph (1) of this subsection shall provide the Administrator an option to acquire any such resource, including a renewable resource, and shall include such other provisions, as the Administrator deems appropriate, for the Administrator's recovery from such sponsors or any assignee of the sponsors, if such sponsor or assignee continues development of the resource, of any advances made by the Administrator pursuant to such agreement.

[Northwest Power Act, §6(f)(3), 94 Stat. 2720.]

**839d(f)(4)**. The Administrator shall not reimburse any expense incurred by the sponsors (except necessary expenses involved in the liquidation of the resource) after the date of a final denial of application for State citing approval or after the date the Administrator determines that the resource to be inconsistent with the plan or the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.

[Northwest Power Act, §6(f)(4), 94 Stat. 2720.]

**839d(g). Environmental impact statements**

At the request of the appropriate State, any environmental impact statement which may be required with respect to a resource, to the extent determined possible by the Administrator in accordance with applicable law and regulations, may be prepared jointly and in coordination with any required environmental impact statement of the State or any other statement which serves the purpose of an environmental impact statement which is required by State law.

[Northwest Power Act, §6(g), 94 Stat. 2720.]

Billing credits

**839d(h). Billing credits**

**839d(h)(1)**. If a customer so requests, the Administrator shall grant billing credits to such customer, and provide services to such customer at rates established for such services, for—

**839d(h)(1)(A)**. conservation activities independently undertaken or continued after December 5, 1980, by such customer or political subdivision served by such customer which reduce the obligation of the Administrator that would otherwise have existed to acquire other resources under this chapter, or
[Northwest Power Act, §6(h)(1)(A), 94 Stat. 2720.]

**839d(h)(1)(B)**. resources constructed, completed, or acquired after December 5, 1980, by a customer, an entity acting on behalf of such customer, or political subdivision served by the customer which reduce the obligation of the Administrator to acquire resources under this chapter. Such resources shall be renewable resources or multipurpose projects or other resources which are not inconsistent with the plan or, in the absence of a plan, not inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(h)(1)(B), 94 Stat. 2720-1.]

**839d(h)(2)**. The energy and capacity on which a credit under this subsection to a customer is based shall be the amount by which a conservation activity or resource actually changes the customer's net requirement for supply of electric power or reserves from the Administrator.
[Northwest Power Act, §6(h)(2), 94 Stat. 2721.]

**839d(h)(3)**. The amount of credits for conservation under this subsection shall be set to credit the customer implementing or continuing the conservation activity for which the credit is granted for the savings resulting from such activity. The rate impact on the Administrator's other customers of granting the credit shall be equal to the rate impact such customers would have experienced had the Administrator been obligated to acquire resources in an amount equal to that actually saved by the activity for which the credit is granted.
[Northwest Power Act, §6(h)(3), 94 Stat. 2721.]

**839d(h)(4)**. For resources other than conservation, the customer shall be credited for net costs actually incurred by such customer, an entity acting on behalf of such customer, or political subdivision served by such customer, in acquiring, constructing, or operating the resource for which the credit is granted. The rate impact to the Administrator's other customers of granting the credit shall be no greater than the rate impact such customers would have experienced had the Administrator been obligated to acquire resources in an amount equal to that actually produced by the resource for which the credit is granted.
[Northwest Power Act, §6(h)(4), 94 Stat. 2721.]

**839d(h)(5)**. Retail rate structures which are voluntarily implemented by the Administrator's customers and which induce conservation or installation of consumer-owned renewable resources shall be considered, for purposes of this subsection, to be (A) conservation activities independently undertaken or carried on by such customers, or (B) customer-owned renewable resources, and shall qualify for billing credits upon the same showing as that required for other conservation or renewable resource activities.
[Northwest Power Act, §6(h)(5), 94 Stat. 2721.]

**839d(h)(6)**. Prior to granting any credit or providing services pursuant to this subsection, the Administrator shall—

**839d(h)(6)(A)**. comply with the notice provisions of subsection (c) of this section, and include in such notice the methodology the Administrator proposes to use in determining the amount of any such credit;
[Northwest Power Act, §6(h)(6)(A), 94 Stat. 2721.]

**839d(h)(6)(B)**. include the cost of such credit in the Administrator's annual or amended budget submittal to the Congress made pursuant to the Federal Columbia River Transmission System Act (16 U.S.C. 838(j))[16 U.S.C. 838 et seq.];
[Northwest Power Act, §6(h)(6)(B), 94 Stat. 2721.]

Excess resources

**839d(h)(6)(C)**. require that resources in excess of customer's reasonable load growth shall have been offered to others for ownership participation or other sponsorship pursuant to subsection (m) of this section, except in the case of conservation, multi-purpose projects uniquely suitable for development by the customer, or renewable resources; and
[Northwest Power Act, §6(h)(6)(C), 94 Stat. 2721.]

**839d(h)(6)(D)**. require that the operators of any generating resource for which a billing credit is to be granted agree to operate such resource in a manner compatible with the planning and operation of the region's power system.
[Northwest Power Act, §6(h)(6)(D), 94 Stat. 2721.]

Contracts

**839d(i). Contracts**
Contracts for the acquisition of resources and for billing credits for major resources, including conservation activities, entered into pursuant to this section shall contain such terms and conditions, applicable after the contract is entered into, as will—

**839d(i)(1)**. insure timely construction, scheduling, completion, and operation of resources.
[Northwest Power Act, §6(i)(1), 94 Stat. 2721.]

**839d(i)(2)**. insure that the costs of any acquisition are as low as reasonably possible, consistent (A) with sound engineering, operating, and safety practices, and (B) the protection, mitigation, and enhancement of fish and

wildlife, including related spawning grounds and habitat affected by the development of such resources, and
[Northwest Power Act, §6(i)(2), 94 Stat. 2722.]

**839d(i)(3)**. insure that the Administrator exercises effective oversight, inspection, audit, and review of all aspects of such construction and operation.
[Northwest Power Act, §6(i)(3), 94 Stat. 2722.]

**839d(i) [cont.]**. Such contracts shall contain provisions assuring that the Administrator has the authority to approve all costs of, and proposals for, major modifications in construction, scheduling or operations and to assure that the Administrator is provided with such current information as he deems necessary to evaluate such construction and operation.
[Northwest Power Act, §6(i), 94 Stat. 2722.]

