IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Nos. 25-7137, 25-7142 (consolidated)

---

PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, WASHINGTON,

and

NORTHWEST REQUIREMENTS UTILITIES,

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

---

# RESPONDENT'S SUPPLEMENTAL EXCERPTS OF RECORD

---

MARCUS H. CHONG TIM
General Counsel
TIMOTHY A. JOHNSON
Assistant General Counsel
MARY C. BODINE-WATTS
Attorney
Bonneville Power Administration
PO Box 3621
Portland, OR 97208
503-230-3000

SCOTT E. BRADFORD
United States Attorney
District of Oregon

SEAN E. MARTIN
Assistant U.S. Attorney
1000 SW Third Ave.
Suite 600
Portland, OR 97201-2902
503-727-1010

J. COURTNEY OLIVE
Special Asst. U.S. Attorney
Attorneys for Respondent

## Index of Supplemental Excerpts of Record


| Document Description | Page Nos. in AR | Date Filed/ Published | Page Nos. in SER |
|---|---|---|---|
| CIP-3 Comments of Northwest Requirements Utilities | 104-05 | 11/13/2024 | 4-5 |
| CIP-12 Comments of Northwest Requirements Utilities | 120-22 | 3/18/2025 | 6-8 |
| Email from John Mertlich, Grant County PUD, to John Hairston, BPA, re: Provider of Choice support | 155 | 8/11/2025 | 9 |
| Email exchange between Mike Normandeau, BPA, and Richard Flanigan, Grant County PUD, re: Follow up | 156-58 | 7/29/2025 | 10-12 |
| 2029 Public Rate Design Methodology, PRDM-26-A-03 (excerpts) | 163, 168 | 7/7/2025 | 13-14 |
| Email from Mike Normandeau, BPA, to Andrew Munro, Grant County PUD, et al., re: Follow Up to Jan 11 Meeting (with attachment) | 747-48 | 3/13/2025 | 15-16 |
| Email from Mike Normandeau, BPA, to Andrew Munro, Grant County PUD, re: Request for Grant PUD amounts in CHWM Policy (with attachment) | 749-51 | 3/10/2025 | 17-19 |
| Bonneville Provider of Choice: Other Process Updates presentation (excerpts) | 829, 834 | 2/19/2025 | 20-21 |
| Grant County PUD Integrated Resource Plan 2024 (excerpts) | 1107, 1135 | 9/9/2024 | 22-23 |

| | | | |
|---|---|---|---|
| Bonneville Provider of Choice Policy Record of Decision (excerpts) | 1354, 1436-39, 1640-43 | 3/21/2024 | 24-32 |
| Tiered Rate Methodology, BP-12-A-03 (excerpts) | 2451, 2465-67 | 7/26/2011 | 33-36 |
| Close-Out Summary: Clarification on the Use of Customer Resource Amounts for High Water Mark Calculations (excerpts) | 2754, 2762-64 | 9/17/2008 | 37-40 |

Northwest Requirements Utilities

(503) 233-5823
825 NE Multnomah
Suite 1135
Portland, Oregon 97232

November 13, 2024

Submitted via electronic portal.

**RE: NRU Comments on the draft CHWM Implementation Policy**

Northwest Requirements Utilities (NRU) appreciates BPA developing the draft CHWM Implementation Policy to document the FY 2026 CHWM Calculation Process and the Provider of Choice Above-CHWM Load Process. NRU is a coalition of 57 mostly small, mostly rural utilities and one generation & transmission cooperative, all of which are customers of the Bonneville Power Administration. NRU represents 37% of Bonneville's Tier 1 load.

Listed below are suggested redlines and clarifying questions to the policy.

- Section 2.1: The publication of the draft CHWMs will kick off a ~~two-week~~ public comment period of at least 10 business days.
  - Recommend using the "at least" language used in the Above-CHWM Load Process section. This will allow BPA and customers more flexibility in determining the appropriate comment period length for the draft CHWMs as the specific timing of the FY 2026 CHWM Calculation Process is locked down.

- Section 3.1: The Preliminary Net Requirements will be based on the most recently agreed-upon load forecasts ~~provided by December of the previous year pursuant to Provider of Choice CHWM Contracts~~ and resource amounts will be based on Exhibit A values.
  - Recommend being less specific in the policy on the timing of load forecasts used in the Above-CHWM Load Process. Load Following customers do not have specific language in the contract requiring load forecast submittals, except regarding NLSLs.

- Section 3.3: If a customer's Above-CHWM load amounts in any year of the rate period are less than 1 aMW, the customer's Above-CHWM load amount may be subject to rounding pursuant to Exhibit C of their POC CHWM Contract.
  - Is this sentence a new Provider of Choice policy regarding Above-CHWM load service less than 1 aMW or is it intending to capture the 0.999 aMW operational convenience

language in the PRDM? If the former, will this load be served at Tier 1 rates? If the latter, will a customer's election to have up to 0.999 aMW of its Above-CHWM Load served through the core Tier 1 rate design result in a modification of its published Above-CHWM Load amounts?

Thank you for providing us with the opportunity to comment and clarify the draft CHWM Implementation Policy. Please let us know if you have any questions regarding our comments.

Sincerely,

Emily Traetow
Rates and Policy Director
Northwest Requirements Utilities

Northwest Requirements Utilities

(503) 233-5823
825 NE Multnomah
Suite 1135
Portland, Oregon 97232

March 18, 2025

Submitted via electronic portal.

**RE: NRU Comments on the draft Final CHWM Implementation Policy**

Northwest Requirements Utilities (NRU) appreciates BPA opening a second public comment period on the draft CHWM Implementation Policy. NRU is a coalition of 56 mostly small, mostly rural utilities and one generation & transmission cooperative, all of which are customers of the Bonneville Power Administration. NRU represents 37% of Bonneville's Tier 1 load.

NRU submitted comments on the first version of the CHWM Implementation Policy shared in October 2024. We appreciate the modifications BPA made to the policy in response to NRU's submitted comments and comments made during Provider of Choice contract workshops. The CHWM Implementation Policy is a crucial document to the Provider of Choice process in that it documents how BPA will conduct the FY 2026 CHWM Calculations and the new Above-CHWM Load Process.

Included in the CHWM Implementation Policy are the "Attachment A – Resources for FY 2026 CWHM Calculation". These amounts will be used to calculate PF-eligible load that is part of the CHWM Calculation for each customer. According to the Provider of Choice Policy, BPA will determine PF-eligible load using the energy net requirements methodology, specifically focusing on the portion of net requirements load which is eligible to be served at a PF rate. PF-eligible load is calculated as Total Retail Load less New Large Single Loads less Dedicated Resources.

In the draft CHWM Implementation Policy published in October 2024, BPA listed each customer and its dedicated resource amounts, if any. However, for Grant PUD's large hydropower resources on the Columbia River, Priest Rapids and Wanapum, BPA listed "TBD" in place of dedicated resource amounts. In the revised policy published in March 2025, BPA renamed these dedicated resources "Priest Rapids Project" and "Priest Rapids Project (NLSL)". This combines Priest Rapids and Wanapum Dams into a singular Priest Rapids Project (PRP), but then effectively creates two PRP dedicated resources for Grant PUD; one for its general requirements load, and one for its NLSLs. Further, the Priest Rapids Project (NLSL) CHWM Calculation Amount is 0 aMW.

We understand that BPA is not going to recreate a Regional Dialogue net requirements exhibit for Grant PUD. However, it is also our understanding that Grant agreed to declare 100 percent of its Priest Rapids Project to load for Regional Dialogue contract purposes, eliminating its "net requirement". Specifically, to eliminate Grant's net requirement and any 5(b) obligation on the Administrator for the term of the Regional Dialogue contract, Grant would need to have increased its existing share of PRP to 100 percent, as proposed, accounting for adjustments for shares owned by other parties, and to utilize other dedicated resources for service to its NLSLs as they were determined; otherwise, Grant would have been eligible to purchase power at PF rates as its general requirements load grew over the term of the contract.

Based on Grant's commitments during the Regional Dialogue process, we do not agree with BPA's determination that 153.648 annual aMW of Priest Rapids Project should be dedicated to Grant's NLSL rather than serving Grant's general requirements load. Issue 2 of Section H of the Regional Dialogue Policy Record of Decision clearly states that it was Grant PUD's intent to reduce its net requirement to 0 aMW in Regional Dialogue by completely dedicating its portion of Priest Rapids Project to load. Allowing Grant PUD to siphon a portion of PRP to its NLSL in Provider of Choice effectively ignores the general requirements load growth that Grant PUD experienced since 2012 and, perhaps more importantly, the language and intent of the Regional Dialogue Policy Record of Decision (ROD).

