**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**No. 25-7137 and 25-7142 (Consolidated)**

---

PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY,

WASHINGTON,

and

NORTHWEST REQUIREMENTS UTILITIES,

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

---

# REPLY BRIEF OF PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, WASHINGTON IN RESPONSE TO THE ANSWERING BRIEF OF RESPONDENT AND THE OPENING BRIEF OF PETITIONER NORTHWEST REQUIREMENTS UTILITIES

---

Irion Sanger
John Maxwell Greene
SANGER GREENE PC
4031 SE Hawthorne Boulevard
Portland, OR 97214
(503) 756-7533
irion@sanger-law.com

*Counsel for Petitioner Public Utility District No. 2 of Grant County, Washington*

## TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 5

I. BPA Cannot Ignore or Bypass the NWPA's Resource Dedication Process .......... 5

A. The NWPA Establishes Requirements for Resource Dedication .......... 8

B. BPA Effectuated a Quasi-Dedication .......... 9

C. BPA Cannot Use Section 5(b)(1) in Rate-Setting Decisions .......... 12

D. Precedent Confirms BPA May Not Use Its General Powers to Replace Specific NWPA Requirements .......... 18

E. BPA's Additional Policy Rationale for Its Quasi-Dedication Is Unavailing .......... 24

II. BPA Changed Its Reasoning in the Amended ROD But Denies That It Did So .......... 25

III. This Court Should Disregard NRU's Argument or, In the Alternative, Allow Supplemental Process .......... 28

A. NRU's Argument Is Not Properly Before the Court .......... 28

B. If the Court Entertains NRU's Argument, It Should Allow Supplemental Briefing and Counter-Declarations .......... 29

C. If the Court Addresses NRU's Substantive Arguments, It Should Remand Rather Than Adopt NRU's Analysis .......... 30

CONCLUSION .......... 32

# TABLE OF AUTHORITIES

## Cases

*Central Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101 (9th Cir. 1984)........ ................................................................................................. 18, 19

*Food and Drug Admin. v. Wages and White Lion Investments, LLC*, 604 U.S. 542 (2025) ................................................................................................ 25, 26

*Golden Northwest Aluminum v. Bonneville Power Admin.*, 501 F.3d 1037 (9th Cir. 2007) ..................................................................................... 18, 19, 20

*Humane Soc. of U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ..............................25

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ................................13

*Michigan v. Env't Prot. Agency*, 576 U.S. 743 (2015) ..........................................14

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).............................................................14

*M-S-R Public Power Agency v. Bonneville Power Admin.*, 297 F.3d 833 (9th Cir. 2002) ..............................................................................................................9

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007) ....14

*Pac. Nw. Generating Coop. v. Bonneville Power Admin.*, 596 F.3d 1065 (9th Cir. 2010) ............................................................................................................20

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007) .......................................................................................... passim

### Statutes

16 U.S.C. § 837b(d) ....................................................................................7

16 U.S.C. § 839 .........................................................................................1

16 U.S.C. § 839c ............................................................... 8, 9, 16, 17

16 U.S.C. § 839c(b)(1) .......................................................................... passim

16 U.S.C. § 839c(b)(1)(A) ....................................................................................9

16 U.S.C. § 839c(b)(1)(B) ....................................................................................9

16 U.S.C. § 839e ........................................................................................ 13, 15, 16

16 U.S.C. § 839e(a)(1) ........................................................................................13

16 U.S.C. § 839e(b)(4) ........................................................................................16

16 U.S.C. § 839f(a) ............................................................................................22

**Other Authorities**

BPA, *Revised Policy on Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act* (2009) ....................................................................................................16

H.R. Rep. No. 96-976, Part II at 46 (1980)...................................................... 15, 16

# INTRODUCTION

Public Utility District No. 2 of Grant County, Washington ("Grant") respectfully submits this Reply responding to the Bonneville Power Administration ("BPA") in its Answering Brief and Northwest Requirements Utilities ("NRU") in its Opening Brief, both relating to BPA's treatment of Grant's Priest Rapids Project ("PRP") in its Contract High Water Mark ("CHWM") Implementation Policy ("Policy") and CHWM Implementation Policy Record of Decision ("ROD"). Notwithstanding BPA's and NRU's arguments, BPA's decision to treat the PRP as dedicated to Grant's load without following the approach authorized by Congress was unlawful under the Pacific Northwest Electric Power Planning and Conservation Act ("NWPA"), 16 U.S.C. § 839 *et seq*.

BPA argues the NWPA provisions Grant relied upon – particularly Section 5(b)(1) – do not apply to the CHWM Policy and ROD, even though BPA itself repeatedly cites that section in its CHWM documents. Now, it characterizes the CHWM process as addressing only the rates Grant will pay and not Grant's entitlement to power, suggesting this characterization renders Section 5(b)(1) irrelevant. However, the dedication process set forth in Section 5(b)(1) is the only way Congress established to assign a customer-owned resource to that customer's load. BPA argues it did not forcibly dedicate the PRP while admitting it accomplished something dedication-like – a quasi-dedication – by unilaterally

assigning PRP "relicensing power" to Grant's load which reduces Grant's entitlement to power at Tier 1 rates.[1]

Even accepting BPA's characterization, however, implementing a quasi-dedication for rate-setting purposes is still a violation of the NWPA.[2, 3] Section 5(b)(1) applies to the determination of a customer's "net requirements" underlying the customer's entitlement to power. Congress established resource dedication to ensure that a customer could develop resources and choose whether that would affect its right to require BPA to meet its firm loads with low-cost power.