**839d(j). Obligations not to be considered general obligations of United States or secured by full faith and credit of United States**

**839d(j)(1)**. All contractual and other obligations required to be carried out by the Administrator pursuant to this chapter and shall be secured solely by the Administrator's revenues received from the sale of electric power and other services. Such obligations are not, nor shall they be construed to be, general obligations of the United States, nor are such obligations intended to be or are they secured by the full faith and credit of the United States.
[Northwest Power Act, §6(j)(1), 94 Stat. 2722.]

Obligations secured by revenues

**839d(j)(2)**. All contracts entered into by the Administrator for the acquisition of resources pursuant to this chapter shall require that, in the sale of any obligations, all offerings and promotional material for the sale of such obligations shall include the language contained in the second sentence of paragraph (1) of this subsection. The Administrator shall monitor and enforce such requirement.
[Northwest Power Act, §6(j)(2), 94 Stat. 2722.]

**839d(k). Equitable distribution of benefits**
In the exercise of his authorities pursuant to this section, the Administrator shall, consistent with the provisions of this chapter and the Administrator's obligations to particular customer classes, insure that benefits under this section, including financial and technical assistance, conduct of conservation demonstrations, and experimental projects, services, and billing credits, are distributed equitably throughout the region.
[Northwest Power Act, §6(k), 94 Stat. 2722.]

Equitable distribution of benefits

**839d(l). Investigations**

**839d(l)(1)**. The Administrator is authorized and directed to investigate opportunities for adding to the region's resources or reducing the region's power costs through the accelerated or cooperative development of resources

located outside the States of Idaho, Montana, Oregon, and Washington if such resources are renewable resources, and are now or in the future planned or considered for eventual development by nonregional agencies or authorities that will or would own, sponsor, or otherwise develop them. The Administrator shall keep the Council fully and currently informed of such investigations, and seek the Council's advice as to the desirability of pursuing such investigations.
[Northwest Power Act, §6(l)(1), 94 Stat. 2722.]

Interregional exchanges

**839d(l)(2)**. The Administrator is authorized and directed to investigate periodically opportunities for mutually beneficial interregional exchanges of electric power that reduce the need for additional generation or generating capacity in the Pacific Northwest and the regions with which such exchanges may occur. The Council shall take into consideration in formulating a plan such investigations.
[Northwest Power Act, §6(l)(2), 94 Stat. 2722.]

**839d(l)(3)**. After the Administrator submits a report to Congress pursuant to paragraph (5) of this subsection, the Administrator is authorized to acquire resources consistent with such investigations and consistent with the plan or, if no plan is in effect, with the priorities of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title. Such acquisitions shall be in accordance with the provisions of this subsection.
[Northwest Power Act, §6(l)(3), 94 Stat. 2722.]

**839d(1)(4)**. The Administrator shall conduct the investigations and the acquisitions, if any, authorized under this subsection with the assistance of other Federal agencies as may be appropriate.
[Northwest Power Act, §6(l)(4), 94 Stat. 2723.]

**839d(1)(5)**. No later than July 1, 1981, the Administrator shall submit to the Congress a report of the results of the investigation undertaken pursuant to this subsection, together with the prospects for obtaining additional resources under the authority granted by this subsection and for reductions in generation or generating capacity through exchanges.
[Northwest Power Act, §6(l)(5), 94 Stat. 2723.]

**839d(m). Offering of reasonable shares to each Pacific Northwest electric utility**

Shares offer to utilities

Except as to resources under construction on December 5, 1980, the Administrator shall determine in each case of a major resource acquisition that a reasonable share of the particular resource, or a reasonable equivalent, has been offered to each Pacific Northwest electric utility for ownership, participation, or other sponsorship, but not in excess of the amounts needed to meet such utility's Regional load.
[Northwest Power Act, §6(m), 94 Stat. 2723.]

Improvements funded by Administrator

**839d-1**. Without further appropriation and without fiscal year limitation, the Secretaries of the Interior and Army are authorized to plan, design, construct,

operate and maintain generation additions, improvements and replacements, at their respective Federal projects in the Pacific Northwest Region, and to operate and maintain the respective Secretary's power facilities in the Region, that the respective Secretary determines necessary or appropriate and that the Administrator subsequently determines necessary or appropriate, with any funds that the Administrator determines to make available to the respective Secretary for such purposes. Each Secretary is authorized, without further appropriation, to accept and use such funds for such purposes: **Provided,** That such funds shall continue to be exempt from sequestration pursuant to section 255(g)(1) of the Balanced Budget and Emergency Deficit Control Act of 1985 [2 U.S.C. 901-922]: **Provided further,** That this section not modify or affect the applicability of any provision of this chapter. This provision shall be effective on October 1, 1993.

[Energy Policy Act of 1992, P. L. No. 102-486, Title XXIV, §2406, Oct. 24, 1992, 106 Stat. 3099.]

**839e. Rates**

Rates for sale and distribution of power

**839e(a). Establishment; periodic review and revision; confirmation and approval by Federal Energy Regulatory Commission**

**839e(a)(1)**. The Administrator shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. Such rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the cost associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law. Such rates shall be established in accordance with sections 9 and 10 of the Federal Columbia River Transmission System Act (16 U.S.C. 838) [16 U.S.C. 838g and 838h], section 5 of the Flood Control Act of 1944 [16 U.S.C. 825s], and the provisions of this chapter.

[Northwest Power Act, §7(a)(1), 94 Stat. 2723.]

**839e(a)(2)**. Rates established under this section shall become effective only, except in the case of interim rules as provided in subsection (i)(6) of this section, upon confirmation and approval by the Federal Energy Regulatory Commission upon a finding by the Commission, that such rates—

Approval by FERC

**839e(a)(2)(A)**. are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

[Northwest Power Act, §7(a)(2)(A), 94 Stat. 2723.]

**839e(a)(2)(B)**. are based upon the Administrator's total system costs, and

[Northwest Power Act, §7(a)(2)(B), 94 Stat. 2723.]

**839e(a)(2)(C)**. insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.
[Northwest Power Act, §7(a)(2)(C), 94 Stat. 2723.]

Application of rates

**839e(b). General application of rates to meet general requirements**

**839e(b)(1)**. The Administrator shall establish a rate or rates of general application for electric power sold to meet the general requirements of public body, cooperative, and Federal agency customers within the Pacific Northwest, and loads of electric utilities under section 839c(c) of this title. Such rate or rates shall recover the costs of that portion of the Federal base system resources needed to supply such loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the cost of additional electric power as needed to supply such loads, first from the electric power acquired by the Administrator under section 839c(c) of this title and then from other resources.
[Northwest Power Act, §7(b)(1), 94 Stat. 2723.]