Moreover, while the 5(b)/9(c) Administrator's ROD anticipates an increase in 5(b) purchases from BPA in the event of a resource loss due to a FERC relicensing order, this is the first instance that we are aware of where the relicensing of a resource resulted in a change in that resource's dedication. Which is concerning not just with respect to this CHWM Implementation Policy, but also when considering the precedent this decision might set for future relicensing efforts. As we note above, Grant made the decision to declare and use all of its Priest Rapids Project output to serve its load, reducing its net requirement to zero. The relicensing of all or a portion of the PRP should not change that. Absent additional detail and justification, which we discuss further below, we have no choice but to strenuously object to the Draft Final CHWM Implementation Policy, and to clearly state our intent to preserve the right to dispute the CHWM Policy and process overall, not just the CHWM of a single NRU member.

Finally, the Provider of Choice Policy and ROD states that Grant PUD, as a returning public utility, will not have any special data provisions or unique processes when it comes to determining its net requirements load, including NLSLs, and CHWM. This means that the Base Allowance amount used for Grant PUD, which is unique because it is based on Grant's Subscription block amount and not FY 2024 RHWMs, does not guarantee that Grant PUD will have its PF-eligible load set equal to its Base Allowance. Instead, Grant PUD is required to go through the rigors of a net requirement process like all other customers, including being subject to the same net requirements transparency processes. All other customers with CHWM Contracts during Regional Dialogue have had their actual loads, load forecasts, and dedicated resources shared

on BPA's website over the years as part of the Net Requirements Transparency Process, RHWM Process, and rate case proceedings. We look forward to BPA making this data available as it considers Grant's net requirement determinations.

Thank you for providing us with the opportunity to comment on the draft CHWM Implementation Policy. Please let us know if you have any questions regarding our comments.

Sincerely,

Emily Traetow
Senior Rates and Policy Director
Northwest Requirements Utilities

**From:** John Mertlich <jmertlich@gcpud.org>
**Sent:** Monday, August 11, 2025 4:26 PM
**To:** Hairston,John L (BPA) - A-7 <jlhairston@bpa.gov>
**Subject:** Provider of Choice support

John – I wanted to connect and let you know Grant appreciates the extra effort you and your staff have put in on the CHWM calculation. Given that Grant is a returning utility and did not have a Regional Dialogue contract, and thus not a common baseline for Grant's CHWM calculation compared to other BPA PoC customers, I believe the final set of CHWM inputs provided to Mike Normandeau on 7/30 is a fair, reasonable and transparent estimate for inputs to the CHWM calculation. On this last point, I know that other BPA customers have expressed concerns that the treatment for Grant's initial CHWM calculation was not transparent. We believe that using the PNCA numbers for identifying the demand driven use of the Priest Rapids Project for 2008-2009 is reasonable and transparent. I believe there will be BPA customers that will question the fairness of any Tier 1 allocation to Grant especially given Grant's PRP resources, but Grant could point out many areas where we are a high value public power partner for the region:

- Our resources are a direct benefit to the region through our annual auction for a 30% slice of PRP,
- Funding and stakeholder work for the continued development of Markets+ to help drive regional market efficiencies,
- Partnering with BPA on transmission – project and operational work at the joint Wanapum Switchyard facilities, the recent work on the alternate CGS black-start route, and
- Bringing on new renewable resources in Grant County that meet growing regional needs.

I look forward to working with you and your team on the PoC contracts as well as other high value partnerships.

Thanks,

-John

**John Mertlich**
*GM/CEO*
**WORK** 509.906.6662
**EMAIL** jmertlich@gcpud.org

**From:** Normandeau,Mike (BPA) - PSE-RONAN <mrnormandeau@bpa.gov>
**Sent:** Tuesday, July 29, 2025 3:09 PM
**To:** Rich Flanigan <Rflanig@gcpud.org>; Andrew Munro <Amunro@gcpud.org>
**Subject:** Re: Follow Up

Thanks. I'm really not sure what to ask for in terms of specifics. Will pass on whatever you deem useful. I've asked BPA staff to do the same if there are specific questions. I may have more guidance tomorrow once we meet with execs.

Mike

---

**From:** Rich Flanigan <Rflanig@gcpud.org>
**Sent:** Tuesday, July 29, 2025 2:58:51 PM
**To:** Normandeau,Mike (BPA) - PSE-RONAN <mrnormandeau@bpa.gov>; Andrew Munro <Amunro@gcpud.org>
**Subject:** RE: Follow Up

Mike, we are trying to "show our work" for the Incremental Hydro and one of the ways we do this with the Washington State Auditor is to give them a download from WREGIS of our Incremental RECs that are in their system. I've attached the download and added a separate tab with the summary of Incremental Hydro RECs from each project. As I mentioned, for the State, we take the maximum 10-year average. Please give me a call if you have any questions or need further information or support.

Thanks,

Rich

---

**From:** Normandeau,Mike (BPA) - PSE-RONAN <mrnormandeau@bpa.gov>
**Sent:** Monday, July 28, 2025 2:05 PM
**To:** Rich Flanigan <Rflanig@gcpud.org>; Andrew Munro <Amunro@gcpud.org>
**Subject:** RE: Follow Up

***CAUTION: This email originated from outside of Grant PUD. Please take care when opening links, attachments or responding. ***

---

Rich- can you please provide the source data behind this table. I was expecting a letter. Is that forthcoming or was it decided not to submit?

Mike

**From:** Rich Flanigan <Rflanig@gcpud.org>
**Sent:** Monday, July 28, 2025 2:29 PM
**To:** Normandeau,Mike (BPA) - PSE-RONAN <mrnormandeau@bpa.gov>; Andrew Munro <Amunro@gcpud.org>
**Subject:** RE: Follow Up

Mike, here is the spreadsheet for the incremental generation gains from both the Priest and Wanapum fish bypasses and Wanapum efficiency gains from new turbines and generators. My back-of-the-envelope calculations I gave you on the call were off a bit for the fish bypasses and more than a bit on the Wanapum efficiency gains (I had a lower efficiency % increase than what we actually saw). Below is the 10-year minimum annual average generation increase for 100% of PRP and our 63%. For I-937, we actually get to pick the 10-year maximum.

| | 10 Year Minimum for PoC Calculations | | | |
|---|---|---|---|---|
| | Annual Avg Gen Increase (aMW) | | | |
| | PR Spill (aMW) | Wan Spill (aMW) | Wan Eff (aMW) | Total |
| **100% PRP** | **62.1** | **54.1** | **22.6** | **138.7** |
| **63% PRP** | **39.1** | **34.1** | **14.2** | **87.4** |

Please let me know if you have any questions. Thanks Mike.

Rich

---

**From:** Normandeau,Mike (BPA) - PSE-RONAN <mrnormandeau@bpa.gov>
**Sent:** Monday, July 28, 2025 9:27 AM
**To:** Rich Flanigan <Rflanig@gcpud.org>; Andrew Munro <Amunro@gcpud.org>
**Subject:** Follow Up

***CAUTION: This email originated from outside of Grant PUD. Please take care when opening links, attachments or responding. ***

Good morning.

Just a quick check in on any documentation you plan to submit. BPA staff is meeting this afternoon to review/discuss.

Thanks.

Mike

B O N N E V I L L E   P O W E R   A D M I N I S T R A T I O N



# 2029 PUBLIC RATE DESIGN METHODOLOGY

***Final Proposal***

PRDM-26-A-03

July 2025

# 1 BACKGROUND AND PURPOSE

Section 7(b)(1) of the Northwest Power Act requires BPA to establish a "rate or rates" for the sale of firm electric power to meet the "general requirements" load of public body, cooperative, and federal agency customers (public customers, or "Publics"). 16 U.S.C. § 839e(b)(1). The public customers' "general requirements" load is the electric power they purchase from the Administrator under Section 5(b) of the Northwest Power Act, excluding new large single loads. *Id.* at § 839e(b)(4).