Neither Section 5(b)(1) nor any other statutory provision allows BPA to effectively achieve the same result by unilaterally implementing a quasi-dedication for rate-setting purposes. BPA cannot provide itself greater flexibility than Congress authorized to achieve the practical equivalent of a resource dedication when a customer has not dedicated the resource to load in the specific manner

---

1 See pages 35-36 of Grant's Opening Brief for an explanation of "relicensing power."

2 Grant argued in its Opening Brief that BPA effectuated a forced dedication in the CHWM Policy and ROD. While Grant continues to believe this is the most straightforward read of the CHWM Policy and ROD and explicitly preserves the arguments in its Opening Brief, for purposes of this Reply Brief Grant largely accepts BPA's framing and explains why BPA's actions were still unlawful.

3 BPA frequently characterizes the dispute in this proceeding as relating primarily to "price"; however, under BPA's framing, the dispute is over *rate*. This difference is not semantic. As explained in this Reply Brief, the NWPA's specific language in Section 7 addresses "rates" and limits BPA's discretion to charge Grant a rate based upon a forced or quasi-dedication.

authorized by Section 5(b)(1). To do so would be to ignore Congress's ordained system for customer resources.

BPA argues Grant used the output of the PRP to serve Grant's retail loads, but BPA now admits Grant did not actually dedicate "relicensing power" under Section 5(b)(1). Specifically, BPA explains in its Answering Brief the factual and policy considerations it applied in the CHWM Policy and ROD to assign "relicensing power" to Grant's load (and thereby provide Grant with less power at Tier 1 rates). These included that Grant did not request a firm power contract for most of its load in 2008 and BPA's belief that Grant used the PRP to serve its general requirements load.

Accepting BPA's characterization of the CHWM Policy and ROD, BPA has attempted to create from whole cloth an alternative to the Section 5(b)(1) resource dedication process. BPA is using its understanding of Grant's treatment of the PRP – *not* Grant's dedication of the resource to load in a contract – to charge Grant different, higher rates. Because Grant did not dedicate "relicensing power" from the PRP under Section 5(b)(1), BPA now admits it cannot penalize Grant by reducing its net requirements; instead, BPA will impose a rate penalty for the choices Grant made in conformance with the NWPA. This Court has previously rejected BPA's attempts to create new processes based on its general

administrative powers to avoid specific obligations under the NWPA; it should do so again here.

BPA also argues its determination of the amount of Grant's "relicensing power" was not an abuse of discretion. BPA argues it should be permitted to correct errors; Grant agrees, but the argument is beside the point. BPA refuses to acknowledge its change in reasoning from the original ROD to the Amended ROD. BPA says that between the two documents, its "reasoning remained exactly the same" and the Amended ROD "show[s] no change to reasoning[.]" Ans. Br. at 32. But BPA's reasoning in the original ROD used a number – 63.5% – based on a misread of Grant's license from the Federal Energy Regulatory Commission ("FERC") to operate the PRP, while its reasoning in the Amended ROD abandoned Grant's FERC license and relied instead on a series of historical documents to adopt a different (but admittedly similar) number – 63.3%. Failing to acknowledge a change in reasoning is an abuse of discretion. BPA argues there was no practical impact from its change in reasoning, but BPA's refusal to acknowledge the change is consistent with its overall poor analysis that went into the determination of Grant's "relicensing power" in both the original ROD and the Amended ROD. BPA did not articulate a standard for its derivation of either percentage, shifting from reliance on an erroneous reading of the FERC license to reliance on planning studies, bond statements, and informal communications that were not

contemporaneous with the PRP's FERC relicensing. If this Court does not determine that BPA's treatment of "relicensing power" is unlawful in the first instance, it should remand for BPA to take a fresh – and more careful and consistent – look based on an articulable and articulated standard.

As to NRU, this Court should disregard its argument entirely. Grant has filed a Motion to Strike the improper Declaration of Emily Traetow ("Declaration") and significant portions of NRU's Opening Brief that rely on the Declaration. BPA agrees the Declaration is inappropriate and NRU's argument writ large is an attempt at assessing PRP dedication *de novo* with material outside the administrative record. Rather than biting on NRU's invitation to turn the Court of Appeals into a trial court or administrative agency by introducing a competing technical analysis, Grant joins BPA's request that the Court reject NRU's arguments outright. However, to the extent this Court considers NRU's substantive arguments, those arguments support Grant's proposed solution: remand, not the imposition of a reduced CHWM as NRU suggests.

## ARGUMENT

### I. BPA Cannot Ignore or Bypass the NWPA's Resource Dedication Process

The NWPA provides one mechanism for assigning a customer-owned resource to that customer's load: the "dedication" mechanism set forth in Section 5(b)(1), which requires either identification of a resource used to serve retail loads

before 1980 or a specific determination by the customer that is memorialized in a contract with BPA. The NWPA establishes this mechanism for the purpose of determining the customer's net requirements and does not suggest that it can be carried out in the rate-setting context.[4] Thus, to the extent BPA's Answering Brief is correct that the CHWM Policy and ROD go only to rate-setting and not entitlement, BPA concedes that it did *not* follow NWPA requirements but instead invented a process to do something akin to, but not quite, dedication. The result is an unlawful limitation on Grant's access to Tier 1 power. Because BPA unilaterally assigned "relicensing power" from the PRP to Grant's load in a manner contrary to the one established by the NWPA, resulting in higher rates for Grant, the CHWM Policy and ROD are unlawful.

The CHWM Policy and ROD identify Section 5(b)(1) as providing the mechanism by which customer resources are dedicated to a customer's load. BPA explained "Section 5(b) of the [NWPA] requires [BPA] to take into account a customer's section 5(b)(1) resources available to serve their load" both "to determine the customer's net requirement" and, ultimately, "to determine their CHWM for the purpose of applying tiered rates."[5] 1-GrantER-0074-75. However,

---

4 Instead, BPA uses the dedication process to determine a customer's net requirements, then uses the results for rate-setting. 1-GrantER-0074-75.