**839e(b)(2)**. After July 1, 1985, the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers, exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events, may not exceed in total, as determined by the Administrator, during any year after July 1, 1985, plus the ensuing four years, an amount equal to the power costs for general requirements of such customers if, the Administrator assumes that—

**839e(b)(2)(A)**. the public body and cooperative customers' general requirements had included during such five-year period the direct service industrial customer loads which are—

**839e(b)(2)(A)(i)**. served by the Administrator, and
[Northwest Power Act, §7(b)(2)(A)(i), 94 Stat. 2724.]

**839e(b)(2)(A)(ii)**. located within or adjacent to the geographic service boundaries of such public bodies and cooperatives;
[Northwest Power Act, §7(b)(1)(A)(ii), 94 Stat. 2724.]

Section 7(b)(2) analysis

**839e(b)(2)(B)**. public body, cooperative, and Federal agency customers were served, during such five-year period, with Federal base system resources not obligated to other entities under contracts existing as of December 5, 1980, (during the remaining term of such contracts) excluding obligations to direct service industrial customer loads included in subparagraph (A) of this paragraph;
[Northwest Power Act, §7(b)(2)(B), 94 Stat. 2724.]

**839e(b)(2)(C)**. no purchases or sales by the Administrator as provided in section 839c(c) of this section were made during such five-year period;
[Northwest Power Act, §7(b)(2)(C), 94 Stat. 2724.]

**839e(b)(2)(D)**. all resources that would have been required, during such five-year period, to meet remaining general requirements of the public body, cooperative and Federal agency customers (other than requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph) were—

**839e(b)(2)(D)(i)**. purchased from such customers by the Administrator pursuant to section 839d of this title, or
[Northwest Power Act, §7(b)(2)(D)(i), 94 Stat. 2724.]

**839e(b)(2)(D)(ii)**. not committed to load pursuant to section 839c(b), of this section
[Northwest Power Act, §7(b)(2)(D)(ii), 94 Stat. 2724.]

**839e(b)(2)(D) [cont.]**. and were the least expensive resources owned or purchased by public bodies or cooperatives; and any additional needed resources were obtained at the average cost of all other new resources acquired by the Administrator; and
[Northwest Power Act, §7(b)(2)(D), 94 Stat. 2724.]

**839e(b)(2)(E)**. the quantifiable monetary savings, during such five-year period, to public body, cooperative and Federal agency customers resulting from—

**839e(b)(2)(E)(i)**. reduced public body and cooperative financing costs as applied to the total amount of resources, other than Federal base system resources, identified under subparagraph (D) of this paragraph, and
[Northwest Power Act, §7(b)(2)(E)(i), 94 Stat. 2724.]

**839e(b)(2)(E)(ii)**. reserve benefits as a result of the Administrator's actions under this chapter
[Northwest Power Act, §7(b)(2)(E)(ii), 94 Stat. 2724.]

**839e(b)(2)(E)[cont.]**. were not achieved.
[Northwest Power Act, §7(b)(2)(E), 94 Stat. 2724.]

**839e(b)(3)**. Any amounts not charged to public body, cooperative, and Federal agency customers by reason of paragraph (2) of this subsection shall be recovered through supplemental rate charges for all other power sold by the Administrator to all customers. Rates charged public body, cooperative, or Federal agency customers pursuant to this subsection shall not include any costs or benefits of a net revenue surplus or deficiency occurring for the period ending June 30, 1985, to the extent such surplus or deficiency is caused by—

Supplemental rate charges

**839e(b)(3)(A)**. a difference between actual power deliveries and power deliveries projected for the purpose of establishing rates to direct service industrial customers under subsection (c)(1) of this subsection, and
[Northwest Power Act, §7(b)(3)(A), 94 Stat. 2724.]

**839e(b)(3)(B)**. an overrecovery or underrecovery of the net costs incurred by the Administrator under section 839c(c) of this title as a result of such difference.
[Northwest Power Act, §7(b)(3)(B), 94 Stat. 2724.]

**839e(b)(3) [cont.]**. Any such revenue surplus or deficiency incurred shall be recovered from, or repaid to, customer over a reasonable period of time after July 1, 1985, through a supplemental rate charge or credit applied proportionately for all other power sold by the Administrator at rates established under other subsections of this section prior to July 1, 1985.
[Northwest Power Act, §7(b)(3), 94 Stat. 2724-5.]

**839e(b)(4)**. The term "general requirements" as used in this section means the public body, cooperative or Federal agency customer's electric power purchased from the Administrator under section 839c(b) of this title, exclusive of any new large single load.
[Northwest Power Act, §7(b)(3), 94 Stat. 2725.]

**839e(c). Rates applicable to direct service industrial customers**

DSI rates

**839e(c)(1)**. The rate or rates applicable to direct service industrial customers shall be established—

**839e(c)(1)(A)**. for the period prior to July 1, 1985, at a level which the Administrator estimates will be sufficient to recover the cost of resources the Administrator determines are required to serve such customers' load and the net costs incurred by the Administrator pursuant to section 839c(c) of this title, based upon the Administrator's projected ability to make power available to such customers pursuant to their contracts, to the extent that such costs are not recovered through rates applicable to other customers; and
[Northwest Power Act, §7(c)(1)(A), 94 Stat. 2725.]

**839e(c)(1)(B)**. for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.
[Northwest Power Act, §7(c)(1)(B), 94 Stat. 2725.]

**839e(c)(2)**. The determination under paragraph (1)(B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account—

**839e(c)(2)(A)**. the comparative size and character of the loads served,
[Northwest Power Act, §7(c)(2)(A), 94 Stat. 2725.]

**839e(c)(2)(B)**. the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and
[Northwest Power Act, §7(c)(2)(B), 94 Stat. 2725.]

**839e(c)(2)(C)**. direct and indirect overhead costs,
[Northwest Power Act, §7(c)(2)(C), 94 Stat. 2725.]

**839e(c)(2) [cont.]**. all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.
[Northwest Power Act, §7(c)(2), 94 Stat. 2725.]

**839e(c)(3)**. The Administrator shall adjust such rates to take into account the value of power system reserves made available to the Administrator through his rights to interrupt or curtail service to such direct service industrial customers.
[Northwest Power Act, §7(c)(3), 94 Stat. 2725.]