This Public Rate Design Methodology (PRDM) is the rate methodology BPA will use beginning FY 2029-30 to develop the Section 7(b) rate for the general requirements of Publics with Contract High Water Mark (CHWM) Contracts. For purposes of the PRDM, the Section 7(b) rate is referred to as the Priority Firm Power (PF) rate. Consistent with Section 7(b) and the rate design discretion afforded to the Administrator by Section 7(e) of the Northwest Power Act, the PF rate design, as described herein, will be composed of two tiers. The first tier (Tier 1 Rates) sets rates designed to recover the costs associated with serving a public customer's general requirements load that is designated as CHWM Load under the terms of the public customer's CHWM Contract. The second tier (Tier 2 Rates) sets rates designed to recover the costs associated with serving a public customer's general requirements load that is designated as Above-Contract High Water Mark (Above-CHWM) Load under the terms of the public customer's CHWM Contract. The PRDM specifies how PF rates will be developed by BPA under these two tiers, with the objective of ensuring—to the maximum extent practical—that Tier 1 Rates do not include costs of serving a public customer's Above-CHWM Load.

**From:** Normandeau,Mike (BPA) - PSE-RONAN
**Sent:** Thursday, March 13, 2025 9:03 AM
**To:** Dave Churchman; Andrew Munro; Lon Peters
**Cc:** Patton,Kathryn B (BPA) - PSW-SEATTLE; Burczak,Sarah E (BPA) - PS-6; Moore,Lisa A (BPA) - PSSE-MEAD-GOB; Evans,Mary Beth (BPA) - PSSE-MEAD-GOB; Arguello,Adela M (BPA) - MSL-SEATTLE-JFB; Booth,Glen S (BPA) - MSL-4
**Subject:** Follow Up to Jan. 11 Meeting re: loads and attachment A calcs
**Attachments:** Grant CHWM Attachment A Amounts_Breakdown.xlsx

**Importance:** High

Good Morning,

Kate and I committed to a couple of follow up items at the end of the call on Tuesday.

1. Net Requirement Calc used to create Exhibit A amounts
2. Identify opportunities to meet with BPA Execs

Item 1 is attached. Please let Kate and I know if there are follow up questions regarding the numbers. We want to ensure a complete understanding of how the numbers were derived so you can make meaningful comments.

Item 2. I spoke with Kim and Sarah yesterday. Kim Thompsons (VP Requirements Marketings) and Suzanne Coooper (Senior VP Power/Interim COO) would like to meet for a discussion in the next couple of weeks. We will need to find a time that works. In the meantime, we request and greatly desire Grant's feedback and comments by Tuesday, March 18th, which is the close of the CHWM Implementation Policy comment period. Customer comments are scheduled to be shared with senior execs and the Administrator later this month. The comments received are the critical path forward for getting from the draft Policy and to a final Record of Decision. It's important that all concerns related to draft CHWM Policy and Attachment A are on the record.

Based on how the call goes with Kim and Suzanne, we can determine if a call with John Hairston is the appropriate next step. Call it "orderly escalation". As is always the case, you can jump the line, but we believe working this up the chain will produce the best result.

I do appreciate your time and attention. Many thanks for the data submission this morning. I'll follow up with Adela and Glen to see if there are follow up questions. We have another meeting scheduled for next Wednesday morning.

Mike

**Michael Normandeau**
**BONNEVILLE POWER ADMINISTRATION**
**DEPARTMENT OF ENERGY**
Customer Account Executive | Power Services/Requirements Marketing | PSE Eastern Hub
mrnormandeau@bpa.gov | 406-360-8714

| Net Requirement | 2010 | 2023 |
|---|---|---|
| **TRL** | 423.591 | 704.060 |
| **NLSLs** | -153.648 | -218.730 |
| **Existing Resources** | -269.943 | -308.198 |
| **Net Requirement** | 0.000 | 177.132 |

**Existing Resources Serving General Requirements Load**

| | | |
|---|---|---|
| PRP - Subscription | 236.123 | 234.869 |
| CEAEA - Subscription | -21.119 | -21.033 |
| PEC Headworks | 3.390 | **3.390** |
| Quincy | 2.910 | **2.910** |
| Pacificorp | -10.011 | |
| Unspecified | 26.844 | |
| Resource Removal | -0.783 | |
| Priest Rapids Returned Amount | 38.669 | 88.93 |
| Returned Amount CEAEA | -5.007 | -5.007 |
| PRP Relicensing Amount | 0 | 4.139 |
| Total Existing Resources | 271.016 | 308.198 |

**Resources Serving NLSLs**

| | | |
|---|---|---|
| PRP Relicensing Amount | 162.976 | 163.062 |
| PRP Relicensing CEAEA Additional Amount | -9.328 | -9.414 |
| Additional Resource Needed | 0 | 65.082 |
| Total NLSL Resources | 153.648 | 218.73 |

**Resource Not Used to Serve Load in Given Year**

| | | |
|---|---|---|
| PRP - Returned Amount | 50.261 | 0 |
| PRP Relicensing Amount | 2.971 | 0 |

| | | |
|---|---|---|
| **Total PNR Amount** | 455.546 | 455.546 |
| PNR Share | 491 | 491 |
| CEAEA | -35.454 | -35.454 |
| Dedicated to General Requirements load | 248.666 | **301.898** |
| Dedicated to NLSLs | 153.648 | **153.648** |

Calculation of PRP Return amount -

| | | Priest | Wanapum | Priest (aMW) | Wanapum (aMW) |
|---|---|---|---|---|---|
| Cowlitz | SUB | 2.00% | 2.70% | 6.571 | 10.596 |
| | RD | 0.16% | 0.16% | 0.601 | 0.610 |
| | | Priest | Wanapum | Priest (aMW) | Wanapum (aMW) |
| EWEB | SUB | 1.70% | 2.30% | 8.590 | 9.630 |
| EWEB | RD | 0.14% | 0.14% | 0.526 | 0.533 |
| | | Priest | Wanapum | Priest (aMW) | Wanapum (aMW) |
| Seattle | SUB | 8.00% | | 26.777 | |
| | RD | 0.27% | 0.27% | 1.014 | 1.029 |
| | | Priest | Wanapum | Priest (aMW) | Wanapum (aMW) |
| Tacoma | SUB | 8.00% | | 26.77 | |
| | RD | 0.29% | 0.29% | 1.089 | 1.105 |

| TRM Attachment C: | Priest | Wanapum | TOTAL |
|---|---|---|---|
| Cowlitz | 6.571 | 10.596 | |
| EWEB | 8.59 | 9.626 | |
| Seattle | 26.777 | - | |
| Tacoma | 26.77 | - | |
| | 68.708 | 20.222 | 88.93 |

| PRP Amounts | |
|---|---|
| PRP Firm PNCA Amount | 775 |
| CEAEA for PRP | 56 |
| Grant Right at 63.31% | 491 |
| CEAEA for Grant PRP | 35.454 |

| CEAEA Amounts | | |
|---|---|---|
| Subscription PRP | 234.869 | *Locked in at 2011 Amounts, last year of Subscription |
| Sub CEAEA | -21.033 | *Locked in at 2011 Amounts, last year of Subscription |
| | | |
| Returned PRP Amount | 88.93 | **Calculated from the returned amounts above |
| Relicensing Amount | 167.201 | *** Total Firm 491 minus Subcription and Returned amounts |
| Non Subscription PRP Amount | 256.131 | |
| Returned PRP % | 0.347205141 | |
| Relicensing PRP % | 0.652794859 | |
| | | |
| Remaining CEAEA | -14.421 | |
| Returned PRP CEAEA | -5.007 | |
| Relicensing PRP CEAEA | -9.414 | |

**From:** Normandeau,Mike (BPA) - PSE-RONAN
**Sent:** Monday, March 10, 2025 1:52 PM
**To:** Andrew Munro
**Cc:** Patton,Kathryn B (BPA) - PSW-SEATTLE; Lon Peters; Dave Churchman
**Subject:** RE: Request for Grant PUD amounts in CHWM Policy
**Attachments:** Attachment A Calc.xlsx

Andrew- Welcome back. I hope your week away was all you hoped for.

Attached is the detailed breakdown that almost matches (not quite) the draft attachment A amounts posted last week. In the effort to show our math, we identified a couple of small calc errors. We'll review the items below as part of the call tomorrow. We'll do our best to answer your questions.