5 BPA explains that Grant's CHWM dictates its entitlement to power at low-cost Tier 1 rates, and "[a]ny power needed by Grant above its CHWM if

the "relicensing power" from the PRP was never dedicated to Grant's load under Section 5(b)(1). Accordingly, BPA invented a new approach to assigning Grant's resource to Grant's load without Grant's dedication and concluded "it is reasonable *to treat the relicensed amount for CHWM purposes as either a section 5(b)(1)(A) or (B) resource amount* since Grant is using that amount of PRP to serve its regional firm power load." 1-GrantER-0083-84 (emphasis added); 3-GrantER-0568.

Whatever it says now in briefing, BPA was clear in the CHWM Policy and ROD that Section 5(b)(1) governs resources dedicated for net requirements purposes, which in turn has a downstream impact on a customer's CHWM and its rights to Tier 1 power. *See* 1-GrantER-0074-75. This conclusion is borne out by BPA's repeated invocation of Section 5(b)(1) in the ROD's section on PRP dedication.[6] *See* 1-GrantER-0074-84. BPA set Grant's CHWM as if Grant had dedicated "relicensing power" under Section 5(b)(1), even though BPA now

supplied by Bonneville will be subject to an applicable PF Tier 2 rate." 1-GrantER-0075. If this Court accepts BPA's conclusion that it did not actually force-dedicate "relicensing power" as Grant argued in its Opening Brief, Grant does not dispute that the main impact of BPA's decision will be reducing Grant's entitlement to low-cost Tier 1 rates.

6 BPA also invokes Section 9(c) of the NWPA and Section 3(d) of the Regional Preference Act of 1964 ("Preference Act"). 16 U.S.C. § 837b(d). Both provisions restrict parties from selling Northwest hydroelectricity outside the region. BPA raises them only to support its conclusion that Grant was actually using the PRP (not selling its power outside the region).

admits that Grant never dedicated it. The practical impact is that BPA will provide Grant with less power at Tier 1 rates because it concluded Grant used PRP but did not dedicate it under Section 5(b)(1). It appears that BPA wants to penalize Grant for using PRP, but because the NWPA does not permit BPA to reduce Grant's net requirements, BPA plans to deny Grant access to low-cost power.

Thus, even accepting BPA's premise that the CHWM Policy and ROD are about rates and price treatment only, BPA's conclusion – that Section 5(b)(1) "does not govern BPA's CHWM Policy" and "is irrelevant" – is wrong. By assigning a resource to Grant's load in a manner contrary to the NWPA and using that quasi-dedication to charge higher rates, BPA's CHWM Policy and ROD are unlawful in violation of the NWPA.

### A. The NWPA Establishes Requirements for Resource Dedication

Section 5(b)(1) requires BPA to offer power contracts to eligible customers in an amount equal to the customer's retail firm power load minus the customer's non-federal resources dedicated to such load. 16 U.S.C. § 839c(b)(1). The NWPA offers two ways to reduce a customer's entitlement to federal power through resource dedications.[7]

[7] This section – including the requirement that dedication under Section 5(b)(1)(B) occur through an agreed and executed contract – is uncontested, *see*, *e.g.*, Ans. Br. at 22 ("Grant correctly identifies the two ways a resource can be dedicated[.]"), but is offered for the Court's reference.

First, a resource is automatically dedicated to the extent it was actually used to serve retail loads prior to 1980. Section 5(b)(1)(A); 16 U.S.C. § 839c(b)(1)(A). Second, a resource may be dedicated only if a customer declares, in a contract under the NWPA, that the resource will be used to serve the customer's firm retail loads on a planning basis. Section 5(b)(1)(B); 16 U.S.C. § 839c(b)(1)(B). As Grant's Opening Brief discussed – and BPA does not dispute – resource dedication under Section 5(b)(1)(B) requires a determination by the customer that is memorialized in a contract with BPA. Grant Op. Br. at 35-47. Where BPA effectively makes a decision that Congress has entrusted to its customer, it violates the NWPA. *M-S-R Public Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 844 (9th Cir. 2002).

**B. BPA Effectuated a Quasi-Dedication**

"[N]otwithstanding sections 5(b)(1)(A) and (B)[,]" BPA assigned a specific numerical value for PRP "relicensing power" to Grant's load in the CHWM Policy and ROD contrary to the NWPA. 1-GrantER-0081.

The CHWM Policy and ROD are founded on legal conclusions about resources that BPA's customers had dedicated to serving their loads under Section 5(b)(1). The CHWM Policy and ROD confirm that resource dedication to determine a customer's net requirements flows through to BPA's determination of

the rate paid by the customer for federal power. For example, the CHWM Policy discusses BPA's treatment of dedicated resources:

> [BPA] accounts for customers' dedicated resource capability as a key component of the net requirements calculation. *In order to establish PF-eligible load*, [BPA] will deduct *dedicated* resources the customer used to serve its load during the index year.

1-GrantER-0036 (emphasis added). The CHWM Policy thus acknowledges that there is a close link between "dedicated resource capability" in the "net requirements" context – related to a customer's entitlement to power – and the "dedicated resources" that will be used "to establish PF-eligible load" – related to a customer's rate treatment. 1-GrantER-0036. BPA further says its approach to dedicated resources in the CHWM context "follows section 5(b)(1) of the [NWPA.]" 1-GrantER-0036. The practical impact of a resource dedication for the customer is the rate the customer will pay.

BPA opened its discussion of Grant's CHWM by observing that "Section 5(b) of the [NWPA] requires [BPA] to take into account a customer's section 5(b)(1) resources available to serve their load." 1-GrantER-0074. BPA identified three PRP categories: "relicensing power", "PRP Dedicated Under Subscription", and "recalled PRP amounts". Except for "relicensing power", BPA's theory was that these categories had previously been dedicated under Section 5(b)(1) for net requirements purposes and therefore were appropriate to treat as dedicated for rate-setting purposes. *See* 1-GrantER-0077-78; 1-GrantER-0078-79.