**839e(d). Discount rates; special rates**

**839e(d)(1)**. In order to avoid adverse impacts on retail rates of the Administrator's customers with low system densities, the Administrator shall, to the extent appropriate, apply discounts to the rate or rates for such customers.
[Northwest Power Act, §7(d)(1), 94 Stat. 2725.]

Low-density discounts

**839e(d)(2)**. In order to avoid adverse impacts of increased rates pursuant to this chapter on any direct service industrial customer using raw minerals indigenous to the region as its primary resource, the Administrator, upon request of such customer showing such impacts and after considering the effect of such request on his other obligations under this chapter, is authorized, if the Administrator determines that such impacts will be significant, to establish a special rate applicable to such customer if all power sold to such customer may be interrupted, curtailed, or withdrawn to meet firm loads in the region. Such rate shall be established in accordance with this section and shall include such terms and conditions as the Administrator deems appropriate.
[Northwest Power Act, §7(d)(2), 94 Stat. 2725.]

**839e(e). Uniform rates; rates for sale of peaking capacity; time-of-day, seasonal, and other rates**

Nothing in this chapter prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms.
[Northwest Power Act, §7(e), 94 Stat. 2726.]

Rate forms

**839e(f). Basis for rates**
Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be based upon the cost of the portions of Federal base system resources, purchases of power under section 839c(c) of this title and additional resources which, in the determination of the Administrator, are applicable to such sales.
[Northwest Power Act, §7(f), 94 Stat. 2726.]

**839e(g). Allocation of costs and benefits**

Allocation of costs

Except to the extent that the allocation of costs and benefits is governed by provisions of law in effect on December 5, 1980, or by other provisions of this section, the Administrator shall equitably allocate to power rates, in accordance with generally accepted ratemaking principles and the provisions of this chapter, all costs and benefits not otherwise allocated under this section, including, but not limited to, conservation, fish and wildlife measures, uncontrollable events, reserves, the excess costs of experimental resources acquired under section 839d of this title, the cost of credits granted pursuant to section 839d of this title, operating services, and the sale of or inability to sell excess electric power.
[Northwest Power Act, §7(g), 94 Stat. 2726.]

**839e(h). Surcharges**
Notwithstanding any other provision of this section (except the provisions of subsection (a) of this section), the Administrator shall adjust power rates to include any surcharges arising under section 838b(f) of this title, and shall allocate any revenues from such charges in such manner as the Administrator determines will help achieve the purposes of section 838b(f) of this title.
[Northwest Power Act, §7(h), 94 Stat. 2726.]

**839e(i). Procedures**

Rate-making procedures

In establishing rates under this section, the Administrator shall use the following procedures:

**839e(i)(1)**. Notice of the proposed rates shall be published in the Federal Register with a statement of the justification and reasons supporting such rates. Such notice shall include a date for a hearing in accordance with paragraph (2) of this subsection.
[Northwest Power Act, §7(i)(1), 94 Stat. 2726.]

Hearings

**839e(i)(2)**. One or more hearings shall be conducted as expeditiously as practicable by a hearing officer to develop a full and complete record and to receive public comment in the form of written and oral presentation of views, data, questions, and argument related to such proposed rates. In any such hearing—

**839e(i)(2)(A)**. any person shall be provided an adequate opportunity by the hearing officer to offer refutation or rebuttal of any material submitted by any other person or the Administrator, and
[Northwest Power Act, §7(i)(2)(A), 94 Stat. 2726.]

**839e(i)(2)(B)**. the hearing officer, in his discretion, shall allow a reasonable opportunity for cross examination, which, as determined by the hearing officer, is not dilatory, in order to develop information and material relevant to any such proposed rate.
[Northwest Power Act, §7(i)(2)(B), 94 Stat. 2726.]

**839e(i)(3)**. In addition to the opportunity to submit oral and written material at the hearings, any written views, data, questions, and arguments submitted by persons prior to, or before the close of, hearings shall be made a part of the administrative record.
[Northwest Power Act, §7(i)(3), 94 Stat. 2726.]

**839e(i)(4)**. After such a hearing, the Administrator may propose revised rates, publish such proposed rates in the Federal Register, and conduct additional hearings in accordance with this subsection.
[Northwest Power Act, §7(i)(4), 94 Stat. 2726.]

**839e(i)(5)**. The Administrator shall make a final decision establishing a rate or rates based on the record which shall include the hearing transcript, together with exhibits, and such other materials and information as may have been submitted to, or developed by, the Administrator. The decision shall include a full and complete justification of the final rates pursuant to this section.
[Northwest Power Act, §7(i)(5), 94 Stat. 2726-7.]

Interim rates

**839e(i)(6)**. The final decision of the Administrator shall become effective on confirmation and approval of such rates by the Federal Energy Regulatory Commission pursuant to subsection (a)(2) of this section. The Commission shall have the authority, in accordance with such procedures, if any, as the Commission shall promptly establish and make effective within one year after December 5, 1980, to approve the final rate submitted by the Administrator on an interim basis, pending the Commission's final decision in accordance with such subsection. Pending the establishment of such procedures by the Commission, if such procedures are required, the Secretary is authorized to approve such interim rates during such one-year period in accordance with the applicable procedures followed by the Secretary prior to December 5, 1980,. Such interim rates, at the discretion of the Secretary, shall continue in effect until July 1, 1982.
[Northwest Power Act, §7(i)(6), 94 Stat. 2727.]

**839e(j). Cost figures to be indicated on rates schedules and power billings**
All rate schedules adopted, and all power billings rendered, by the Administrator pursuant to this section shall indicate—

**839e(j)(1)**. the approximate cost contribution of different resource categories to the Administrator's rates for the sale of energy and capacity, and
[Northwest Power Act, §7(j)(1), 94 Stat. 2727.]

**839e(j)(2)**. the cost of resources acquired to meet load growth within the region and the relation of such cost to the average cost of resources available to the Administrator.

[Northwest Power Act, §7(j)(2), 94 Stat. 2727.]