Mike

---

**From:** Andrew Munro
**Sent:** Monday, March 10, 2025 1:28 PM
**To:** Normandeau,Mike (BPA) - PSE-RONAN
**Cc:** Patton,Kathryn B (BPA) - PSW-SEATTLE ; Lon Peters ; Dave Churchman
**Subject:** Request for Grant PUD amounts in CHWM Policy
**Importance:** High

Hi Mike,

In order for Grant PUD to provide comments on the CHWM Policy, can you please provide us with the following information ASAP:

- Data, calculations and explanations for the Grant PUD amounts in the CHWM Policy Footnotes C, F, H, L, S, and T.
    - Some specific questions:
        - Please show the specific amounts that BPA used to get 300.73 aMW for PRP? The CHWM model does not show specific amounts even when you open the hidden tabs for Data, Attachment A, etc.
            - Grant did not ever declare or dedicate this amount in any contract. Recalculating what "could have been" is against the PoC Policy and against what Grant PUD, PPC and customers supported. PPC took significant efforts to negotiate an agreement that all of public power could support. For example, Grant PUD gave up conservation "that could have" been credited to us during RD period.
        - Footnote H: Where and how did BPA calculate the this NLSL amount?
        - Footnote L: What is the CEAEA amount that BPA is using for Grant PUD, and how did BPA calculate this?
        - S: This needs further explanation from BPA. Again, Grant never declared more of PRP. BPA took action on its own. This opens a huge can of worms as it appears that the utilities claiming recalled power have never declared their additional physical rights to PRP (i.e., 6.69%).
        - T: Please explain the data amount. Also, why is this subject to change?

Previously, you indicated we would have a 30-day comments period. Or are comments due by March 18?

Thank you,

**Andrew Munro**

*Senior Manager*

*Energy Supply Management*

OFFICE 509.793-1552

CELL 509.668.0430

EMAIL amunro@gcpud.org

Grant PUD

grantpud.org

Version: 8-Mar-25

| | Data in aMW | Notes |
|---|---|---|
| **Load Data** | | |
| TRL | 423.591 | 2010 TRL |
| NLSL | 153.648 | 2010 NLSL (note this value could change pending formal NLSL determination underway). |
| **Existing Resources Serving General Requirements Load** | | |
| PEC Headworks | 3.390 | If resource removal is granted, the resource will be removed consistent with the determination which may include (1) removal from Provider of Choice Exhibit A and (2) setting the CHWM Implementation Policy Attachment A value to 0. The actual implications will be included in the resource removal determination letter expected in April/May 2025. |
| Quincy | 2.910 | |
| Priest Rapids Project (Subscription) | 234.869 | The amount as dedicated under the Subscription contract will be carried forward. |
| CEAEA (Subscription) | -21.033 | The amount as dedicated under the Subscription contract will be carried forward. |
| Priest Rapids Project (Recalled) | 88.930 | This is the amount that was recalled ahead of Regional Dialogue (consistent with Issue 2 starting on page 66 of the Regional Dialogue Policy Record of Decision). |
| CEAEA (Recalled) | -5.007 | This is the CEAEA share of the recalled amount. |
| Priest Rapids Project (Relicensing) | 4.386 | This is remaining reliscening amount that was not dedicated to serve NLSLs. |
| CEAEA (Relicensing) | -0.247 | This is the CEAEA share of the relicensing amount. |
| **Existing Resources Serving NLSL** | | |
| Priest Rapids Project (Relicensing) | 162.815 | This is the relicensed share of PRP net of the recalled amount and then applied to serve NLSLs. This is the total amount, inclusive of the CEAEA share, that would have served NLSLs based on FY 2010 NLSL data. |
| CEAEA (Relicensing) | -9.167 | This is the CEAEA share of the relicensing amount. |

| Priest Rapids Project Total | Data in aMW | Notes |
|---|---|---|
| Grant's Physical Rights | 491.000 | This is based on the firm PNCA amount applying the 63.31% physical rights Grant has access to. |
| Relicensed PRP Amount | 256.131 | This amount is distributed between Recalled and Relicensing amounts above. |
| CEAEA Share | 35.454 | This is based on the CEAEA agreement in place in FY 2023 but only accounts for 63.31% of the total CEAEA in line with physical rights. This CEAEA determination is consistent with CEAEA applied to other Priest Rapids and Wanapum amounts accounted for in other customer contracts. |

| Attachment A Values for Priest Rapids Project | Data in aMW | Notes |
|---|---|---|
| Dedicated to General Requirements load | 301.898 | This is the aggregate of all PRP amounts dedicated to serve general requirements load net of CEAEA. Note this is slightly higher than the amount published in Attachment A. When assembling this spreadsheet it was determined there was an inaccurate accounting of the amount of relicensed PRP dedicated to general services load based on CEAEA application (too much CEAEA was applied). Given that NLSL determinations could change these amounts, Bonneville does not intend to update Attachment A, consistent with the footnote that amounts in the final policy could differ. |
| Dedicated to NLSLs | 153.648 | This is the PRP amount dedicated to serve NLSLs net of CEAEA. |



# Provider of Choice: Other Process Updates

February 18, 2025

Updated 2/19/2025

PROVIDER OF CHOICE POST 2028

# What are the Standards for Resource Declarations?

- The Standards:
  - Establish the amount of power from customers' 5(b)(1) resources included in customers' Exhibit A.
- Under Regional Dialogue:
  - Bonneville updated the Standards for Resource Declarations consistent with the Regional Dialogue policy and contracts.
  - Bonneville posted the standards with no comment period.

# INTEGRATED RESOURCE PLAN

# 2024



Grant County
PUBLIC UTILITY DISTRICT

Resolution 8889 | August 14, 2024 | Exhibit A

# 4 | Existing Resources

## SUPPLY SIDE RESOURCES




**Figure 2. Map of Grant County PUD existing electric generating resources**

### The Wanapum Development

The Wanapum Development consists of a dam and ten-unit hydroelectric generating station with a nameplate rating of 1,221 MW. Located on the Columbia River in Grant and Kittitas Counties, the Wanapum Development includes switching, transmission, and other facilities necessary to deliver electric output to the transmission networks of Grant PUD, BPA, and other power purchasers. Grant County PUD holds the physical rights to 63.31% of this development.

### The Priest Rapids Development

The Priest Rapids Development consists of a dam and ten-unit hydroelectric generating station with a nameplate rating of 950 MW. Located on the Columbia River in Grant and Yakima Counties, 18 miles downstream of the Wanapum Development, the Priest Rapids Development includes switching, transmission, and other facilities necessary to deliver the electric output to the transmission networks of Grant PUD, BPA, and other power purchasers. Grant County PUD holds the physical rights to 63.31% of this development.

Together, Wanapum and Priest Rapids Developments, collectively called the Priest Rapids Project (PRP), provide Grant PUD with energy, capacity, ancillary services, energy storage, and carbon-free attributes. These large hydroelectric, carbon-free resources provide Grant PUD's foundational supply of electricity.

### Quincy Chute Project

Under an agreement with the Quincy and South Columbia Basin Irrigation Districts, Grant PUD operates and purchases the entire capability of the Quincy Chute hydroelectric generating facility. This 9.4 MW project is located on one of Grant County's main irrigation canals of the Columbia Basin Irrigation Project. Grant PUD financed, designed, and constructed the project and is responsible for operation and maintenance during the period of the current agreement, which expires in 2025. This facility operates

# Bonneville Power Administration
# Provider of Choice Policy
# Record of Decision
# March 2024

In the draft Policy, Bonneville did not discuss how a customer's CHWM, and its corresponding eligibility to purchase power at a PF Tier 1 rate, would be impacted by achievements in energy conservation savings during the contract period.

**Public Comments**

WPAG requested that Bonneville affirm that any investments in energy efficiency would allow a customer to reduce its take-or-pay obligation during the Provider of Choice contract period. WPAG commented that extending this Regional Dialogue Policy will support energy efficiency as a favored resource in planning and help meet regional obligations. POC-045-WPAG.

**Evaluation and Decision**

Bonneville will maintain the practice of accounting for energy efficiency/conservation savings achieved through either Bonneville's Energy Conservation Agreements (ECAs) or customer self-funded measures in determining a customer's net requirements under Provider of Choice. Because conservation is a resource that operates to reduce the electric demand of the customer's retail load, its achievement is reflected in the customer's net requirements load. For example, if a customer implements conservation measures that reduce its load to at or below its CHWM, the customer's purchase obligation would be reduced and result in a lower take-or-pay obligation for power priced at a PF Tier 1 rate. Such a customer would not be able to purchase power in excess of their net requirements, which may result in CHWM headroom because the customer would not lose CHWM because of its conservation achievements.