In contrast, for "relicensing power", BPA assigned the "relicensed share of the PRP resource to serving Grant's load notwithstanding sections 5(b)(1)(A) and (B)" and concluded that it was "reasonable to treat the relicensed amount for CHWM purposes as either a section 5(b)(1)(A) or (B) resource[.]" 1-GrantER-0081; 1-GrantER-0083-84. BPA acknowledged that, even if BPA could not reduce Grant's net requirements, it would treat the relicensed power as if Grant had dedicated the resource. In doing so, BPA effectuated a quasi-dedication, bypassing Section 5(b)(1) and assigning Grant's resource to its load contrary to the statute.

Now in briefing, BPA argues Section 5(b)(1) is irrelevant because the CHWM Policy and ROD go to rate-setting rather than net requirements. This argument overlooks BPA's statement that its policy is "to establish PF-eligible load" by "deduct[ing] *dedicated* resources" and to "follow[] section 5(b)(1) of the [NWPA.]" 1-GrantER-0036. The CHWM Policy and ROD specifically state that BPA treated Grant's "relicensing power" as if it were dedicated. 1-GrantER-0083-84; 3-GrantER-0568. This "as if" demonstrates that no such action was taken by Grant to effectuate dedication of "relicensing power". BPA's Answering Brief now pivots, saying the decision was not based on Section 5(b)(1), but admitting it was based on its beliefs about Grant's actual use of PRP power and informal communications between Grant and BPA in 2008. Ans. Br. at 12-14. According to BPA in briefing, Grant did not dedicate "relicensing power", but BPA's action

will achieve the same practical result in the rate context: assigning "relicensing power" to Grant's load and reducing Grant's CHWM. BPA has unlawfully effectuated a quasi-dedication of that "relicensing power" through a price increase rather than a net requirements reduction. The impact to Grant is the same.

### C. BPA Cannot Use Section 5(b)(1) in Rate-Setting Decisions

Administrative law principles, the text, context, and legislative history of the NWPA, formal BPA policies, and this Court's case law further support the conclusion that Section 5(b)(1) provides the only way to assign a customer resource to load and it cannot be used directly for rate-setting decisions. These sources confirm that BPA cannot "ignore[] [a process] that Congress created in the NWPA" – here, the Section 5(b)(1) dedication process – or "insist[] on greater flexibility … than Congress was willing to give it." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1036 (9th Cir. 2007) ("*PGE*").

#### 1. NWPA

The NWPA was designed as a comprehensive chapter comprising a series of interacting sections. The NWPA provides preference customers with certain price protections, allows BPA to set different rates for certain types of customers, including higher rates for preference customers' new loads, and provides only one pathway for a customer to assign a resource to serve its load – which is *not* using a quasi-dedication process to charge the customer a different rate.

Congress was explicit that the statute was designed to be read as a whole. For example, Section 7(a) of the NWPA, which authorizes BPA to set rates, provides that "[s]uch rates shall be established … in accordance with … the provisions of this chapter." 16 U.S.C. § 839e(a)(1). Thus, the CHWM Policy and ROD must be executed "in accordance with … this chapter."

The NWPA establishes only one mechanism to assign a resource to a customer's load: the 5(b)(1) dedication process. Once a customer dedicates a resource to load under Section 5(b)(1), BPA may treat the resource as such for ratemaking purposes. This approach ensures "rates shall be established … in accordance with … this chapter." Section 7(a), 16 U.S.C. § 839e(a)(1). BPA's general ratemaking powers, however, do not authorize it to invent a new way of assigning a resource to a customer's load in contravention of the mechanism identified by Congress.

Whether the NWPA authorizes BPA to rely upon Section 5(b)(1) to set rates is a purely legal question on which BPA receives no deference, and the Court should review the statute *de novo* and identify the "best" read. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024). However, BPA's actions also fail the traditional "arbitrary and capricious" test because BPA "has relied on factors which Congress has not intended it to consider[.]" *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983); *see also Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (striking down BPA action as arbitrary and capricious).

Congress understood that BPA's preference customers might use their own resources in different ways, and it established different consequences for different choices about those resources. Specifically, if a customer determined, through a contract, to use a resource to serve its load, then its net requirements (right to federal power) would be reduced. When Congress establishes a specific factor for a specific statutory consequence, the agency cannot make a decision based on factors absent from the statute. *State Farm*, 463 U.S. at 43; *see also Michigan v. Env't Prot. Agency*, 576 U.S. 743, 755-56 (2015) (explaining where a statute "expressly directs [an agency] to regulate on the basis of a factor … the Act normally should not be read as implicitly allowing the Agency to consider" a different factor). Here, Grant elected to use the PRP itself, but did not do so through a contract. BPA looked to actual use and past communications, relying on factors Congress deliberately did not establish, to assign "relicensing power" to load and penalize Grant with the same practical result (denial of access to power at Tier 1 rates based on the "relicensing power" amount).

Legislative history affirms Congress's design of the NWPA. A 1980 report from the House of Representatives explained: "Section 5(b)(1) requires BPA to

offer to sell to each requesting utility the power needed … to meet its firm load within the region in excess of the utility's own firm resources, *and specifies the method of determining the utility's own firm resources*." H.R. Rep. No. 96-976, Part II at 46 (1980) ("House Report") (emphasis added). "*[T]he* method", not *a* method. The report goes on to explain: "[D]uring any period of insufficiency … the contract formula for allocating entitlements … shall disregard resources of such customers other than those *dedicated* to their firm loads prior to the effective date of this Act." *Id.* at 47 (emphasis added). While this provision is limited to periods of insufficiency, it shows that resources dedicated under Section 5(b)(1) – not resources assigned to a customer's load unilaterally by BPA – are disregarded as part of "the contract formula for allocating entitlements[.]" *Id.*

Moreover, plain meaning and legislative history demonstrate that Congress provided direction in setting rates, including mechanisms to set aside a portion of a BPA customer's load for different rate treatment. The NWPA provides for different rate classes, including direct service industry, residential exchange, discount, special rates, uniform, sales of peaking capacity, time of day, seasonal, sales outside of the United States, and other rates and surcharges. Section 7; 16 U.S.C. § 839e.