**839e(k). Statutory basis for procedures used in establishing rates or rate schedules**

Rates for nonfirm

Notwithstanding any other provision of this chapter, all rates or rate schedules for the sale of nonfirm electric power within the United States, but outside the region, shall be established after December 5, 1980, by the Administrator in accordance with the procedures of subsection (i) of this section (other than the first sentence of paragraph (6) thereof) and in accordance with the Bonneville Project Act [16 U.S.C. 832 et seq.], the Flood Control Act of 1944, and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.]. Notwithstanding section 201(f) of the Federal Power Act [16 U.S.C. 824(f)], such rates or rate schedules shall become effective after review by the Federal Energy Regulatory Commission for conformance with the requirements of such Acts and after approval thereof by the Commission. Such review shall be based on the record of proceedings established under subsection (i) of this section. The parties to such proceedings under subsection (i) of this section shall be afforded an opportunity by the Commission for an additional hearing in accordance with the procedures established for ratemaking by the Commission pursuant to the Federal Power Act [16 U.S.C. 791a et seq.].

Review by FERC

[Northwest Power Act, §7(k), 94 Stat. 2727.]

**839e(l). Rates for sales outside United States; negotiations**

Negotiated rates outside U.S.

In order to further the purposes of this chapter and to protect the consumers of the region, the Administrator may negotiate, or establish, rates for electric power sold by the Administrator to any entity not located in the United States which shall be equitable in relation to rates for all electric power which is, or may be, purchased by the Administrator or the Administrator's customers from entities outside the United States. In establishing rates other than by negotiation, the provisions of subsection (i) of this section shall apply. In the case of any negotiation with an entity not located in the United States, the Administrator shall provide public notice of any proposal to negotiate such rates. Such negotiated rates shall be not less than rates established under this chapter for nonfirm power sold within the United States but outside the region. The Administrator shall also afford notice of any rates negotiated pursuant to this subsection.

[Northwest Power Act, §7(l), 94 Stat. 2727.]

Payments

**839e(m). Impact aid payments; formula**

**839e(m)(1)**. Beginning the first fiscal year after the plan and program required by section 838b(d) and (h) of this title are finally adopted, the Administrator may, subject to the provisions of this section, make annual impact aid payments to the appropriate local governments within the region with respect to major transmission facilities of the Administrator, as defined

in section 3(c) of the Federal Columbia River Transmission Act [16 U.S.C. 838a(c)]—

**839e(m)(1)(A)**. which are located within the jurisdictional boundaries of such governments,
[Northwest Power Act, §7(m)(1)(A), 94 Stat. 2727-8.]

**839e(m)(1)(B)**. which are determined by the Administrator to have a substantial impact on such governments, and
[Northwest Power Act, §7(m)(1)(B), 94 Stat. 2728.]

**839e(m)(1)(C)**. where the construction of such facilities, or any modification thereof, is completed after December 5, 1980, and, in the case of a modification of an existing facility, such modification substantially increases the capacity of such existing transmission facility.
[Northwest Power Act, §7(m)(1)(C), 94 Stat. 2728.]

**839e(m)(2)**. Payments made under this subsection for any fiscal year shall be determined by the Administrator pursuant to a regionwide, uniform formula to be established by rule in accordance with the procedures set forth in subsection (i) of this section. Such rule shall become effective on its approval, after considering its effect on rates established pursuant to this section, by the Federal Energy Regulatory Commission, In developing such formula, the Administrator shall identify, and take into account, the local governmental services provided to the Administrator concerning such facilities and the associated costs to such governments as the result of such facilities.
[Northwest Power Act, §7(m)(2), 94 Stat. 2728.]

Payment formula

**839e(m)(3)**. Payments made pursuant to this subsection shall be made solely from the fund established by section 11 of the Federal Columbia River Transmission System Act [16 U.S.C. 838i]. The provisions of section 13 of such Act [16 U.S.C. 838k], and any appropriations provided to the Administrator under any law, shall not be available for such payments. The authorization of payments under this subsection shall not be construed as an obligation of the United States.
[Northwest Power Act, §7(m)(3), 94 Stat. 2728.]

**839e(m)(4)**. No payment may be made under this subsection with respect to any land or interests in land owned by the United States within the region and administered by any Federal agency (other than the Administrator), without regard to how the United States obtained ownership thereof, including lands or interests therein acquired or withdrawn by a Federal agency for purposes of such agency and subsequently made available to the Administrator for such facilities.[8]
[Northwest Power Act, §7(m)(4), 94 Stat. 2728.]

8 §8 of this Act consists of amendments to existing law and is codified as part of the statutes that it amends. See, e.g., Transmission System Act §11(b)(6) 16 U.S.C. §838i(b)(6) *supra*, page 64.

**839e(n). Limiting the inclusion of costs of protection of, mitigation of damage to, and enhancement of fish and wildlife, within rates charged by the Bonneville Power Administration, to the rate period in which the costs are incurred**

Notwithstanding any other provision of this section, rates established by the Administrator, under this section shall recover costs for protection, mitigation and enhancement of fish and wildlife, whether under this chapter or any other Act, not to exceed such amounts the Administrator forecasts will be expended during the fiscal year 2002-2006 rate period, while preserving the Administrator's ability to establish appropriate reserves and maintain a high Treasury payment probability for the subsequent rate period.

[As amended Pub.L. 106-60, § 316, Sept. 29, 1999, 113 Stat. 497.]

**839f. Administrative provisions**

Contracts

**839f(a). Contract authority**

Subject to the provisions of this chapter, The Administrator is authorized to contract in accordance with section 2(f) of the Bonneville Project Act of 1937 (16 U.S.C. 832a(f)). Other provisions of law applicable to such contracts on December 5, 1980, shall continue to be applicable.

[Northwest Power Act, §9(a), 94 Stat. 2729-30.]

**839f(b). Executive and administrative functions of Administrator of Bonneville Power Administration; sound and businesslike implementation of chapter**

The Administrator shall discharge the executive and administrative functions of his office in accordance with the policy established by the Bonneville Project Act of 1937 (16 U.S.C. 832 and following), section 7152(a)(2) and (3) of title 42, and this chapter. The Secretary of Energy, the Council, and the Administrator shall take such steps as are necessary to assure the timely implementation of this chapter in a sound and business-like manner. Nothing in this chapter shall be construed by the Secretary, the Administrator, or any other official of the Department of Energy to modify, after, or otherwise affect the requirements and directives expressed by the Congress in section 7152(a)(2) and (3) of title 42 or the operations of such officials as they existed prior to December 5, 1980.

[Northwest Power Act, §9(b), 94 Stat. 2730.]