For a customer with Above-CHWM load, achieving conservation would help to reduce the customer's exposure to purchasing firm requirements power sold at a PF Tier 2 rate and/or supplying its load needs with potentially higher cost non-federal resources. For such a customer, it would not reduce their take-or-pay obligation for power sold at a PF Tier 1 rate unless their conservation reduced their load below their CHWM.

## Issue 25: Should Bonneville offer contracts under which customers agree to waive their section 6(h) right to request billing credits?

**Policy Proposal**

Bonneville proposed, in Section 2.3.2.1 of the draft Policy, to include a provision in the Provider of Choice contracts under which customers agree to waive their ability to request billing credits for both non-federal resources and conservation. Bonneville and customers agreed upon this approach in the Regional Dialogue contract. Bonneville and customers agreed that allowing billing credits was antithetical to tiered rates because billing credits effectively allow non-federal resources costs to be recovered through the PF Tier 1 rates. Bonneville allowing for billing credit costs to be included in the PF Tier 1 rates would effectively result in the cost of some customer resources being socialized among all customers when the purpose of tiered

rates is to provide customer autonomy with respect to other customers' non-federal resource acquisitions.

**Public Comments**

NRU commented that it had no objection to the proposal. POC-031-NRU. However, PNGC asserted that waiving their statutory right to billing credits should not be required under the Provider of Choice contract. PNGC commented that Bonneville had previously requested for customers to waive their right to billing credits because Bonneville was not acquiring resources. PNGC believes that Bonneville could conduct a request for offer (RFO) to establish a competitive value for a resource acquisition and then map billing credits to appropriate cost pools. PNGC concluded that a billing credit for a Tier 2 cost pool is no different than Bonneville acquiring a resource. Alternatively, PNGC commented that Bonneville could use the average price of energy and capacity sales and no RFO would be needed. POC-046-PNGC.

Seattle commented that it is "reluctant to waive its right to request billing credits" due to the uncertainty around the next contract period. Seattle contended that billing credits could potentially offer a valuable incentive and they would go through a resource acquisition process where Bonneville could decide whether to grant the billing credit if it is cost effective. Seattle requested that Bonneville retain billing credits as an option under the final Provider of Choice policy as "one way to encourage customers' investments in energy efficiency and development of non-federal resources." POC-039-Seattle.

**Evaluation and Decision**

Section 6(h) of the Northwest Power Act authorizes Bonneville, if requested by a customer, to grant billing credits for certain costs incurred by the customer for activities they independently undertake to conserve or develop resources, completed or acquired after December 5, 1980, that reduce Bonneville's load obligation. Under Regional Dialogue, which was Bonneville's first adoption of the tiered rate construct, customers agreed to contractually waive their statutory right to request billing credits for non-federal resources; the parties broadly agreed billing credits are misaligned with the tiered rate construct. During Provider of Choice workshops, Bonneville expressed concern that allowing the cost of billing credits into the PF Tier 1 rate cost pool would undermine a foundational tenet of tiered rates. In addition, Bonneville anticipates that the value of resource characteristics, including environmental attributes, energy shape, location and capacity availability, will increase in the future. Therefore, implementing billing credits and socializing the cost of any customer resources could become at odds with other customer preferences for resource acquisitions.

Under tiered rates, Bonneville adopted a tenet to insulate one customer from another customer's non-federal resource decisions. If Bonneville offers billing credits, the costs of billing credits based on one customer's resource investment would be included in Bonneville's rates and recovered from Bonneville's firm power customers. Bonneville could allocate the cost to either the PF Tier 1 rate cost pool or an applicable PF Tier 2 rate cost pool. Section 7(g) provides

that the cost of billing credits be equitably allocated to power rates. If allocated to the PF Tier 1 cost pool, it could result in an increase in the applicable PF rate regardless of whether Bonneville had a need to acquire resources to serve load at that rate. If billing credits were allocated to a limited PF Tier 2 cost pool, it would place the burden of paying those costs on a more limited group of customers. In either case, the effect would be to recover costs incurred by a customer to independently undertake conservation and non-federal resource actions to serve its load growth from other customers. This would be inapposite to the tenet of insulating customers from other customers' non-federal resource investment choices underlying the Policy, power sales contracts, and tiered rate construct.

Bonneville proposed in the draft Policy that if it needed to acquire resource(s) on a long-term basis, it would issue an RFO. Through an RFO, Bonneville could describe characteristics of resources that would best meet its need—such as generation profile, proximity to load, and reduction to transmission constraints—and could then consider giving preference to public customer developed or sponsored non-federal resources. Under this scenario, a customer would respond and submit its resource to an RFO for full transparency and, if selected and acquired, that resource would be included in Bonneville's resource portfolio used to meet its customer firm power load obligations. Bonneville believes this approach provides the most transparency and provides flexibility to ensure requirements, such as load shape or environmental attributes, can change throughout the contract period as regional sentiments or needs change.

Finally, billing credits were originally included in the Northwest Power Act to incentivize customers to develop conservation and other resources independently of Bonneville. Today there are several regional laws that require investments in conservation measures or provide incentives for conservation improvements. For non-federal resource development, the Inflation Reduction Act is an example of how new funding opportunities and incentives have evolved for utilities to pursue non-federal resource development. In light of these developments, Bonneville disagrees with commenters that waiving statutory right to billing credits would limit a customer's ability to invest in conservation or non-federal resources. Instead, customers have the option to purchase or develop non-federal resources without cost impacts on other customers.

Bonneville also acknowledges that customers are entitled to participate in billing credits and cannot be forced to waive their rights to do so. However, Bonneville is not forcing customers to waive their right to billing credits; rather Bonneville is affording customers a choice. Customers may elect to sign a Provider of Choice contract based on tiered rates and agree not to request billing credits, which includes greater pricing certainty afforded by tiered rates. Alternatively, customers could retain their rights to billing credits, and receive a different power sales contract, one not predicated on tiered rates and the other beneficial features of the Provider of Choice contract. The reasoning Bonneville described in the Regional Dialogue Contract ROD regarding billing credits is equally applicable to the treatment of billing credits under Provider

of Choice: "for contracts structured around the discretionary construct of tiered rates, it is reasonable to have a contract provision under which customers agree to not request new billing credits during the term of the contracts since billing credits would defeat or frustrate the tiered rates pricing signals by shifting the cost of such credits onto other customers." Regional Dialogue Contract ROD at 29. It remains reasonable for Bonneville to include terms in the Provider of Choice contracts whereby a customer agrees to not request new billing credits as these would frustrate the purpose of tiered rates.

As described in the draft Policy, Bonneville will include terms in the Provider of Choice contracts requesting customers to waive their rights to billing credits.

## Issue 26: How will Bonneville define new and existing resources in the Provider of Choice contracts, and how will it apply each resource type?

**Policy Proposal**

In Section 2.3.3.4 of the draft Policy, Bonneville stated that it anticipates proposing specific changes to the 5(b)9(c) Policy to reflect the transition from Regional Dialogue to the Provider of Choice Policy and contracts. These changes would be addressed in a separate public process. Two examples of anticipated updates include: 1) specifying that resources considered "New Resources" under Regional Dialogue will be considered "existing resources" for Provider of Choice, and 2) considerations resulting from Bonneville's decisions on WRAP and emerging markets."

**Public Comments**

Peninsula Light Company (Peninsula), Benton REA, and NRU requested specific definitions of new and existing resources. POC-019-Peninsula; POC-009-Benton-REA; POC-031-NRU.

Peninsula and Benton REA advocated for all new resources that were dedicated to loads during Regional Dialogue to maintain their status as new resources under the Provider of Choice contracts. POC-019-Peninsula; POC-009-Benton-REA. Peninsula requested that Bonneville keep "new, specified, dedicated resources that were integrated during the [Regional Dialogue] contract, designated as new resources in the [Provider of Choice] contract. Only in this way will customers be kept whole and not harmed at the outset, and for the duration of the next 16 years of power deliveries." POC-019-Peninsula.