BPA may also set different rates to meet preference customers' general requirements. For power entitlement purposes, preference customers' general

requirements include new large single loads ("NLSLs"). Section 5; 16 U.S.C. § 839c. But when setting rates for those loads under Section 7(b)(4), Congress excluded NLSLs from a customer's "general requirements" load, reserving special price treatment for loads other than "new large single load[s]". 16 U.S.C. § 839e(b)(4); House Report at 52. Congress explained: "This provision … affects power rates only, not the amount of power supplied to the customer under section 5(b)." *Id.* Congress did not create any differential rate treatment that follows from resources BPA assigns to a customer's load outside the Section 5(b)(1) process like it did for NLSLs.

**2. BPA Policies**

BPA argues that its 5(b)/9(c) Policy supports assigning "relicensing power" from the PRP to Grant's load. *See* BPA, *Revised Policy on Determining Net Requirements of Pacific Northwest Utility Customers Under Sections 5(b)(1) and 9(c) of the Northwest Power Act* at 2-4 (2009) ("5(b)/9(c) Policy").[8] BPA reasons that the 5(b)/9(c) Policy allows it to *decrement* a dedicated resource (increasing a customer's access to low-cost federal power) when a licensure change *reduces* that customer's entitlement to the resource; so, the logic goes, BPA should be able to *increase* a resource declaration (reducing the customer's access to low-cost federal

[8] Grant's Opening Brief also discussed the original 2000 5(b)/9(c) Policy and BPA's 2003 Clarifications to the 5(b)/9(c) Policy.

power) when a license *increases* a customer's entitlement. 1-GrantER-0082; Ans. Br. at 40-41.

There are three problems with this. First, a unilateral right vested in BPA to increase the assignment of a resource to a customer's load runs counter to the NWPA, which requires that a customer *determine* a resource dedication and memorialize that decision in a contract. Under the statute, a dedication may be reduced due to "loss of resource, or loss of contract rights" but it may only be increased by agreement. Section 5(b)(1); 16 U.S.C. § 839c(b)(1).

Second, BPA's logic is bad and creates an administrative power that Congress did not contemplate. For example: on Halloween, one may hand out candy to trick-or-treating children; this does not create a countervailing right to take candy away from trick-or-treating children (even if those children arrive at one's door with more candy than they had when they started the night).

Third, BPA's reliance on the 5(b)/9(c) Policy in the CHWM Policy and ROD and in its Answering Brief demonstrates that *Section 5(b)(1) is relevant here*. The 5(b)/9(c) Policy is an interpretation and implementation of Section 5(b)(1) for the purposes of determining a utility's net requirements. Net requirements are relevant to CHWM determinations. In addition to direct references to Section 5(b)(1), the CHWM Policy and ROD invoke the 5(b)/9(c) Policy and its predecessors thirty-five times, applying the 5(b)/9(c) Policy to multiple customers.

As to Grant, in the ROD, BPA looked to the 5(b)/9(c) Policy for guidance on how to treat the PRP as well. 1-GrantER-0077. BPA's reliance upon the 5(b)/9(c) Policy in the CHWM Policy and ROD demonstrates that BPA viewed Section 5(b)(1) as relevant to its quasi-dedication for CHWM purposes.

#### 3. Ninth Circuit Case Law

The Ninth Circuit in *PGE* has also affirmed that BPA cannot "ignore" one provision of the NWPA – here, the Section 5(b)(1) resource dedication process – when carrying out administrative functions under other statutory authority.[9]

### D. Precedent Confirms BPA May Not Use Its General Powers to Replace Specific NWPA Requirements

*PGE* holds that BPA cannot use its general authority to bootstrap a replacement for a process spelled out explicitly in the NWPA. BPA cites *Golden Northwest Aluminum v. Bonneville Power Admin.*, 501 F.3d 1037 (9th Cir. 2007) for the proposition that entitlement to power does not mean entitlement to "the cheapest available power", but the case at bar has more in common with *PGE*. This Court handed down these two decisions together, so Grant will address them together. *PGE* stands for the proposition that BPA may not "construe[] and exercise[] its … authority in a manner that [is] contrary to the clearly expressed

---

9 This Court has followed this principle since the early cases interpreting the NWPA. *See Central Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1125 (9th Cir. 1984) (discussing the need to read provisions of the NWPA "in tandem with" one another).

intent of Congress in … the NWPA." *PGE*, 501 F.3d at 1025. Here, BPA has "insisted on greater flexibility" in addressing resource dedication "than Congress was willing to give it." *Id.* at 1036. The *PGE* Court determined that "Congress ordained one system [for the REP program]; BPA appears to prefer another." *Id.* Here, Congress ordained one system for how customer-owned resources are treated; BPA appears to prefer another. BPA's divergence from the NWPA is unlawful.

*Golden* and *PGE* were decided on the same day by the same panel, and collectively they address a host of issues related to BPA. First, it is worth discussing *Golden*. In that case, "[t]wo sets of petitioners contend[ed] that BPA unlawfully inflated the rates charged to public utilities and cooperatives – BPA's 'preference' customers" while "a third group of petitioners … argue[d] that [BPA's] rates [we]re not sufficient to satisfy BPA's fish and wildlife obligations." *Golden*, 501 F.3d at 1040-41. In resolving these competing claims – rejecting some petitioners' rate concerns and accepting others – the Court confirmed preference customers are not entitled to "the cheapest available power" under the NWPA. *Id.* at 1046. Grant does not dispute this conclusion.