Contracts outside Pacific Northwest

**839f(c). Limitations and conditions on contracts for sale or exchange of electric power for use outside Pacific Northwest**

Any contract of the Administrator for the sale or exchange of electric power for use outside the Pacific Northwest shall be subject to limitations and conditions corresponding to those provided in sections 2 and 3 of the Act of August 31, 1964 (16 U.S.C. 837a and 837b) for any contract for the sale, delivery, or exchange of hydroelectric energy or peaking capacity generated within the Pacific Northwest for use outside the Pacific Northwest. In applying such sections for the purposes of this subsection, the term "surplus energy" shall mean electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy, and the term "surplus

peaking capacity" shall mean electric peaking capacity for which there is no demand in the Pacific Northwest at the rate established for the disposition of such capacity. The authority granted, and duties imposed upon, the Secretary by sections 5 and 7 of such Act (16 U.S.C. 837e and 837f) [16 U.S.C. 837d and 837f] shall also apply to the Administrator in connection with resources acquired by the Administrator pursuant to this chapter. The Administrator shall, in making any determination, under any contract executed pursuant to section 839c of this title, of the electric power requirements of any Pacific Northwest customer, which is a non-Federal entity having its own generation, exclude, in addition to hydroelectric generated energy excluded from such requirements pursuant to section 3(d) of such Act (16 U.S.C. 837b(d)), any amount of energy included in the resources of such customer for service to firm loads in the region if (1) such amount was disposed of by such customer outside the region, and (2) as a result of such disposition, the firm energy requirements of such customer or other customers of the Administrator are increased. Such amount of energy shall not be excluded, if the Administrator determines that through reasonable measures such amount of energy could not be conserved or otherwise retained for service to regional loads. The Administrator may sell as replacement for any amount of energy so excluded only energy that would otherwise be surplus.
[Northwest Power Act, §9(c), 94 Stat. 2730.]

**839f(d). Disposition of power which does not increase amount of firm power Administrator is obligated to provide to any customer**
No restrictions contained in subsection (c) of this section shall limit or interfere with the sale, exchange or other disposition of any power by any utility or group thereof from any existing or new non-Federal resource if such sale, exchange or disposition does not increase the amount of firm power the Administrator would be obligated to provide to any customer. In addition to the directives contained in subsections (i)(1)(B) and (i)(3) and subject to:

**839f(d)(1)**. any contractual obligations of the Administrator,
[Northwest Power Act, §9(d)(1), 94 Stat. 2730.]

**839f(d)(2)**. any other obligations under existing law, and
[Northwest Power Act, §9(d)(2), 94 Stat. 2730.]

**839f(d)(3)**. the availability of capacity in the Federal transmission system,
[Northwest Power Act, §9(d)(3), 94 Stat. 2731.]

**839f(d) [cont.]**. the Administrator shall provide transmission access, load factoring, storage and other services normally attendant thereto to such utilities and shall not discriminate against any utility or group thereof on the basis of independent development of such resource in providing such services.
[Northwest Power Act, §9(d), 94 Stat. 2730-1.]

Judicial Review

**839f(e). Judicial review; suits**

**839f(e)(1)**. For purposes of sections 701 through 706 of title 5, the following actions shall be final actions subject to judicial review—

**839f(e)(1)(A)**. adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;
[Northwest Power Act, §9(e)(1)(A), 94 Stat. 2731.]

**839f(e)(1)(B)**. sales, exchanges, and purchases of electric power under section 839c of this title;
[Northwest Power Act, §9(e)(1)(B), 94 Stat. 2731.]

**839f(e)(1)(C)**. the Administrator's acquisition of resources under section 839d of this title;
[Northwest Power Act, §9(e)(1)(C), 94 Stat. 2731.]

**839f(e)(1)(D)**. implementation of conservation measures under section 839d of this title;
[Northwest Power Act, §9(e)(1)(D), 94 Stat. 2731.]

**839f(e)(1)(E)**. execution of contracts for assistance to sponsors under section 839d(f) of this title;
[Northwest Power Act, §9(e)(1)(E), 94 Stat. 2731.]

**839f(e)(1)(F)**. granting of credits under section 839d(h) of this title;
[Northwest Power Act, §9(e)(1)(F), 94 Stat. 2731.]

**839f(e)(1)(G)**. final rate determinations under section 839e of this title; and
[Northwest Power Act, §9(e)(1)(G), 94 Stat. 2731.]

**839f(e)(1)(H)**. any rule prescribed by the Administrator under section 839e(m)(2) of this title.
[Northwest Power Act, §9(e)(1)(H), 94 Stat. 2731.]

Record of final action

**839f(e)(2)**. The record upon review of such final actions shall be limited to the administrative record compiled in accordance with this chapter. The scope of review of such actions without a hearing or after a hearing shall be governed by section 706 of title 5, except that final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e(i) of this title considered as a whole. The scope of review of an action under section 839d(c) of this title shall be governed by section 706 of title 5. Nothing in this section shall be construed to require a hearing pursuant to section 554, 556, or 557 of title 5.
[Northwest Power Act, §9(e)(2), 94 Stat. 2731.]

**839f(e)(3)**. Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator.
[Northwest Power Act, §9(e)(3), 94 Stat. 2731.]

**839f(e)(4)**. For purposes of this subsection—

**839f(e)(4)(A)**. major resources shall be deemed to be acquired upon publication in the Federal Register pursuant to section 839d(c)(4)(B) of this title;
[Northwest Power Act, §9(e)(4)(A), 94 Stat. 2731.]

**839f(e)(4)(B)**. resources, other than major resources, shall be deemed to be acquired upon execution of the contract therefor;
[Northwest Power Act, §9(e)(4)(B), 94 Stat. 2731.]

**839f(e)(4)(C)**. conservation measures shall be deemed to be implemented upon execution of the contract or grant therefore; and
[Northwest Power Act, §9(e)(4)(C), 94 Stat. 2731.]

**839f(e)(4)(D)**. rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission.
[Northwest Power Act, §9(e)(4)(D), 94 Stat. 2731.]

Legal challenges

**839f(e)(5)**. Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. 832 et seq.], the Act of August 31, 1964 (16 U.S.C. 837-837h), or the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.
[Northwest Power Act, §9(e)(5), 94 Stat. 2731-2.]