Benton REA commented that the shift of resources from new to existing resources "requires utility resources that have been acquired to be allocated to serve what was historically Tier 1 load at a much higher cost instead of being used to serve Tier 2 or AHWM load as originally intended. This essentially penalizes utilities that have made significant investments in resource acquisition." Benton REA also commented that they feel this re-classifying of resources "precludes utilities from engaging in resource development and acquisition prior to the beginning of the Provider of Choice contract and would certainly result in a reduction or total

if the underlying power is claimed under another state's cap-and-trade program then the REC cannot be used to demonstrate use of carbon-free power under CETA. So, from the viewpoint of CETA, a REC is no longer just a *type* of environmental attribute (signifying energy from a state-defined "renewable" resource under an RPS), instead the REC itself *contains* all the environmental attributes—meaning it is the embodiment of the carbon-free emissions characteristics of the underlying energy, as well as the "renewable" nature of the generator that created the energy. Notably, to date only Washington's CETA contemplates a REC in this manner. Other states, such as California, recognize that hydro is carbon-free without having to create RECs to make it so.

The draft Policy did not address the application of the Bonneville Project Act's preference clause regarding any of these state-law-derived concepts of environmental attributes. Bonneville stated in the draft Policy that it would convey the environmental attributes of the power sold, including emissions and any RECs, commensurate with a customer's firm power purchase amount and rate elections. Many of the commenters appear to read more into Bonneville's proposal, asserting that Bonneville has "clearly articulated" that statutory preference applies to environmental attributes. *See, e.g.*, POC-044-EWEB: "EWEB agrees with BPA's affirmation that preference includes the environmental attributes of the federal system . . . and we thank BPA for clearly articulating these rights in their Draft Policy." Other commenters acknowledge that Bonneville has not made such a statement but they suggest "now is the time" to do so. POC-014-Cowlitz. And others believe that Bonneville is disregarding preference. POC-013-OPALCO; POC-046-PNGC.

The commenters' varying understandings of preference, and their assertions that Bonneville has concluded (or should conclude) that preference applies, necessitate that Bonneville set forth its position on this issue. This will ensure parties do not misunderstand Bonneville's position when drafting the contracts,[46] and this will avoid confusion when discussing environmental attributes in other forums (such as day-ahead market discussions and residential exchange).

*III. Preference is a statutory right of access to electric energy in specific situations*

The comments on this issue describe preference as a broad, conceptual framework. For example, NRU asserts that "preference applies not only to the output of the FBS, but also to the capacity and environmental attributes therefrom." POC-031-NRU. Similarly, PPC states that preference equates to "first right of access to [FBS] resources at cost, which Public Power views

[46] For example, NRU's comment reflects the misunderstanding and shows how it could be a problem when drafting the contracts: "NRU appreciates the fact that Bonneville clearly articulates [a] preference customer right to the environmental attributes" and "NRU looks forward to working with Bonneville through the implementation and contract development phases to ensure the contract language documenting that conveyance is clear and unquestionable." (POC-031-NRU, at 43). Similarly, PPC states: "[t]he post-2028 contracts must fully address this preference right . . . ." (POC-029-PPC, at 2).

as a fully bundled power product with first in right entitlement to all the energy, capacity, and environmental attributes (*e.g.*, Renewable Energy Credits and low carbon attributes) of such resources." POC-029-PPC. However, none of the comments provide legal authority or analysis in support of these views.

As reflected in comments there are many points of view regarding preference and environmental attributes. Bonneville evaluated this issue and has concluded that it will convey the environmental attributes of the power sold, including emissions and any RECs, commensurate with a customer's firm power purchase amount and rate elections. However, the basis for this decision is not preference. There are several reasons why preference is not applicable.

*First*, the plain language of the preference clause of the Bonneville Project Act of 1937 states: "the administrator shall at all times, in disposing of *electric energy* generated at said project, give preference and priority to public bodies and cooperatives." 16 U.S.C. § 832c(a) (2022) (emphasis added). The Northwest Power Act of 1980 reaffirmed that preference applies to electric energy, aka power: "All *power* sales . . . shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 . . .." 16 U.S.C. § 839c(a) (emphasis added); *see also* 16 U.S.C. § 839g(c) (2022) ("preference and priority in the sale of federally generated electric *power*." (emphasis added)). Accordingly, the plain language of preference applies only to "electric energy" or "power sales."[47]

To this end, no commenters assert that the draft Policy denies public customers preference to the electric power Bonneville intends to sell under its Provider of Choice contracts. *See Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037, 1046 (9th Cir. 2007) ("There is no allegation here that BPA failed to provide the power necessary 'to meet the firm power load' of its preference customers." (quoting 16 U.S.C. § 839c(b)(1))). The statutory preference language does not require Bonneville to apply the concept of "preference" by extrapolation to intangible benefits created by states. States cannot alter federal rights or create new federal obligations on Bonneville's sale of power. Only Congress has that power. There is nothing in either the plain language of Bonneville's statutes or legislative history that indicate congressional intent to create an obligation to apply statutory preference to the varying, state-defined concepts of environmental attributes.

*Second*, preference applies only in specific situations. Namely, when there are competing applications for an allocation of a limited amount of electric energy between a public body and a private entity, Bonneville must give priority to the public body. 16 U.S.C. § 832c(b) (2022); *See also Aluminum Co. of Am. v. Cent. Lincoln People's Util. Dist.,* 467 U.S. 380, 393 (1984). There is nothing about this tie-breaking function that suggests Bonneville must convey environmental attributes.

[47] This includes capacity. *See* 16 U.S.C. § 839a(9).

*Third*, preference's role is not implicated here. There are no conflicting or competing applications for an allocation of electric energy, which would trigger the application of statutory preference to power. PPC's comment illustrates this point well. PPC states "[t]he post-2028 contracts must fully address this preference right by ensuring that BPA does not offer to sell any portion of the energy, capacity, and/or environmental attributes of the Federal system to non-preference customers before providing a timely and meaningful opportunity to its preference customers to exercise their preference rights." POC-029-PPC. PPC presents a hypothetical that *if* there were a competing application, the Administrator would need to give public customers a meaningful opportunity to exercise their preference rights before selling to others. However, because there is no competing application for power, there is no obligation on the Administrator to apply preference.

What is implicated here is section 5(b) of the Northwest Power Act. If public customers execute a Provider of Choice contract they are exercising their section 5(b) right to buy from Bonneville "whenever requested." 16 U.S.C. § 839c(b) (2022). Bonneville has determined, in the final Policy, that it will convey all the attributes commensurate with the physical sale of power. But it is not preference that is causing that outcome; rather, it is Bonneville's policy that if a customer takes physical power, then Bonneville will convey the intangible state-defined benefits along with it. In other words, it is the mere fact of the sale itself and Bonneville's willingness to agree in this final Policy that it will "convey the environmental attributes of the power sold . . . commensurate with a customer's firm power purchase amount . . . ."

*Fourth*, preference is to supply; it does not speak to price. As the Ninth Circuit explained: "[we have] rejected the premise that preference customers were entitled to purchase not just available power, but the cheapest available power." *Golden Nw.*, 501 F.3d at 1046 (citing *Cent. Lincoln Peoples' Util. Dist. v. Johnson,* 735 F.2d 1101, 1125 (9th Cir. 1984) (quotation omitted)). The preference provisions "protect the preference customers' access to power supply; they do not speak directly to price." *Id*. By suggesting that preference entitles them to environmental attributes, the public customers are effectively arguing that preference protects price by requiring Bonneville to convey something that will lower their state regulatory compliance costs. Preference does not speak to price, so it cannot give them a right to receive a state-defined concept that would make the power more valuable to them.