However, the Court also acknowledged that BPA is "required to honor its preference customers' 'right to purchase power at a reasonable price.'" *Id.* at 1046 (quoting *Cent. Lincoln*, 735 F.2d at 1125). It quoted the Congressional Record for

the proposition that "[t]he lowest rates will be reserved for the normal loads … of preference utilities[.]" *Id.* at 1046. And it affirmed "the notion that preference customers enjoy price benefits." *Id.* at 1046.

The issue in *Golden* involved BPA's decision to include the costs of acquiring additional power in the rates of all preference customers, and the legal question of whether, when deciding whether to include those costs, BPA needed to ensure preference customers as a class received the cheapest possible rates. *Id.* at 1044-46. The Court held that BPA may, when setting rates for a class, allocate generally incurred costs across rate classes – it need not allocate costs only to certain classes of customers to ensure the lowest possible costs for preference customers. This conclusion was consistent with other cases involving BPA rate-setting, such as *Pac. Nw. Generating Coop. v. Bonneville Power Admin.*, 596 F.3d 1065 (9th Cir. 2010) and *PGE*, which explain that BPA provides the lowest possible rates subject to sound business principles and NWPA requirements.

*Golden* did not involve circumstances like here, where BPA proposes to restrict a single preference customer's access to Tier 1 rates based on factors not contemplated by Congress. The fact that BPA need not offer preference customers as a class "the cheapest available power" does not mean BPA can depart from the NWPA's approach to resource dedication and forcibly assign a single customer's resource to its load simply to provide that customer with less power at Tier 1 rates.

Grant is not asking for special treatment; rather, Grant is asking that BPA follow the NWPA in its treatment of Grant and the PRP.

*PGE* better fits the facts of this case. In *PGE*, a group of "publicly owned utilities … challenge[d] the actions taken by [BPA] in reaching settlement agreements … with six investor-owned utilities ('IOUs')." *PGE*, 501 F.3d at 1013. The petitioners contended that "BPA's authority to settle out of power contracts is bound by the power exchange requirements of the [NWPA.]" *Id.* They opposed the inclusion in their rates of costs associated with the settlement, arguing Congress intended their rates to reflect the power exchange program that Congress designed, not a replacement that BPA designed. The Court "h[e]ld that BPA was bound by the power exchange requirements of the NWPA, and that BPA exercised its settlement authority contrary to those requirements." *Id.* The Court indicated that including BPA's settlement costs in preference customers' rates violated Congress's intent "that any steps BPA took to exchange power with non-preference customers could not result in an increase in the preference customers' rates." *Id.* at 1036.

In *PGE*, BPA argued that it had broad settlement authority under Section 2(f) of the Bonneville Project Act, and that its settlement with the IOUs "was governed by § 2(f) only" while "expressly den[ying] that the settlement agreement would be subject to §§ 5(c) and 7(b)." *Id.* at 1027. BPA argued that "Petitioners'

argument about section 5(c) is irrelevant with respect to the … Settlement Agreements." *Id.*

The Court was not impressed. It held "BPA's broad reading of its settlement authority is contrary to a plain reading of the Bonneville Project Act and the NWPA[.]" *Id.* at 1028. It explained: "BPA's settlement authority is subject to the constraints of the NWPA" by operation of "Section 9(a) of the NWPA", which provides that BPA's overall contracting authority is "'*[s]ubject to the provisions of this chapter.*'" *Id.* (quoting 16 U.S.C. § 839f(a)) (emphasis added by the Court). The Court concluded "BPA is not excused from § 5(c) by calling its actions here a § 2(f) 'settlement'" and "BPA's contract and settlement powers must facilitate and be grounded in its substantive authority contained in 'this chapter.'" *Id.* at 1032 (quoting 16 U.S.C. § 839f(a)).

Grant's petition is not a claim that BPA is including too much in rates – a *Golden*-type case – but rather a claim that BPA is failing to adhere to Section 5 of the NWPA – a *PGE*-type case. Like *PGE*, the upshot is an effective increase in petitioner Grant's rate for some federal power. While some details differ, the basic analysis is on all fours; some of the parallels are eerie.[10]

---

[10] Compare, for example, BPA's arguments from *PGE* with its arguments in this case. From *PGE*:

In *PGE*, BPA sought to bypass Section 5(c)'s residential exchange program. *Id.* at 1027. Here, BPA seeks to bypass Section 5(b)(1)'s resource dedication approach. In *PGE*, BPA reached a settlement with investor-owned utilities without recourse to Section 5(c). *Id.* Here, BPA assigned Grant's "relicensing power" to Grant's load without recourse to Section 5(b)(1). In *PGE*, BPA issued a record of decision explaining its policy rationale for bypassing Section 5(c). *Id.* at 1018-19. Here, BPA issued the ROD explaining its policy rationale for bypassing Section 5(b)(1).

In some ways, BPA's actions here are weaker than BPA's actions in *PGE* that this Court struck down. In *PGE*, BPA invoked its Section 9 authority and its general settlement authority under Section 2 of the Bonneville Project Act as legal authority for bypassing Section 5(c). *Id.* at 1017-18. Here, BPA has offered no statutory authority for bypassing Section 5(b)(1), arguing only that the CHWM Policy and ROD are rate-setting documents so Section 5(b) does not apply. In

---

- "BPA is not interpreting section 5(c) of the [NWPA]." *PGE*, 501 F.3d at 1027.
- "Petitioners' argument about section 5(c) is irrelevant[.]" *Id.*

From this case:

- "[T]here is nothing to interpret regarding section 5(b)(1)." Ans. Br. at 24.
- "Grant's statutory interpretation of section 5(b)(1) is irrelevant." Ans. Br. at 24.

other words, BPA is invoking "greater flexibility" with respect to assigning customer resources to customer load "than Congress was willing to give it." *Id.* at 1036.

BPA has ignored Congress's direction on how to treat customer resources. It has insisted on greater flexibility when assigning a customer's resources to the customer's load than Congress was willing to give it. Similar to *PGE*, Congress ordained one system for assigning customer resources to load; BPA appears to prefer another. Because BPA has followed its own preferred approach rather than the one prescribed by Congress, BPA's effective dedication of "relicensing power" from the PRP is unlawful under the NWPA. *Id.* at 1036-37.