**839f(f). Tax treatment of interest on governmental obligations**
For purposes of enabling the Administrator to acquire resources necessary to meet the firm load of public bodies, cooperatives, and Federal agencies from a governmental unit at a cost no greater than the cost which would be applicable in the absence of such acquisition, the exemption from gross

income of interest on certain governmental obligations provided in section 103(a)(1) of title 26 shall not be affected by the Administrator's acquisition of such resources if—

**839f(f)(1)**. the Administrator, prior to contracting for such acquisition, certifies to his reasonable belief, that the persons for whom the Administrator is acquiring such resources for sale pursuant to section 839c of this title are public bodies, cooperatives, and Federal agencies, unless the Administrator also certifies that he is unable to acquire such resources without selling a portion thereof to persons who are not exempt persons (as defined in section 103(b) of title 26), and
[Northwest Power Act, §9(f)(1), 94 Stat. 2732.]

**839f(f)(2)**. based upon such certification, the Secretary of the Treasury determines in accordance with applicable regulations that less than a major portion of the resource is to be furnished to persons who are not exempt persons (as defined in section 103(b) of title 26).
[Northwest Power Act, §9(f)(2), 94 Stat. 2732.]

**839f(f) [cont.]**. The certification under paragraph (1) shall be made in accordance with this subsection and a procedure and methodology approved by the Secretary of the Treasury. For purposes of this subsection, the term "major portion" shall have the meaning provided by regulations issued by the Secretary of the Treasury.
[Northwest Power Act, §9(f), 94 Stat. 2732.]

**839f(g). Review of rates for sale of power to Administrator by investor-owned utility customers**

FERC review of investor-owned utility rates

When reviewing rates for the sale of power to the Administrator by an investor-owned utility customer under section 839c(c) or 839d of this title, the Federal Energy Regulatory Commission shall, in accordance with section 824h of this title—

**839f(g)(1)**. convene a joint State board, and
[Northwest Power Act, §9(g)(1), 94 Stat. 2732.]

**839f(g)(2)**. invest such board with such duties and authority as will assist the Commission in its review of such rates.
[Northwest Power Act, §9(g)(1), 94 Stat. 2732.]

**839f(h). Companies which own or operate facilities for the generation of electricity primarily for sale to Administrator**

**839f(h)(1)**. No "Company" (as defined in section 79b(a)(2) of title 15), which owns or operates facilities for the generation of electricity (together with associated transmission and other facilities) primarily for sale to the Administrator under section 839d of this title shall be deemed an "electric utility company" (as defined in section 79b(a)(3) of the title 15), within the meaning of any provision or provisions of chapter 2C of title 15, if at least

90 per centum of the electricity generated by such company is sold to the Administrator under section 839d of this title, and if—

**839f(h)(1)(A)**. the organization of such company is consistent with the policies of section 79a(b) and (c) of title 15, as determined by the Securities and Exchange Commission, with the concurrence of the Administrator, at the time of such organization; and
[Northwest Power Act, §9(h)(1)(A), 94 Stat. 2732.]

**839f(h)(1)(B)**. participation in any facilities of such "company" has been offered to public bodies and cooperatives in the region pursuant to section 839d(m) of this title.
[Northwest Power Act, §9(h)(1)(B), 94 Stat. 2733.]

**839f(h)(2)**. The Administrator shall include in any contract for the acquisition of a major resource from such "company" provisions limiting the amount of equity investment, if any, in such "company" to that which the Administrator determines will be consistent with achieving the lowest attainable power costs attributable to such major resource.
[Northwest Power Act, §9(h)(2), 94 Stat. 2733.]

**839f(h)(3)**. In the case of any "company" which meets the requirements of paragraph (1), the Administrator, with the concurrence of such Commission, shall approve all significant contracts entered into by, and between, such "company" and any sponsor company or any subsidiary of such sponsor company which are determined to be consistent with the policies of section 79a(b) and (c) of title 15 at the time such contracts are entered into. The Administrator and the Securities and Exchange Commission shall exercise such approval authority within sixty days after receipt of such contracts. Such contracts shall not be effective without such approval.
[Northwest Power Act, §9(h)(3), 94 Stat. 2733.]

**839f(h)(4)**. Paragraph (1) of this subsection shall continue to apply to any such "company" unless the Administrator or the Securities and Exchange Commission, or both, through periodic review, (A) determine at any time that the "company" no longer operates in a manner consistent with the policies of section 79a(b) and (c) of title 15 and in accordance with this subsection, and (B) notify the "company" in writing of such preliminary determination. This subsection shall cease to apply to such "company" thirty days after receipt of notification of a final determination thereof. A final determination shall be made only after public notice of the preliminary determination and after a hearing completed not later than sixty days from the date of publication of such notice. Such final determination shall be made within thirty days after the date of completion of such hearing.
[Northwest Power Act, §9(h)(4), 94 Stat. 2733.]

**839f(i). Electric power acquisition or disposition**

Acquisition and disposition of electric power

**839f(i)(1)**. At the request and expense of any customer or group of customers of the Administrator within the Pacific Northwest, the Administrator shall, to the extent practicable—

**839f(i)(1)(A)**. acquire any electric power required by (i) any customer or group of customers to enable them to replace resources determined to serve firm load under section 839c(b) of this title, or (ii) direct service industrial customers to replace electric power that is or may be curtailed or interrupted by the Administrator (other than power the Administrator is obligated to replace), with the cost of such replacement power to be distributed among the direct service industrial customers requesting such power; and
[Northwest Power Act, §9(i)(1)(A), 94 Stat. 2733.]

**839f(i)(1)(B)**. dispose of, or assist in the disposal of, any electric power that a customer or group of customers proposes to sell within or without the region at rates and upon terms specified by such customer or group of customers, if such disposition is not in conflict with the Administrator's other marketing obligations and the policies of this chapter and other applicable laws.
[Northwest Power Act, §9(i)(1)(B), 94 Stat. 2733.]

**839f(i)(2)**. In implementing the provisions of subparagraphs (A) and (B) of paragraph (1), the Administrator may prescribe policies and conditions for the independent acquisition or disposition of electric power by any direct service industrial customer or group of such customers for the purpose of assuring each direct service industrial customer an opportunity to participate in such acquisition or disposition.
[Northwest Power Act, §9(i)(2), 94 Stat. 2733.]