For all these reasons, preference is not applicable to the intangible, varying, state-defined concepts of environmental attributes. Environmental attributes and RECs are recent concepts created under state laws, with differing definitions, which continue to change. These concepts were not contemplated at the time when preference was established.[48] And there is no federal law directing Bonneville's treatment of these concepts. Thus, Bonneville has discretion in this

[48] Certainly not when preference was first established in the Reclamation Act of 1906 nor in any subsequent federal statutes with a preference clause, including the Bonneville Project Act of 1937 and the Northwest Power Act of 1980. RECs emerged in the late 1990s to early 2000s, and the notion of environmental attributes (variously defined) came some years later.

area and it is reasonable, as a matter of policy, for Bonneville to conclude these non-power characteristics can accompany Bonneville's sales of power.[49]

*IV. Preference does not entitle public customers to "all" RECs*

As noted above, OPALCO's and PNGC's comments state that "it is unacceptable for BPA to retain any RECs" and "[w]e firmly assert that all RECs associated with the FCRPS in its entirety belong to its preference customers." POC-013-OPALCO; POC-046-PNGC. First, the discussion above explains why this assertion is wrong. Second, Bonneville has never given public customers "all" RECs. Prior to Regional Dialogue contracts, Bonneville sold RECs only to interested parties. Thus, there is no precedent or requirement that all RECs be conveyed to public customers. Lastly, if OPALCO and PNGC's argument were taken to its logical conclusion, then public customers would have preference to "all" RECs no matter how much power they bought, which would produce the absurd result that section 5(b) creates a right to buy only environmental attributes without *any* power. For these reasons, and those discussed above, the statutory preference to electric power is not implicated for environmental attributes, including RECs, and does not entitle public customers to "all" RECs.

*V. Environmental attributes and Investor-Owned Utilities*

The last issue is WPAG's and Cowlitz's comments state that they "do not support, and would strongly object to, any post-2028 allocation of power and/or environmental attributes from the federal system to the investor-owned utilities." POC-045-WPAG; POC-014-Cowlitz. WPAG takes the position that allocating a portion of the environmental attributes of the federal system to the IOUs "would be a clear violation of preference rights." POC-045-WPAG.

As discussed above, Bonneville has explained that preference does not apply to environmental attributes. Bonneville has also explained its decision that the environmental attributes associated with Bonneville's system will follow the physical sale of power. To the extent that WPAG and Cowlitz's comments are directed at the REP under Northwest Power Act section 5(c), those comments are outside the scope of the Provider of Choice process. Bonneville will determine how to implement the REP in the separate process that is underway for that program.

*VI. Conclusion*

The state-defined characteristics of the power that customers buy from Bonneville will flow to those customers commensurate with the physical amount of power they buy. Bonneville remains committed to assisting customers with their efforts to comply with state renewable energy and carbon programs, as reflected in the commitments throughout the Policy.

---

[49] Bonneville's public customers are not the sole and exclusive purchasers of the entire electrical generation produced by Bonneville's system.

B O N N E V I L L E   P O W E R   A D M I N I S T R A T I O N

## 2012 Wholesale Power and Transmission Rate Adjustment Proceeding (BP-12)

# Tiered Rate Methodology

July 2011

BP-12-A-03

**Direct-Service Industrial Customers (DSIs)** has the meaning specified in section 3(8) of the Northwest Power Act.

**Discretionary Contracts** means those purchases, sales, and exchanges resulting from BPA marketing transactions as of September 30, 2006, and identified on Tables 3.3 and 3.4.

**Diurnal Flattening Service** is a service that makes a resource that is variable or intermittent, or that portion of such resource that is variable or intermittent, equivalent to a resource that is flat within each Monthly/Diurnal period.

**Eligible Load** means the Existing Customer's Measured FY 2010 Load that is used by BPA in the determination of each Existing Customer's CHWM, modified as specified in section 4.1.3.2.

**Existing Customer** means a Public that is eligible on December 1, 2008, to take requirements power at a PF rate or that would be eligible on December 1, 2008, if it was not serving load with Non-Federal Resources.

**Existing Public** means a Public that has a CHWM Contract at the time there is an annexation of some portion of its service territory.

**Existing Resource** means a Specified Resource listed in section 2 of Exhibit A of a customer's CHWM Contract that such customer was obligated by contract or statute to use to serve its Total Retail Load prior to October 1, 2006.

**Existing Resources for CHWMs** means Non-Federal Resource amounts, shown in Attachment C, that are designated for use in FY 2010 in Exhibit C of each Existing Customer's Subscription Contract, in effect as of September 30, 2006; Existing Resources for CHWMs are adjusted as follows:

1) **Renewable Resources.** The output of renewable resources added during the term of the Subscription Contracts will be excluded from the calculation of CHWMs.

2) **Centralia Resource.** Contingent on the signing of a CHWM Contract by an Existing Customer, the output of the Centralia resource will be excluded from BPA's calculation of such Existing Customer's CHWM.

3) **Grant PUD.** Grant PUD has indicated that it will be recalling from purchasers hydropower from the Priest Rapids and Wanapum projects. This action will result in a redistribution of resources for Grant PUD and the affected BPA customers, for CHWM purposes, as shown in Attachment C. These changes are reflected as a zero FY 2010 resource value for Priest Rapids and Wanapum hydro resource shares for Cowlitz PUD, Eugene Water and Electric Board, Seattle City Light, and Tacoma Public Utilities. Correspondingly, Grant PUD's Priest Rapids and Wanapum hydro resource shares will be increased by the amount necessary to result in a zero CHWM for Grant PUD, except for the town of Grand Coulee load currently served by BPA as full requirements service.

4) **Raft River Annexation.** The Non-Federal Resources associated with the transfer of Idaho Power Company's Nevada service territory to Raft River Rural Electric Cooperative will be excluded by BPA from the calculation of the Raft River CHWM.

5) **PURPA Resources.** PURPA resources with a capability of less than 3 aMW will not be counted for CHWM calculations as a resource; however, any load that the resource serves in FY 2010 that would otherwise be retail load served by the BPA customer will be included in the Measured FY 2010 Load for that customer. For PURPA resources with a capability greater than 3 aMW, amounts used by BPA to calculate a customer's CHWM will be the smaller of 1) the declared amount of such resource designated for use to serve a customer's retail load in FY 2010 in Exhibit C of such customer's Subscription Contract, in effect as of September 30, 2006, or 2) the actual output of such resource used to serve the customer's load in FY 2010.

6) **Consumer-owned Resources.** Customers will identify in their CHWM Contracts what consumer-owned generation amounts their consumers will apply to serve the customer's

Total Retail Load. Consumer-owned generation amounts will be listed by BPA in Exhibit A at the time of CHWM Contract signing for each customer.

(7) **Resource Clarifications.** In FY 2008, BPA conducted a public process to establish amounts for certain customers' Non-Federal Resources for CHWM purposes. This was done in cases where the declared amount of resources designated for use in FY 2010 in Exhibit C of such customers' Subscription Contracts, in effect as of September 30, 2006, were missing or in error. The amounts established for those resources are reflected in Attachment C.

Attachment C sets out the amounts of Existing Resources for CHWMs.

**Federal Base System (FBS)** has the meaning specified in section 3(10) of the Northwest Power Act.

**Federal Columbia River Power System (FCRPS)** means the integrated power system that includes, but is not limited to, the transmission system constructed and operated by BPA and the hydroelectric dams in the Pacific Northwest constructed and operated by the U.S. Army Corps of Engineers and the Bureau of Reclamation.

**Firm Critical Output** means the forecast output from Tier 1 System Resources that is determined in accordance with sections 3.1.3.1, 3.1.3.3, and 3.1.3.4.

**Fiscal Year (FY)** means the period beginning each October 1 and ending the following September 30.

**Forced Outage Reserve Service (FORS)** means a service that provides an agreed-to amount of capacity and energy to load during the forced outages of a qualifying resource.

**Forecast Net Requirement** means the forecast of each customer's Annual Net Requirement that BPA performs in each RHWM Process.

# Close-Out Summary: Clarification on the Use of Customer Resource Amounts for High Water Mark Calculations

**Background**

On June 6, 2008, BPA sent a letter to interested parties regarding BPA's proposal to correct identified inaccuracies in the Subscription power sales contracts Exhibit C Fiscal Year (FY) 2010 resource numbers for its existing public agency customers. BPA enclosed several customer-specific proposed clarifications and corrections to the FY 2010 Existing Resources amounts that will be used in contract high water mark (CHWM) calculations. BPA invited public comment on the proposed corrections prior to finalizing the numbers on specific customer resources that will be used for CHWM determination purposes. The final numbers will be included as an attachment to the final Tiered Rate Methodology. The proposal laid out a set of criteria to correct the identified inaccuracies in the Exhibit C FY 2010 resource numbers. These clarifications and associated resource adjustments are limited to CHWM determination purposes only.

BPA also included a table of all customer resources and associated amounts for use in CHWM determinations, except for dedicated consumer-owned resource amounts that will not be known until Regional Dialogue contracts are signed, and Public Utility Regulatory Policies Act (PURPA) resource amounts that will not be known until 2011. This table reflected both the unadjusted resource numbers and the proposed adjusted resource numbers.