### E. BPA's Additional Policy Rationale for Its Quasi-Dedication Is Unavailing

BPA's NWPA violation is enough: the CHWM Policy and ROD are unlawful in their treatment of "relicensing power" from the PRP. BPA's policy rationale is also unconvincing.

This Reply Brief has already addressed some elements of BPA's policy rationale. *See*, *e.g.*, *supra* at Section I(C)(3). Its invocation of Section 9(c) of the NWPA and Section 3(d) of the Preference Act is a non sequitur because it is undisputed that Grant has not sold PRP power outside the region, and BPA does not need to deny Grant access to Tier 1 rates to ensure Grant continues not to sell outside the region. *See supra* at 7 n.6; *see also* Grant Op. Br. at 47-49. As to

Grant's uniqueness as a returning utility, its lack of a Regional Dialogue contract for most of its load, and its actual PRP use, these do not give BPA authority to create a means of assigning a resource to customer load in contravention of the mechanism set forth in the NWPA.

## II. BPA Changed Its Reasoning in the Amended ROD But Denies That It Did So

BPA asserts on appeal that the new material it adopted in the Amended ROD does not reflect a change in reasoning, so its decision was not arbitrary and capricious. However, it is precisely BPA's refusal to acknowledge its change in reasoning that is arbitrary and capricious in violation of the APA.[11]

It is arbitrary and capricious for an agency to change its reasoning without adequate explanation. *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1050-51 (9th Cir. 2010). BPA cites *Food and Drug Admin. v. Wages and White Lion Investments, LLC*, 604 U.S. 542 (2025) in response to this argument. But *White Lion* supports Grant, confirming that "[a]gencies are free to change their existing policies *as long as they … display awareness that they are changing position*" (among other requirements). *White Lion*, 604 U.S. at 568 (emphasis added). BPA

[11] BPA also argues that it should not be penalized for correcting its mistakes. Grant agrees. BPA must still acknowledge its changed reasoning and provide sufficient reasoning.

refuses to acknowledge that it has changed its reasoning; this refusal is arbitrary and capricious. *Id.*

BPA also argues Grant's argument is moot because 63.3% is similar to 63.5%, so even if BPA acted arbitrarily, its poor approach to determining "relicensing power" was harmless. However, it is not the change in *number* that Grant focuses on, but the change in BPA's *rationale*.

BPA's failure to acknowledge its changed reasoning is part and parcel of broader analytical issues. BPA's shifting logic underscores that BPA's overall analysis of "relicensing power" is essentially *ad hoc*, and BPA has not clearly identified any specific methodology or standard it applied. Grant's status as a returning utility without an existing Exhibit A reflecting any resource dedication counsels in favor of more clarity than is reflected in the CHWM Policy and ROD. This Court should remand for determination of a CHWM that does not wrongly assign "relicensing power" to Grant's load. However, if this Court finds that some amount of "relicensing power" is within BPA's authority to assign to Grant's load, reducing Grant's CHWM, it should remand to BPA to make a principled determination of what that figure should be. Grant discussed this in more detail in its Opening Brief. Grant Op. Br. at 49-56. BPA's refusal to acknowledge that it changed its reasoning is evidence of agency decision-making that needs more careful attention than it has received to date. It is unclear, for example, why BPA

announced a reference year of 2009 for determining "relicensing power", 1-GrantER-0082-83, but relied on documents from 2010, 2013, and 2024 for its analysis rather than contemporaneous sources such as the Pacific Northwest Coordination Agreement ("PNCA") Final Regulation from 2008-2009. 3-GrantER-0591-93. Contrary to BPA's characterization, the 2008 FERC license alone did not define Grant's PRP entitlement. Grant's bilateral power sales contracts executed in 2001 provide important contemporaneous context regarding Grant's PRP rights and obligations, yet BPA neither addressed those contracts in the ROD nor included them in the administrative record. The issue is not whether those contracts dictate a particular outcome, but BPA's failure to explain why its reliance on post-relicensing documentation, rather than contemporaneous evidence, governed its CHWM determination. Absent an explanation of why BPA chose to rely on, for example, a 2013 bond measure rather than a contemporaneous power contract to determine Grant's PRP entitlement, the most reasonable conclusion is that BPA did so to avoid changing its math after it picked an erroneous figure as a starting point for its "relicensing power" analysis.

Again, the issue is not which percentage is correct. The issue is that BPA never clearly articulated the standards or methodology explaining why its chosen approach, rather than actually contemporaneous indicators of Grant's resource entitlement, governed the CHWM determination.

Finally, BPA suggests correspondence in which BPA and Grant discussed the 63.3% number is relevant to the question of its failure to acknowledge that it changed its reasoning. It is not. This correspondence was part of an effort to reach a mutually acceptable resolution to Grant's CHWM. That effort failed. The correspondence shows only what BPA says it does – that Grant is not surprised by the number – no more, and no less.

## III. This Court Should Disregard NRU's Argument or, In the Alternative, Allow Supplemental Process

### A. NRU's Argument Is Not Properly Before the Court

Petitioner NRU's Opening Brief relies heavily on a Declaration that is not part of the record and therefore improper. NRU's brief is styled as raising different arguments, all of which boil down to NRU's position that BPA should have engaged in an alternative calculation – developed for the first time on appeal and presented in the Declaration – to determine Grant's PRP dedication. *See generally* NRU Op. Br. NRU cannot present new, extra-record technical analysis to this Court when it could have provided that analysis to BPA in the first instance. Without that evidence, there is no basis for the Court to impose an alternative calculation.