**839f(i)(3)**. The Administrator shall furnish services including transmission, storage, and load factoring unless he determines such services cannot be furnished without substantial interference with his power marketing program, applicable operating limitations or existing contractual obligations. The Administrator shall, to the extent practicable, give priority in making such services available for the marketing, within and without the Pacific Northwest, of capability from projects under construction on December 5, 1980, if such capability has been offered for sale at cost, including a reasonable rate of return, to the Administrator pursuant to this chapter and such offer is not accepted within one year.
[Northwest Power Act, §9(i)(3), 94 Stat. 2734.]

**839f(j). Retail rate designs which encourage conservation and efficient use of electric energy, installation of consumer-owned renewable resources, and rate research and development**

Report

**839f(j)(1)**. The Council, as soon as practicable after December 5, 1980, shall prepare, in consultation with the Administrator, the customers, appropriate State regulatory bodies, and the public, a report and shall make recommendations with respect to the various retail rate designs which will

encourage conservation and efficient use of electric energy and the installation of consumer-owned renewable resources on a cost-effective basis, as well as areas for research and development for possible application to retail utility rates within the region. Studies undertaken pursuant to this subsection shall not affect the responsibilities of any customer or the Administrator which may exist under the Public Utility Regulatory Policies Act of 1978.
[Northwest Power Act, §9(j)(1), 94 Stat. 2734.]

**839f(j)(2)**. Upon request, and solely on behalf of customers so requesting, the Administrator is authorized to (A) provide assistance in analyzing and developing retail rate structures that will encourage cost-effective conservation and the installation of cost-effective consumer-owned renewable resources; (B) provide estimates of the probable power savings and the probable amount of billing credits under section 839d(h) of this title that might be realized by such customers as a result of adopting and implementing such retail rate structures; and (C) solicit additional information and analytical assistance from appropriate State regulatory bodies and the Administrator's other customers.
[Northwest Power Act, §9(j)(2), 94 Stat. 2734.]

**839f(k). Executive position for conservation and renewable resources**

Executive for conservation

There is hereby established within the administration an executive position for conservation and renewable resources. Such executive shall be appointed by the Administrator and shall be assigned responsibility for conservation and direct-application renewable resource programs (including the administration of financial assistance for such programs). Such position is hereby established in the senior executive service in addition to the number of such positions heretofore established in accordance with other provisions of law applicable to such positions.
[Northwest Power Act, §9(k), 94 Stat. 2734.]

**839g. Savings provisions**

**839g(a). Rights of States and political subdivisions of States**

Nothing in this chapter shall be construed to affect or modify any right of any State or political subdivision thereof or electric utility to—

**839g(a)(1)**. determine retail electric rates, except as provided by section 839c(c)(3) of this title;
[Northwest Power Act, §10(a)(1), 94 Stat. 2734.]

**839g(a)(2)**. develop and implement plans and programs for the conservation, development, and use of resources; or
[Northwest Power Act, §10(a)(2), 94 Stat. 2734.]

**839g(a)(3)**. make energy facility citing decisions, including, but not limited to, determining the need for a particular facility, evaluating alternative sites,

and considering alternative methods of meeting the determined need.
[Northwest Power Act, §10(a)(3), 94 Stat. 2734.]

**839g(b). Rights and obligations under existing contracts**
Nothing in this chapter shall alter, diminish, or abridge the rights and obligations of the Administrator or any customer under any contract existing as of December 5, 1980.
[Northwest Power Act, §10(b), 94 Stat. 2735.]

**839g(c). Statutory preferences and priorities of public bodies and cooperatives in sale of federally generated power**
Nothing in this chapter shall alter, diminish, abridge, or otherwise affect the provisions of other Federal laws by which public bodies and cooperatives are entitled to preference and priority in the sale of federally generated electric power.
[Northwest Power Act, §10(c), 94 Stat. 2735.]

**839g(d). Contractual rights under provisions later found to be unconstitutional**
If any provision of this chapter is found to be unconstitutional, then any contract entered into by the Administrator, prior to such finding and in accordance with such provisions, to sell power, acquire or credit resources, or to reimburse investigation and preconstruction expenses pursuant to section 839c of this title, and section 839d(a), (f) or (h) of this title shall not be affected by such finding.
[Northwest Power Act, §10(d), 94 Stat. 2735.]

**839g(e). Treaty and other rights of Indian tribes**
Nothing in this chapter shall be construed to affect or modify any treaty or other right of an Indian tribe.
[Northwest Power Act, §10(e), 94 Stat. 2735.]

**839g(f). Reservation of electric power for Montana; Hungry Horse and Libby Dams and Reservoirs**
The reservation under law of electric power primarily for use in the State of Montana by reason of the construction of Hungry Horse and Libby Dams and Reservoirs within that State is hereby affirmed. Such reservation shall also apply to 50 per centum of any electric power produced at Libby Reregulating Dam if built. Electric power so reserved shall be sold at the rate or rates set pursuant to section 839e of this title.
[Northwest Power Act, §10(f), 94 Stat. 2735.]

**839g(g). Rights of States to prohibit recovery of resource construction costs through retail rates**
Nothing in this chapter shall be construed to affect or modify the right of any State to prohibit utilities regulated by the appropriate State regulatory body from recovering, through their retail rates, costs during any period of resource construction.
[Northwest Power Act, §10(g), 94 Stat. 2735.]

**839g(h). Water appropriations**

Nothing in this chapter shall be construed as authorizing the appropriation of water by any Federal, State, or local agency, Indian tribe, or any other entity or individual. Nor shall any provision of this chapter of any plan or program adopted pursuant to the chapter (1) affect the rights or jurisdictions of the United States, the States, Indian tribes, or other entities over waters of any river or stream or over any groundwater resource, (2) alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by the States, or (3) otherwise be construed to alter or establish the respective rights of States, the United States, Indian tribes, or any person with respect to any water or water-related right.

[Northwest Power Act, §10(h), 94 Stat. 2735.]

**839g(i). Existing Federal licenses, permits, and certificates**

Nothing in this chapter shall be construed to affect the validity of any existing license, permit, or certificate issued by any Federal agency pursuant to any other Federal law.

[Northwest Power Act, §10(i), 94 Stat. 2735.]

**839h. Separability of provisions**

If any provision of section 839b(a) through (c) of this title or any other provision of this chapter or the application thereof to any person, State, Indian tribe, entity, or circumstance is held invalid, neither the remainder of section 839b of this title or any other provisions of this chapter, nor the application of such provisions to other persons, States, Indian tribes, entities, or circumstances, shall be affected thereby.

[Northwest Power Act, §12, 94 Stat. 2735.]