Opportunity to submit comment on BPA's proposal ended on June 27, 2008. BPA received a total of 31 comments.

In addition, on June 16, 2008, BPA sent another letter to interested parties informing them of Grays Harbor PUD's proposed purchase and use of the Weyerhaeuser Pulp Mill co-generation resource at Cosmopolis in Grays Harbor County, Washington and asking for public comments. The public comment period ended on June 20, 2008. BPA received a total of seven comments as a result of the Weyerhaeuser letter.

The list of commenters is attached as Appendix A. The comments are posted on BPA's web site at http://www.bpa.gov/applications/publiccomments/CommentList.aspx?ID=35, or are available from BPA.

BPA has reviewed and evaluated the comments submitted in response to the two letters. For purposes of correcting the FY 2010 resource numbers in customers' Exhibits C, the responses below articulate the specific allowances that BPA will make to correct errors or inaccuracies that exist in the individual customer contracts.

In making corrections and adjustments in the Exhibit C resource numbers, BPA applied the following reviewing criteria in deciding whether to make corrections to the identified errors and omissions in resource amounts.

## III. Other Corrections

Finally, BPA found it necessary to address a few additional matters that relate to customer resources and the calculation of CHWMs.

- New Renewables Exception

In the July 2007 Policy, BPA stated it would make an exception in the calculation of customers' CHWMs for New Renewable resources reflected in a customer's Exhibit C FY 2010 resource amounts in effect on September 30, 2006. The New Renewables exception was intended for customers who took advantage of a provision in the Subscription contracts to develop and serve load with New Renewable resources. This provision assured customers that the rate treatment for loads returned to BPA Priority Firm service would be the same as if the customer had never served its load with the New Renewable Resource. The July 2007 Policy named three customers that used this provision, and who therefore are eligible for the exception.

PNGC and Emerald PUD suggested an expansion of the July 2007 Policy's New Renewables exception to include landfill gas resources that served load outside (prior to) the Exhibit C New Renewables exception. The commenters support such an expansion because of the similar or superior environmental benefits of landfill gas resources compared to other renewable resources.

While there is no doubt of the environmental benefits related to landfill gas resources, BPA proposed only to correct for errors and omissions in Exhibit C for purposes of calculating customer CHWMs. BPA did not propose to enlarge the scope of the July 2007 Policy's New Renewable exception. Indeed, the landfill gas resources in question were developed prior to the development of the Subscription contracts and are not New Renewable resources. As a result, BPA will not expand the July 2007 Policy's New Renewables exception for calculating CHWM to include landfill gas resources.

- Priest Rapids/Wanapum Hydroelectric Resources

The Priest Rapids and Wanapum hydroelectric developments (the Priest Rapids Project) are two non-Federal dams and powerhouses on the Columbia River, both licensed to and operated by Grant County PUD (Grant). Four large publicly owned utility customers of BPA currently purchase shares of the output from one or both of the developments.

In public comment during preparation of the July 2007 Policy, Grant notified BPA that it would recall the shares of Priest Rapids Project power from Cowlitz Public Utility District, the Eugene Water and Electric Board, Seattle City Light, and Tacoma Public Utilities to serve its own loads, starting in Fiscal Year 2012. In response to this information the July 2007 Policy specified a CHWM exception stating, "To calculate the contract HWM, BPA will adjust the FY 2010 non-Federal resources of Grant and the affected public utilities as proposed by Grant PUD."

The July 2007 Policy anticipated that Grant would receive no CHWM, save for a small portion of Grant load (Grand Coulee load area) in the BPA Balancing Authority.

Because of the Grand Coulee load's geographic location (at the base of Grand Coulee dam) BPA and Grant historically have agreed to serve the load as a full requirements customer and under Grant's Subscription power sales contract the load is provided full requirements service, even though the remainder of service provided to Grant is under a Block contract. This load is isolated from the remainder of the Grant electrical system.

Except for the Grand Coulee load, Grant would therefore forego a CHWM for the remainder of its Net Requirements. Grant's Block purchase for FYs 2002 through 2006 was 162 aMW, and its FY 2007-2011 purchase is 188 aMW. The net result of following the direction given in the July 2007 Policy would be to free up Federal resources available for sale to, and increase CHWM amounts for, all other public utility customers.

BPA proposed to zero-out the Priest Rapids Project shares for Cowlitz, EWEB, Seattle and Tacoma, resulting in a net reduction of about 86 aMWs from the shares originally appearing in the four customers' Subscription Contracts. At the same time, BPA left open the amount of Priest Rapids and Wanapum resources to be reflected in Grant's HWM resources.

SUB expressed concern that Grant appeared to be backing away from its position of recalling Priest Rapids Project power from the other utilities. SUB opined that if Grant were not to recall the power from Cowlitz, EWEB, Seattle and Tacoma, then the Priest Rapids Project resource amounts should be used to calculate those customers CHWMs.

BPA received a letter from Grant dated August 13, 2008, in which Grant affirmed that it would not request service for its load or establish a CHWM for the main (Block) part of its load, and would request service and only establish a CHWM for its Grand Coulee load area. BPA will rely upon this affirmation by Grant that it will not request service except for the Grand Coulee load, and this letter should assuage the concern expressed by SUB. In light of Grant's decision, BPA will zero-out the shares of Priest Rapids Project power for Cowlitz, EWEB, Seattle, and Tacoma. For Grant, BPA will not calculate a CHWM for the Block part of its load, and the value of its CHWM resources is of no relevance. Therefore, the amount of Grant's (Block) resources will be recognized as Not Applicable (N/A).

BPA will calculate a CHWM based on the metered load of the Grand Coulee load area, for which no CHWM resources identified.

| **Customer, Resource** | **September 30, 2006 Exhibit C Amount (aMW)**[3] | **June 6, 2008 Proposed Amount (aMW)** | **Adjusted Amount (aMW)** |
|---|---|---|---|
| Cowlitz, Priest Rapids/Wanapum | 17.167 | 0 | 0 |
| EWEB, Priest Rapids/Wanapum | 18.216 | 0 | 0 |
| Grant, Priest Rapids/Wanapum | 239.475 | TBD | N/A |
| Seattle, Priest Rapids/Wanapum | 26.777 | 0 | 0 |
| Tacoma, Priest Rapids/Wanapum | 26.770 | 0 | 0 |

- <u>Grays Harbor PUD Weyerhaeuser Pulp Mill (Cosmopolis) Resource</u>

In its June 6, 2008 letter, BPA proposed to assign the Cosmopolis resource a value of 14.355 aMW for purposes of calculating Grays Harbor's CHWM. This resource capability was derived from a 5-year average of historical generation. At the time it was BPA's understanding that as of September 30, 2006, Grays Harbor had a contractual right to the output of the Cosmopolis resource and had designated the resource in its Subscription contract as potentially serving its retail load.

In response to its proposal, Grays Harbor informed BPA that the Cosmopolis co-generation resource was no longer a PUD resource because it had lost the right to purchase the output after the resource ceased generating power following the closure by Weyerhaeuser of its Cosmopolis pulp and paper mill in October 2005. Grays Harbor also informed BPA that the utility was in the process of buying the generating facilities attached to the Cosmopolis plant as part of a purchase of the plant by a new owner. Grays Harbor requested BPA to determine the use of the resource and its application by the PUD. Grays Harbor believed the generating facilities should not be used for CHWM purposes since the Cosmopolis resource was a consumer-owned resource that was not dedicated to serve the PUD's load and that it would be a New Resource for purposes of BPA's proposed Regional Dialogue CHWM contracts.

After reviewing the contracts and circumstances regarding the Cosmopolis resource, BPA agreed that the resource should not be included as a resource amount in Grays Harbor's Exhibit C for purposes of determining the PUD's CHWM and will assign it no output value. See also Appendix D.

| **Customer, Resource** | **September 30, 2006 Exhibit C Amount (aMW)** | **June 6, 2008 Proposed Amount (aMW)** | **Adjusted Amount (aMW)** |
|---|---|---|---|
| Grays Harbor, Cosmopolis | 0 | 14.355 | 0 |

---

[3] These resource amounts did not account for the associated CEAEA obligation (negative resource) amounts. Accounting for those obligations reduces the net impact of zeroing these resources to approximately 86 aMW.