Grant explained that the Declaration is improper in its Motion to Strike, Dkt. 35, which has been referred to the merits panel. Dkt. 39. Grant incorporates the Motion to Strike into this Reply Brief. If the Court grants Grant's Motion to

Strike, then it will be left with the redlined Opening Brief of NRU included with the Motion to Strike as Attachment B. Removing the improper Declaration, what is left is primarily a series of conclusory statements and characterizations of the record. Because it relies so extensively on the Declaration, NRU's argument overall is not properly before the Court.

### B. If the Court Entertains NRU's Argument, It Should Allow Supplemental Briefing and Counter-Declarations

BPA argues that "if the Court wishes to consider NRU's" technical analysis, "fairness dictates that BPA be afforded the opportunity to file limited supplemental briefing on that issue and to submit a counter-declaration." Ans. Br. at 45. Grant joins BPA's request.

BPA notes that "BPA also does not support Grant's declaration attached to its motion to strike", the Affidavit of Lon Peters ("Peters Affidavit"). Ans. Br. at 45 n.19. If the Court strikes NRU's Declaration, Grant does not seek admission of the Peters Affidavit into the record on appeal. Motion to Strike at 18. However, if the Court decides to consider the Declaration, the Peters Affidavit was only offered "for the purpose of rebutting NRU" – not to provide a counter-declaration addressing the underlying data at the same level as NRU's Declarant.

To develop a fulsome record on which to address technical issues, Grant would need to submit a more detailed declaration or affidavit providing analysis of

the underlying data (as opposed to simply identifying issues with the Declaration), followed by an opportunity to address that new evidence in briefing.

### C. If the Court Addresses NRU's Substantive Arguments, It Should Remand Rather Than Adopt NRU's Analysis

To the extent this Court considers NRU's substantive arguments, those arguments counsel in favor of Grant's proposed solution – remand – and not the imposition of a reduced CHWM.

NRU frames its arguments as follows: "BPA failed to consistently apply its own PNCA-based methodology to Grant PUD's Attachment A", "BPA's inconsistent treatment of Grant PUD relative to all other PNCA-resource POC customers is independently arbitrary and capricious", and "even if BPA's methodology is accepted as applied to Grant PUD, BPA used incorrect PNCA data." NRU Op. Br. at iii-iv. Grant agrees with these headings, but with substantially different reasoning and outcomes in mind. To that end, NRU's arguments are best understood as supporting remand rather than any particular substantive outcome.

Two of NRU's three arguments suggest that BPA failed to apply its own PNCA-based methodology to Grant. If the Court does not hold BPA's quasi-dedication unlawful, Grant would welcome the opportunity to work through the relevant PNCA calculations from 2008-09 with BPA on remand to derive a more appropriate CHWM. As noted in Grant's Opening Brief, the PNCA calculations

for 2008-09 are more contemporaneous with the PRP's 2008 FERC license than the evidence BPA relied on to derive Grant's entitlement to PRP output following relicensing. Moreover, BPA's policy is to rely on the 2008-09 PNCA for PRP data. 1-GrantER-0082-83.

Using the 2008-09 PNCA to identify Grant's post-relicensing PRP share also better reflects BPA's contemporaneous treatment of relicensing. The new FERC license for PRP was issued in March 2008, but there was no dedication of any additional amounts of PRP during the roughly 2.5 remaining years of the contract then in place between Grant and BPA. If the Court determines that BPA may assign "relicensing power" to Grant's load and remands based on BPA's use of the PNCA Final Regulation for 2008-09, then Grant recommends the Court direct BPA to consult the PNCA or other contemporaneous evidence regarding Grant's entitlement to the PRP in the 2008-09 period immediately following relicensing, such as Grant's power contracts at the time.

NRU's other argument is that treating Grant differently than other customers was arbitrary and capricious. While Grant agrees that certain differential treatment – such as assigning un-dedicated "relicensing power" from the PRP to Grant's load – was unlawful, the differential treatment that NRU complains of was not. Essentially, NRU argues that policy decisions BPA made were arbitrary and

capricious; Grant, on the other hand, seeks only to hold BPA to its obligations under the NWPA.

The significance of NRU's arguments is not that they establish a particular outcome. Rather, they underscore the absence of a clearly articulated methodology explaining why BPA selected one approach over reliance on data sources that were actually contemporaneous with PRP relicensing. That uncertainty supports remand.

## CONCLUSION

Grant respectfully requests that this Court hold unlawful and set aside BPA's CHWM Policy and ROD to the extent they assign "relicensing power" to Grant's load contrary to the NWPA. Grant requests that the Court remand the matter to BPA to determine a CHWM that does not reflect unlawful PRP assignment.

Date: July 20, 2026

*<u>/s/ Irion A. Sanger</u>*
Irion Sanger
John Maxwell Greene
SANGER GREENE PC
4031 SE Hawthorne Boulevard
Portland, OR 97214
(503) 756-7533
irion@sanger-law.com

*Counsel for Petitioner Public Utility District No. 2 of Grant County, Washington*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Ninth Circuit Rule 32-1(b) because it contains 6,838 words, excluding the parts of the brief exempted by Ninth Circuit Rule 32-1(c) and Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

As required by Circuit Rule 32-1, this Reply Brief is further accompanied by Form 8 certifying compliance with the foregoing rules.

Date: July 20, 2026

*/s/ John Maxwell Greene*

John Maxwell Greene
SANGER GREENE PC
4031 SE Hawthorne Boulevard
Portland, OR 97214
(401) 339-2990
max@sanger-law.com

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7137, 25-7142

I am the attorney or self-represented party.

**This brief contains** 6,838 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated [ ].
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/John Maxwell Greene **Date** 7/20/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on July 20, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Date: July 20, 2026

*_/s/ John Maxwell Greene_*
John Maxwell Greene
Irion Sanger
SANGER GREENE PC
4031 SE Hawthorne Boulevard
Portland, OR 97214
(401) 339-2990
max@sanger-law.com

*Counsel for Petitioner Public Utility District No. 2 of Grant County, Washington*